# UNITED STATES DISTRICT COURT

## Northern District of Illinois

Case Number: _____

State Court Case No.: 07 CH 25396

OPTIONSXPRESS, INC.,

      Petitioner,

v.

LINDA HALE,

      Respondent.

_____/

**08CV0179**
**JUDGE KENDALL**
**MAG.JUDGE VALDEZ**

**FILED**

JAN - 8 2008
Jan 8, 2008
**MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT**

## NOTICE OF REMOVAL AND MOTION TO TRANSFER

Respondent, LINDA HALE ("Ms. Hale"), respectfully applies for removal of the civil

action titled -- Optionsexpress, Inc. v. Linda Hale:  Circuit Court of Cook County, Illinois,

County Department, Chancery Division Case No. 07 CH 25396 (the "State Court Action") --

from the Chancery Division of the Illinois State court, to this Court, and that upon such removal,

it be transferred to the Honorable Kenneth Ryskamp of the United States District Court,

Southern District of Florida, West Palm Beach Division.

## REMOVAL

As grounds for removal, Ms. Hale states:

1.     Ms. Hale was served with Petitioner's Amended Application to Vacate Arbitration

Award on December 14, 2007 (the "Amended Application").  Although it claims to have filed

one, Petitioner never served Ms. Hale with an initial application to vacate the arbitration award,

or any other pleadings/summonses prior to December 14, 2007.

2.    All pleadings and papers that were served on Ms. Hale on December 14, 2007 in connection with State Court Action are attached hereto as Composite Exhibit 1.

3.    This action may be removed to this Court pursuant to 28 U.S.C. § 1441(a), which provides for removal of any civil actions "brought in a State court of which the district courts of the United States have original jurisdiction . . . ." This is a civil action in which this Court has original jurisdiction pursuant to 28 U.S.C. § 1332.

4.    Specifically, Section 1332 provides that the district courts shall have original jurisdiction over all civil actions in which there is diversity of citizenship and the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.

5.    At the time this action was filed and at the time of filing this Notice of Removal, Ms. Hale was and is a citizen of the State of Florida.

6.    At the time this action was filed and at the time of filing this Notice of Removal, Petitioner was and is Delaware corporation with its principal place of business in Chicago, Illinois, and is therefore is a citizen of the States of Delaware and/or Illinois.

7.    Accordingly, complete diversity of citizenship exists under 28 U.S.C. § 1332(1) because this case is between citizens of different states.

8.    Petitioner's Amended Application seeks to vacate a final arbitration award entered in Ms. Hale's favor for $175,000. Therefore, the amount in controversy exceeds the jurisdictional threshold. A copy of the FINRA Dispute Resolution Award (the "Award") is attached to the Amended Application as Exhibit C.

9.    This Notice of Removal is timely under the provisions of 28 U.S.C. § 1446. Ms. Hale was served with the Amended Application on December 14, 2007. Petitioner never served Ms.

Hale with an initial application to vacate the arbitration award or any other pleadings/summons prior to December 14, 2007.[1]

10.    This action is not a non-removable action as described in 28 U.S.C. § 1445.

11.    Promptly after filing this Notice, Ms. Hale will give written notice thereof to Petitioner and will file a copy of this Notice with the Clerk of Circuit Court of Cook County, Illinois, County Department, Chancery Division.

## **MOTION TO TRANSFER**

As grounds for transfer, Ms. Hale states:

12.    Upon removal, pursuant to 28 U.S.C § 1404(a), the Amended Application should be transferred to the Honorable Kenneth Ryskamp of the United States District Court, Southern

---

[1] Pursuant to FINRA Rule 10330(h), as the arbitration loser, Petitioner was required to pay the Award or file a motion to vacate thirty (30) days. Prior to filing and serving the Amended Application, Petitioner indicated to FINRA that it had filed an initial application to vacate the Award on September 12, 2007 -- the thirtieth (30th) day after receipt of the Award. *See* Exhibit 2 (September 12, 2007 letter from Petitioner to FINRA Dispute Resolution). In its September 12, 2007 letter to FINRA, Petitioner also indicated that the initial application was an "enclosure" to that letter. *Id.* For whatever reason, Petitioner sent its September 12, 2007 letter to undersigned counsel "*w/o enclosure*". *Id.* Petitioner sent its September 12, 2007 letter to FINRA via facsimile and FedEx. *Id.* But sent it to undersigned counsel via U.S. Mail. *Id.*

Due to the different service methods, undersigned counsel did not receive Petitioner's September 12, 2007 letter until September 15, 2007 – "w/o" the initial application. In the interim, as he did not know whether Petitioner paid the Award or filed an application to vacate the Award by the September 12, 2007 deadline, undersigned counsel sent an email to Petitioner on September 13, 2007 in which he inquired if Petitioner had planned to pay the Award or file a motion to vacate. *See* Exhibit 3. In the same email, undersigned counsel offered to accept service of a motion to vacate, to the extent that one was filed. *Id.* Petitioner never responded to this email, thereby rejecting the offer to accept service of the purported initial application. It is undisputed that Petitioner received the email in which undersigned counsel offered to accept service.

Petitioner was required by Illinois Supreme Rule 102 to serve the initial application within 30 days. Instead, Petitioner did absolutely nothing -- until November 27, 2007 when it filed the Amended Application and obtained an "Alias" summons. The Amended Application and "alias" summons were served on December 14, 2007 – 17 days later. *See* Composite Exhibit 1. If Petitioner was able to serve the Amended Application and "alias" summons within the 30-day time limit of Rule 102 it has no valid reason for not serving the original summons and initial application within 30 days of September 12, 2007. If Petitioner had accepted the offer to accept service and/or complied with the law by serving the initial application within 30 days of filing it, a determination regarding the Award would likely already have been made.

District of Florida, West Palm Beach Division in the interest of justice and to promote judicial economy.

13.    Pursuant to 9 U.S.C. § 10, the Amended Application may have been brought in the United States District Court, Southern District of Florida.  Specifically, Section 10 of the FAA states that the United States District Court "in and for the district wherein the award was made" can issue an order vacating an arbitration award.

14.    From its inception through the issuance of the Award, the arbitration that resulted in the Award was administered by FINRA's office in Boca Raton, Palm Beach County, Florida.

15.    The final hearing of the arbitration that resulted in the Award was conducted in FINRA's office in Boca Raton, Palm Beach County, Florida.

16.    As such, the Award "was made" in Palm Beach County, Florida.

17.    Therefore, pursuant to 9 U.S.C. § 10, the Amended Application may have been brought in the United States District Court, Southern District of Florida and venue is proper there.

18.    In addition, venue would be proper in the United States District Court, Southern District of Florida pursuant to 28 U.S.C § 1391(a)(1) as Ms. Hale is a resident of same.

19.    On November 16, 2007 -- prior to the filing and service of the Amended Application -- Ms. Hale filed and placed for service with the U.S. Marshal an Application to Confirm Arbitration Award (the "Application to Confirm") in the United States District Court, Southern District of Florida, West Palm Beach Division. [2]  *See* Exhibit 4.  The Application to Confirm was assigned to the Honorable Kenneth Ryskamp.  Therefore, in the interest of judicial economy, the Amended Application should be transferred to the of the West Palm Beach Division of United

---

[2] Pursuant 9 U.S.C. § 9, Ms. Hale was required to use the U.S. Marshal to effect service.  On November 16, 2007, within one hour of filing the Application to Confirm, undersigned delivered all of the necessary paperwork and a $250 check to the U.S. Marshal to start this process expeditiously.  *See* Exhibit 5.  Petitioner's Amended Application was filed on November 27, 2007 (11 days after the Application to Confirm was filed).

4

States District Court, Southern District of Florida where the Application to Confirm was already pending prior to the filing and service of the Amended Application.

20. Further, the Amended Application should be transferred in the interest of justice. Ms. Hale and undersigned counsel reside in the Southern District of Florida. Ms. Hale has virtually no income and is living off her credit cards, and therefore cannot afford to travel to and/or pay her counsel to travel to Chicago, Illinois to argue the merits of the Amended Application or otherwise appear in person in the Northern District of Illinois, to the extent that becomes necessary. Indeed, the $350 filing fee for this Notice is burdensome for Ms. Hale.

21. On the other hand, according to its SEC filings, Petitioner's net income in 2006 was greater than $71,000,000. As such, it would not be a burden for it to travel to the Southern District of Florida to litigate Ms. Hale's Application to Confirm which is already pending there and its Amended Application to Vacate.

22. The interest of justice further requires transfer because Petitioner has unnecessarily delayed a final decision regarding the arbitration award. Petitioner asserts it filed an initial application on September 12, 2007. Undersigned counsel offered to accept service of same one day later. Petitioner ignored this offer and never served the purported initial application. Petitioner did not serve the Amended Application until three months after the offer to accept service of the initial application -- and more than four months after receiving the Award. *See* note 1.

23. The delay solely caused by Petitioner appears to have been purposeful. In any event, the delay solely caused by Petitioner is directly at odds with purpose and goals of arbitration. As such, justice would not be served if this action is permitted to remain in the Northern District of Illinois – which is presumably Petitioner's preferred Federal forum.

WHEREFORE, Ms. Hale respectfully requests that the State Court Action now pending in the Circuit Court of Cook County, Illinois, County Department, Chancery Division, be removed to this Court. Ms. Hale further requests that this Court accept jurisdiction of said action, and, upon acceptance of jurisdiction, transfer this matter to the Honorable Kenneth Ryskamp of United States District Court, Southern District of Florida, West Palm Beach Division.

Respectfully submitted,

NEIL B. SOLOMON, P.A.

By:_____

Neil B. Solomon
Illinois Bar No.: 6243930
4174 St. Lukes Lane
Jupiter, FL 33458
Tel: 561-762-4991
Fax: 561-626-2721
Email: neilbsolomonesq@gmail.com
*Attorney for RESPONDENT*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Notice of Removal

and Motion to Transfer has been furnished via Federal Express this day of January, 2008 to:

Hilary A. Victor, Esq.
Corporate Counsel
optionsXpress, Inc.
39 S. LaSalle Suite 220
Chicago, IL 60603

Jeffry M. Henderson, Esq.
Henderson & Lyman
175 West Jackson, Suite 240
Chicago, IL 60604

Neil B. Solomon

# COMPOSITE EXHIBIT 1

| | | |
|---|---|---|
| 2120 - Served | 2121 - Served | **GISSEN & ZAWYER** |
| 2220 - Not Served | 2221 - Not Served | |
| 2320 - Served By Mail | 2321 - Served By Mail | **REF#:** _____ |
| 2420 - Served By Publication | 2421 - Served By Publication | |
| **SUMMONS** | **ALIAS - SUMMONS** | CCG N001-10M-1-07-05 (          ) |

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, _____CHANCERY_____ DIVISION

(Name all parties)

OPTIONSXPRESS, INC.,                    Plaintiff,

v.                                                    No. _____07 CH 25396_____

LINDA HALE,                                   Defendant.

### ALIAS  SUMMONS

**To each Defendant:** Linda Hale, 5000 No. Ocean Blvd., #1410, Lauderdale by the Sea, Florida 33308

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, and pay the required fee, in the Office of the Clerk of this Court at the following location:

☑ Richard J. Daley Center, 50 W. Washington, Room _____802_____, Chicago, Illinois 60602

| | | |
|---|---|---|
| ☐ **District 2 - Skokie**<br>5600 Old Orchard Rd.<br>Skokie, IL 60077 | ☐ **District 3 - Rolling Meadows**<br>2121 Euclid<br>Rolling Meadows, IL 60008 | ☐ **District 4 - Maywood**<br>1500 Maybrook Ave.<br>Maywood, IL 60153 |
| ☐ **District 5 - Bridgeview**<br>10220 S. 76th Ave.<br>Bridgeview, IL 60455 | ☐ **District 6 - Markham**<br>16501 S. Kedzie Pkwy.<br>Markham, IL 60426 | ☐ **Child Support**<br>28 North Clark St., Room 200<br>Chicago, Illinois 60602 |

You must file within 30 days after service of this Summons, not counting the day of service.
**IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF REQUESTED IN THE COMPLAINT.**

**To the officer:**

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than 30 days after its date.

| | |
|---|---|
| **Atty. No.:** _34832_ | **WITNESS,** _____NOV 2 7 2007_____, _____ |
| **Name:** Robert B. Christie | |
| **Atty. for:** Plaintiff | _____ |
| **Address:** 175 West Jackson Boulevard, Suite 240 | **Clerk of Court** |
| **City/State/Zip:** Chicago, Illinois 60604 | **Date of service:** _____, _____ |
| **Telephone:** (312) 986-6960 | (To be inserted by officer on copy left with defendant or other person) |

Service by Facsimile Transmission will be accepted at: _____
                                                                                    (Area Code)    (Facsimile Telephone Number)

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

OPTIONSXPRESS, INC.,

        Petitioner,

v.

LINDA HALE,

        Respondent.

Docket No. 07 CH 25396

## AMENDED APPLICATION TO
## VACATE ARBITRATION AWARD

Petitioner optionsXpress, Inc., through its attorneys and pursuant to section 12 of the

Illinois Uniform Arbitration Act, 710 ILCS 5/12, requests the entry of an order vacating the

Arbitration Award dated August 13, 2007, in favor of respondent Linda Hale and against

petitioner optionsXpress, Inc. in the FINRA arbitration, *Hale v. optionsXpress, Inc.*, FINRA

Case No. 06-5183.[1]

### I. The Parties

1.     Petitioner optionsXpress, Inc. ("optionsXpress") is a corporation and

registered as a broker-dealer with the Securities Exchange Commission and with various

self-regulatory organizations, and is primarily engaged in the self-directed retail online

discount brokerage business.

---

1  On July 30, 2007, the New York Stock Exchange dispute resolution body, NYSE Dispute Resolution, and
the National Association of Securities Dealers' dispute resolution body, NASD Dispute Resolution
(hereinafter, the "NASD"), combined operations as the Financial Industry Regulatory Authority ("FINRA").
Pursuant to FINRA's rules, matters commenced under the NASD rules, as was the case with the instant matter,
would be adjudicated under the Rules of the NASD Dispute Resolution in force at the time of the merger.

2.      Respondent Linda Hale ("Hale") is an individual, who resides in Fort Lauderdale, Florida.

3.      Non-party Tim Wise ("Wise"), is an individual, who, at all times relevant, was the confidant and personal investment adviser of Hale. Wise had over thirty years experience in the financial markets and over twenty years experience in trading options, and as of the commencement of the underlying hearing, the NASD had no public record of any disciplinary history concerning Wise. (**Exhibit N** at 142-43, partial transcript of August 8, 2007; **Exhibit K** at 18, partial transcript of August 7, 2007)

## II. Procedural History

4.      On or about December 2, 2006, Hale commenced an arbitration action with the NASD by filing an arbitration claim against optionsXpress (the "Claim"). A true and correct copy of Hale's Arbitration Claim is attached hereto as **Exhibit A**. In her Claim, Hale failed to state or allege any specific cause of action, but made a number of allegations concerning optionsXpress' alleged "reckless decision to allow Ms. Hale [to] engage in speculative options trading strategies [sic]." (*See* **Exhibit A**) Hale sought compensatory damages of $200,000, $1,000,000 in punitive damages, attorneys' fees, and costs in her Claim against optionsXpress.

5.      On February 7, 2007, in response to her Claim, optionsXpress filed its Answer, which contained a motion to dismiss (the "Answer"). OptionsXpress' motion to dismiss was subsequently denied by the Panel on June 29, 2007. A true and correct copy of optionsXpress Answer, *sans exhibits*, is attached hereto as **Exhibit B**.

6. A four-day arbitration hearing in the underlying matter was commenced on August 6, 2007, before a FINRA appointed panel of three arbitrators (the "Panel").

7. On August 13, 2007, the Panel entered an arbitration award (the Award"). A true and correct copy of the Award is attached hereto as **Exhibit C**. The Panel awarded $175,000 to Hale and against optionsXpress as a result of the Panel's finding of liability for suitability, breach of contract, failure to supervise, and negligence, and denied Hale's request for punitive damages, attorneys' fees, and costs.

8. Petitioner optionsXpress' filing of its Application to Vacate Arbitration Award (Application) was timely. Pursuant to section 12 of the Illinois Uniform Arbitration Act, 710 ILCS 5/12, a party has 90 days from receipt of the Award to file a petition in a court of competent jurisdiction to vacate the Award.

### III. Factual Background[2]

9. As an online self-directed retail brokerage firm, the accounts of optionsXpress' customers are self-directed – that is, optionsXpress makes no recommendations to its customers and its customers typically place their respective orders to buy or sell stock, options, or other securities electronically, via the internet. (*See* **Exhibit B**) As such, optionsXpress does not solicit customer orders, and does not provide customers with tax, accounting, or specific market advice. *Id.* In essence, optionsXpress provides execution and ministerial services to its customers, as was the case with Hale.

---

2  Citations to the Record will be formatted as "Tr. (-date-) at ___," e.g. Tr. (8/10/07) at 10, for citations to the transcript of the proceeding, "OX Ex. ___," for citations to optionsXpress' exhibits produced at the underlying hearing, and "LH Ex. ___," for citations to Linda Hale's exhibits produced at the underlying hearing.

3

a.    *Hale's application to open her online self-directed Accounts with optionsXpress.*

10.    On November 14, 2002, optionsXpress was electronically provided with two on-line account applications, which included certain information about Hale, under which Hale agreed to optionsXpress' "Terms and Conditions" and other agreements, which would govern the activity in her accounts ("Application"). The Applications were electronically sent to and received by optionsXpress for the purpose of opening Hale's self-directed options trading accounts on behalf of her living trust and her IRA (the "Accounts"). (OX Ex. 2-3) After submitting the information and agreement to the "Terms and Conditions" and other agreements which would govern the activity of her online self-directed accounts with optionsXpress, an Account Overview was generated for the Accounts, which Hale signed, confirming, in summary, the accuracy of the information electronically submitted to optionsXpress in the Application and her agreement to the optionsXpress "Terms and Conditions" and other agreements ("Account Overview(s)"). A true and correct copy of the Account Overview(s) is attached hereto as **Exhibit D**. On November 15, 2002, Hale forwarded each of the signed Account Overviews to optionsXpress together with other documents detailed below. Hale completed and submitted to optionsXpress, both her Trust and IRA Applications via the internet and her signed Account Overviews without assistance or advice from optionsXpress.

11.    In its application forms, optionsXpress listed four investment objectives that a customer may consider and select: speculation, aggressive growth, growth, and income. Hale indicated in her Applications that speculation was the investment objective for both of

her Accounts.

12.    In submitting her application forms to optionsXpress, Hale entered into and agreed to the terms of the optionsXpress User/Customer Agreement (the "Customer Agreement"), and confirmed her agreements by submitting the Account Overview(s). (OX Ex. 2-3)

13.    At all times relevant, Section 14 of the Customer Agreement provided, in part, as follows:

> You understand that we, through our web site, *provide no tax, legal or investment advice of any kind,* nor do we give advice or offer any opinion with respect to the nature, potential value or suitability of any particular securities transaction or investment strategy. . . . Any investment you make will be *based solely on your own evaluation* of your financial circumstances and investment objectives and the suitability for you of any security or any investment or trading strategy.

(emphasis added)

b.    *Hale appointed an investment adviser as her agent.*

14.    The day after submitting her Applications to optionsXpress on November 14, 2002, and together with her signed Account Overviews confirming the information submitted in her Applications and agreement to optionsXpress' "Terms & Conditions" and other Agreements, Hale also provided optionsXpress with a power of attorney for each of her Accounts, titled <u>Fee Payment & Limited Trading Authorization</u> which were dated November 14, 2002 and November 15, 2002, respectively (the "POAs"). A true and correct copy of the POAs are attached hereto as **Exhibit E.**

15.    Under the POAs, Hale appointed Tim Wise as her agent and adviser (the "Investment Adviser"), and provided her Investment Adviser with the "discretion, power

5

and authority to purchase and/or sell options contracts . . . and to make agreements relating to same." (*See* **Exhibit E**)  At all times relevant, Hale's Investment Adviser operated as an exempt investment adviser.

16.     The POAs further provided that optionsXpress was "directed to follow the instructions of [Hale's Investment Adviser], who shall be solely responsible for suitability of Investments, timing of purchases of sales and all related matters." (*See* **Exhibit E**)

17.     Hale's Investment Adviser was not an employee, broker, or independent contractor of optionsXpress.  Hale's Investment Adviser was an independent third party account controller known by Hale long before opening the Accounts with optionsXpress.

18.     Hale's Investment Adviser had an active trading account open with optionsXpress at the time Hale submitted her account application to optionsXpress.

19.     In the Investment Adviser's application submitted to optionsXpress, the Investment Adviser provided information about his financial condition and trading history.

20.     In his application, Hale's Investment Adviser represented to optionsXpress that he had over thirty years of experience in the financial markets and over twenty years experience trading options.   (**Exhibit N** at 142-43, partial transcript of August 8, 2007; **Exhibit K** at 18, partial transcript of August 7, 2007)  In fact, Hale's Investment Adviser traded accounts for persons other than Hale, and received compensation for his services. Simply put, Hale's Investment Adviser was an industry professional.

21.     The Investment Adviser was an agent of Hale, and, pursuant to the terms of the POAs, Hale authorized optionsXpress to "pay management fees directly" from the

Accounts to her Investment Adviser, and Hale notified optionsXpress that it could "rely on the invoices submitted by [her Investment Adviser], and optionsXpress [would] have no responsibility to calculate or verify fees so invoiced as [she had] that responsibility." (*See* **Exhibit E**)

22.    At no time did Hale ever revoke the POAs given to Hale.

**c.    *optionsXpress review of Hale's application.***

23.    optionsXpress determined that Hale was qualified to trade options, and thus, approved her Accounts to trade options based on the following factors:

i        The financial information and investment objectives provided by Hale in her Application;

ii.      The fact that Hale had retained a professional investment adviser to manage her account;

iii.     Her Investment Adviser had over 20 years experience in the financial markets; and

iv.     Her Investment Adviser had managed the accounts that Hale intended to transfer to optionsXpress from her predecessor trading firm

24.    The account numbers for Hale's living trust and IRA accounts were 4097-8276 and 4097-8278, respectively.  Those accounts numbers were changed in August 2004 to 5AD6-LL1 and 5AD6-LM1, respectively.  (OX Ex. 5 & 8)

**d.    *Hale transferred her accounts, including her options positions, from Wall St. Access, a registered broker-dealer, to optionsXpress.***

25.    Prior to opening her Accounts with optionsXpress, Hale had maintained other securities and options trading accounts as far back as February 2000, with broker-dealers DLJ Direct Inc., CSFB direct Inc., and Wall St. Access, where her Investment Adviser also acted as an agent, adviser and third party account controller for which Hale

7

paid the Investment Adviser. (OX Ex. 11-15)

26.    On December 4, 2002, Hale transferred her stock and options positions held at Wall St. Access to her Accounts with optionsXpress. At the end of December 2002, her Accounts had a combined equity value of $141,896.01. (OX Ex. 5 & 8)

27.    During the course of the next four years, Hale withdrew $30,728.48 from her Accounts, paid transaction fees of $13,045.90, and paid management fees to her Investment Adviser of $51,925.70, for a total of $95,700.07 in withdrawals and fees.[3] (OX Ex. 5 & 8)

28.    By December 29, 2006, the same month Hale filed her Arbitration Claim with the NASD, the value of Hale's Accounts totaled $21,143.17. Accordingly, after accounting for Hale's withdrawals from her Accounts and the payment of transaction and management fees, Hale's actual loss in her Accounts totaled no more than $25,052.77. Furthermore, after accounting for the $23,982 in rebates to Hale, Hale incurred virtually no losses in her Accounts.[4]

## IV. Argument And Authorities For Application To Vacate Award

a.    *The Court has jurisdiction over this matter and Hale.*

29.    At all times relevant, there was in effect in the State of Illinois a provision of law commonly called the Illinois Arbitration Act (the "Act"), 710 ILCS 5/1 *et seq.* Section 16 of the Act provided, in part, as follows:

The term "court" means any circuit court of this State. The making of an

---

3    During optionsXpress cross-examination of Hale at the hearing, Hale admitted that $23,982 of the management fees she paid to Wise from her IRA were rebated to her by Wise. Hale also admitted that the rebate was a scheme that she and Wise had created to allow Hale to withdraw money from her IRA account without paying the required penalty to the IRS for early withdrawal.

4    Hale's losses on the date she filed her Complaint were $1,070.77.

agreement described in Section 1 providing for arbitration in this State confers jurisdiction on the court to enforce the agreement under this Act and to enter judgment on an award thereunder.

710 ILCS 5/16.

30.    At all times relevant, the parties agreed to arbitrate any dispute between them pursuant to Section 43 of the Customer Agreement, which was appropriately titled as "Arbitration Provisions."

31.    Pursuant to Section 43 of the Customer Agreement, Hale agreed "to arbitrate all such controversies before the NASD in Chicago, Illinois." Accordingly, this Court has subject matter jurisdiction in this matter.

32.    Furthermore, pursuant to Section 43 of the Customer Agreement, Hale gave her "consent to the jurisdiction of the State of Illinois over [her] individually." Accordingly, this Court has personal jurisdiction over Hale in this matter.

b.    *The standard applied to an Application to vacate an arbitration award.*

33.    At all times relevant, Section 12 of the Act provided a statutory basis for vacating an arbitration award. 710 ILCS 5/12.

34.    In addition to the statutory basis for vacating an award under 710 ILCS 5/12, Illinois Court have also held that an award may be vacated as a result of an arbitrator's gross error of judgment in law or a gross mistake of fact if those mistakes or errors are apparent upon the face of the award. *Garver v. Ferguson*, 76 Ill. 2d 1 at 10-11 (1979).

35.    In the instant case, based on the record and applicable law, it is apparent on the face of the award that the Arbitration Panel made a gross error of judgment in law and/or gross mistake of fact in arriving at their finding that optionsXpress was liable for

9

failure to supervise, suitability, negligence, and breach of contract.

c.    *Summary of the Panel's gross errors of judgment in law and gross mistakes of fact.*

36.    As more fully set forth below in subsections d, e, f, g, and h, with regard to Hale's claims involving "know your customer" rule, failure to supervise and suitability, negligence, breach of contract, and damages, the Panel was informed and/or supplied with a plethora of case law confirming that:

- optionsXpress had the right to rely on the extensive experience of Hale's professional Investment Adviser in determining, pursuant to the "know your customer rule," that Hale was qualified to open an options trading account.

- optionsXpress had no duty as a matter of law to monitor or supervise Hale's self-directed Accounts to determine the suitability of the investments entered in her Accounts.  (*See* **Exhibit B**, and optionsXpress Brief in Support of its Motion to Dismiss and optionsXpress Reply in Response to Claimant's Response to its Motion to Dismiss and Response to Claimant's Motion for Summary Judgment, *sans exhibits*, which are attached hereto as **Exhibits F** and **G**, respectively).

- in the absence of any duty, there can be no finding of negligence as a matter of law. *Id.*

- a violation of an exchange rule or NASD rule does not constitute a private cause of action for damages, for which damages can be awarded. *Id.*

- based on the proofs, the compensatory damage award of $175,000 was a patently gross mistake of fact, in view of the fact that Hale lost virtually no money in her Account.

37.    In fact, at no time during the proceeding was the panel ever provided with any conflicting or contradictory case law by Hale. Moreover, at the hearing Hale, through her attorney, stipulated that the only matter at issue was the "know your customer" rule for options trading, which concerned the due diligence required of a broker in opening an option account for a customer. (*See* **Exhibit J** at 13-14, partial transcript of August 6, 2007, hearing session;  **Exhibit K** at 95-96, , partial transcript of August 7, 2007, hearing session)(wherein the Panel Chair "agree[d] . . . that is the stipulation and that is where we're headed.  So please limit your questions to [CBOE Rule] 9.7[, the 'know your customer' rule]").

38.    The "know your customer" rule was codified by various self-regulatory organizations, e.g. Chicago Board Options Exchange ("CBOE") Rule 9.7 and the National Association of Securities Dealers (NASD) Rule 2860(b)(16). (*See* **Exhibit L** (CBOE Rule 9.7), **Exhibit M** (NASD Rule 2860(16)))

39.    The foregoing notwithstanding, in each instance and with respect to each of Hale's referenced claims, despite Hale's stipulation that the only claim she was pursing was  a violation of the "know your customer" rule, the Panel ignored Hale's stipulation, blatantly ignored the well settled law, and as a result made gross errors in law or fact which is apparent on the face of the Award.

40.    In addition, based on the proofs, the compensatory damage award of $175,000 was a patently gross mistake of fact, in view of the fact that Hale lost virtually no money in her Accounts.

**d.    The Panel made a gross error of judgment in law and gross mistake of fact in finding optionsXpress liable for claims of suitability, because optionsXpress had only a "know your customer" obligation which it fulfilled.**

41.    There is no dispute that at the time Hale submitted her application to open an account she had disclosed that she had retained a professional investment adviser and provided that investment adviser with a power of attorney to place trades in her account with optionsXpress.

42.    There is also no dispute that Hale's Investment Adviser had over thirty years of experience in the financial markets, had over twenty years experience trading options, had managed Hale's accounts at another firm, and that he was an established customer of optionsXpress. (**Exhibit N** at 142-43, partial transcript of August 8, 2007; **Exhibit K** at 18, partial transcript of August 7, 2007)

43.    CBOE Rule 9.7 "know your customer" enables optionsXpress to rely on the experience of Hale's Investment Adviser  and her transfer of options positions in discharging its know your customer obligation. A firm need not solely look to the information provided by the customer on the application, but may also consider "other information known about the customer." *Report of the SEC's Special Study of the Options Market* (December 22, 1978) at p. 345, available at: http:// www.sechistorical.org/ collection/ papers/1970/ 1978_SS_SEC_OptMrkt/ 08_Chapter_V_3.pdf.  (hereinafter "SEC's Special Study of the Options Market")

44.    Based on Hale's disclosures and her experience with her other accounts and her Investment Adviser's extensive experience in trading options (including his management of Hale's accounts at prior firms), Hale was qualified to open an account with

optionsXpress to trade options.

45.     In the instant case, optionsXpress' due diligence inquiry went substantially beyond the requirements imposed under the law.  In this regard, it is well established that a broker has no duty to investigate each customer of an investment adviser or to inquire about the agreement between an investment adviser and his client, and that such inquiries would be ethically unsound.  (*See Unity House. v. North Pacific Investments, Inc.,* 918 F. Supp. 1384, 1393 (D. Hi. 1996)(following *Cumis Ins. Soc'y v. E.F. Hutton & Co.,* 457 F. Supp. 1380, 1390 (S.D.N.Y. 1978); *see also* SEC's Special Study of the Options Market; *See* **Exhibit K** at 145-47, partial transcript of August 7, 2007, hearing session (wherein the Panel was reminded that optionsXpress may consider additional information including the investment adviser's experience)).

46.     Accordingly, on the face of the Award, the Panel made a gross error of judgment in law and gross mistake of fact in finding that optionsXpress was liable for Hale's claims of suitability, when optionsXpress had no "suitability" obligation and only a "know your customer" obligation – which Hale's counsel conceded. (*See* **Exhibit K** at 95-96, partial transcript of August 7, 2007, hearing session, wherein Hale's counsel objected to CBOE Rules 9.7 and 9.9 and withdrew that objection reiterating that Hale did not make a claim that a recommendation was made under Rule 9.9  (the suitability rule) "there is no obligation in this case and the only suitability obligation we are talking about at the time the account is open," which in fact is the "know your customer" obligation and not a "suitability" obligation).

13

e.    **The Panel made a gross error of judgment in law and gross mistake of fact in finding optionsXpress liable for failure to supervise and suitability because optionsXpress had no duty to supervise or to determine the suitability of investments made in Hale's self-directed Accounts.**

47.    There is no dispute that Hale's Accounts were self-directed and that she retained an independent investment adviser, who was not an employee, broker, or independent contractor of optionsXpress, to trade on her behalf.    Moreover, Hale stipulated at hearing that not a single trade placed in her Accounts was recommended by optionsXpress and that optionsXpress makes no recommendations.    (*See* **Exhibit J** at 13-14, partial transcript of August 6, 2007, hearing session (wherein Hale's counsel represented to the Panel that "we stipulate on the record optionsXpress made no specific recommendations from any specific transaction").    Because Hale's Accounts were self-directed, optionsXpress had no duty to supervise or monitor those Accounts for the suitability of Hale's investments.    (*See* **Exhibits B, F, and G**).

48.    It has long been the rule that a broker-dealer has no duty to supervise and monitor the investments made in a self-directed account, especially when the customer has retained an investment adviser to use his discretion in placing trades in the account.    *See Cumis Ins. Soc'y. Inc. v. E.F. Hutton & Co.*, 457 F. Supp. 1380, 1390 (S.D.N.Y. 1978)(finding that placing a burden on a broker to monitor an investment adviser's activities "would be more than burdensome; it would be ethically unsound").    In fact it is well settled that a fundamental element required of a claim for suitability is a showing that the broker made a recommendation to buy or sell a specific security.    *Parsons v. Hornblower & Weeks-Hemphill, Noyes*, 447 F.Supp. 482 (M.D.N.C. 1977); *See also In re Thomas E. Warren*, III, 1994 SEC LEXIS

14

508 * 11 (Feb. 24, 1994)(holding that suitability claims were not supported because the record does not contain any evidence that broker "recommended the transactions that were effected in these accounts"). In the instant case, Hale's attorney stipulated that no such recommendations where made by optionsXpress. (*See* **Exhibit J** at 13-14)

49.    In the instant case, the Panel was supplied with an undisputed breadth of case law regarding the absence of any suitability or supervision duty at various stages of the proceeding, and Hale never submitted any authority to the contrary or disputed this authority. (*See* **Exhibits B, F, & G**) Again, the Panel blatantly ignored the well-settled and undisputed body of law, and as a result grossly erred in their judgment of the law in finding that optionsXpress was liable under a suitability theory.

50.    The rule that a broker-dealer has no duty to supervise or monitor the activities in a self-directed account is even more compelling where the broker is a discount broker, as was the case in this matter. *See Shwe Ming Chee, M.D. v. Marine Midland Bank, N.A.*, 1991 U.S. Dist. LEXIS 1151 at *10-11 (E.D.N.Y. Jan. 29, 1991) (holding that "[t]here is even greater reason to reject monitoring liability [on a broker-dealer] in the case of discount brokers whose admitted function is *not* to give advice so investors can save money on commission") (emphasis in the original). A copy of the *Shwe Ming Chee, M.D. v. Marine Midland Bank, N.A.* decision is attached hereto as **Exhibit H**.

51.    Not only is there no duty, but as recognized by the court in *Unity House*, to impose the duty of suitability and supervision on a broker holding a self-directed account would be even more unwarranted in a case where the broker knows that an investment adviser is trading on behalf of another. *See Unity House, Inc. v. North Pacific Inv., Inc.*, 918 F.

Supp. 1384, 1393 n.7 (D. Haw. 1996).

52.     Hale has never claimed that optionsXpress failed to fulfill its only duty to properly execute or carry out the orders placed in her Accounts. (*See* **Exhibit A**)  Because Hale's accounts were self-directed, optionsXpress' duty to Hale was exceedingly narrow and limited to the execution of the orders that she, or her adviser, placed in her account. *T-Bill Option Club v. Brown & Co. Sec. Corp.*, 1994 U.S. App. LEXIS 11976 * 12 (7th Cir. May 23, 1999) (following the general rule that "[t]he scope of the duty 'owed by a broker carrying a nondiscretionary account for a customer is an exceedingly narrow one, consisting at most of a duty to properly carry out transactions ordered by the customer'").  A copy of the *T-Bill Option Club v. Brown & Co. Sec. Corp.* decision is attached hereto as **Exhibit I**.  Again, the Panel was supplied with an undisputed body of case law at various stages of the proceeding in support of this position, and Hale never submitted any contrary authority. (*See* **Exhibits B, F, & G**)

53.     It is an undisputed fact that optionsXpress ascertained Hale's financial situation and investment objectives before approving her Accounts for options trading, that none of the trades placed in her Accounts were recommended by optionsXpress, and that the Accounts were self-directed.  Based on the foregoing, the finding of liability by the Panel for suitability, which requires a finding of an unsuitable recommendation by optionsXpress regarding a particular trade, was a gross error in law and gross mistake of fact on the face of the Award.

54.     Accordingly, on the face of the Award, the Panel made a gross error of judgment in law and gross mistake of fact in finding that optionsXpress was liable for

suitability or failure to supervise.

f.   **Because optionsXpress had no duty to supervise or monitor the investments placed in Hale's Accounts and no duty to determine the suitability of those investments, the Panel made a gross error of judgment in law and gross mistake of fact in finding optionsXpress liable for negligence.**

55.   It is well established that in order to prove a cause of action in negligence, a claimant must show that the broker owed her a duty, that the duty was breached, that she suffered damages, and that the broker's breach was the proximate cause of the injury. *Martello v. Century Supply Co.*, 163 Ill. App. 3d 521, 523 (1987).

56.   In the instant case, optionsXpress supplied the panel with the breadth of case law confirming, as a matter of law, that optionsXpress had no duty to Hale other than to properly execute the orders placed in her Accounts – a duty that Hale has not claimed was breached. (*See* **Exhibits B, F, & G**)  Hale provided no authority or law contradicting or contesting this authority.  Accordingly, it is axiomatic that the failure to prove the existence of a duty defeats a claim of negligence. *Id.* at 524 (finding that a plaintiff's failure to show a legal duty "obviates the need to address the issue of proximate cause").

57.   As explained by the court in *Unity House v. North Pac. Invs. Inc.*, 918 F. Supp. 1384, 1393 (D. Hi. 1996)(dismissing claimant's negligence claim), in following the general rule that a discount broker's only obligation to a customer was to enter their orders within a reasonable period of time, the court noted that:

> To hold otherwise would impose unjustifiably onerous burdens on brokers to (1) ascertain whether their immediate clients actually were handling funds for undisclosed third parties and (2) prevent trades by the immediate clients that are unsuitable *for the third parties. See Securities Indus. Ass'n v. Bd. of Governors of Federal Reserve Sys.*, 468 U.S. 207, 209 n. 2, 82 L. Ed. 2d 158, 104 S. Ct. 3003 (1984) ("Schwab is known as a 'discount' broker

17

because of the low commissions it charges. Schwab can afford to charge lower commissions than full-service brokerage firms because it does not provide investment advice or analysis, but merely executes the purchase and sell orders placed by its customers."); *Chee v. Marine Midland Bank, N.A.*, 1991 U.S. Dist. LEXIS 1151, 1991 WL 15301, *4 (E.D.N.Y. 1991) ("There is even greater reason to reject monitoring liability in the case of discount brokers whose admitted function is not to give advice so investors can save money on commissions.").

Indeed, as recognized by *Cumis Ins. Soc'y v. E.F. Hutton & Co.*, 457 F. Supp. 1380 (S.D.N.Y. 1978), such a burden would be unwarranted even where the immediate client is an *investment advisor*, in which case the broker *knows* that the advisor is trading on behalf of another:
The burden of such a duty would be massive, as it would effectively require a broker to identify and to investigate each customer of each investment advisor, and to inquire about the various agreements that the advisors had made with their clients. This duty would be more than burdensome; it would be ethically unsound. *Id.* at 1390. Such a proposed duty is "a good example of a plaintiff's deep-pocket theory that attempts to stretch the securities laws beyond recognition." *Id.* at 1382.

58.    Even had optionsXpress executed orders for unsuitable securities placed in Hale's Accounts by her Investment Adviser, whom she vested with discretionary authority, optionsXpress still could not be liable. *See Rolf v. Blyth Eastman Dillon & Co., Inc., et al., per curium*, 1978 WL 4098 at footnote 16A (2nd Cir. 1978) (noting that liability is not imposed on a "broker-dealer who merely executes orders for 'unsuitable' securities made by an investment adviser vested with sole discretionary authority to control the account").

59.    On the face of the Award, in view of the absence of any duty owed by optionsXpress to Hale, the Panel made a gross error of judgment in law and gross mistake of fact in finding that optionsXpress was liable for negligence.

3.    **Because there is no cause of action for a breach of an exchange or self-regulatory organization's rules, the Panel made a gross error of judgment in law and a gross mistake of fact in finding optionsXpress liable for breach of contract.**

60.    In her Claim, Hale alleged that optionsXpress breached rules of the NASD and the Chicago Board Options Exchange ("CBOE"). Nowhere did Hale allege a breach of contract, or any of the elements of a breach. (*See* **Exhibit A**)

61.    Even if there was some theory to support a private right of action, and assuming for argument sake that Hale had alleged a breach of contract, and that Hale was a party to a contract between optionsXpress and a exchange or self regulatory organization, Hale would not be entitled to assert a private cause of action. It is well-settled law, and the Panel was supplied with an uncontradicted body of case law at various stages of the proceeding, that an investor generally does not have a private cause of action for a violation of an exchange rule or rules of the NASD, absent a finding of fraud. *See Shull v. Dain, Kalman & Quail, Inc.*, 561 F.2d 152, 160 (8th Cir. 1977); *See Spicer v. Chicago Bd. of Options Exchange, Inc.*, 977 F.2d 255, 264 (7th Cir. 1992) (citing to *Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 410 F.2d 135 (7th Cir. 1969)(holding that New York Stock Exchange Rule 405 (the NYSE's "know your customer" rule) did not support a private right of action without a finding of fraud); *See also Smith v. Smith, Barney, Harris, Upham & Co., Inc., et al*, 505 F. Supp. 1380 (D.C. Mo. 1981); *Birotte v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 468 F. Supp 1172 ( D. N.J. 1979)(Dismissing plaintiff's causes of action for breach of the Chicago Board of Options  Exchange Rule 9.7 ("know your customer") and Rule 9.9 ("suitability"), because there was no private right of action in favor of investor against brokerage firm for firm's alleged violation of exchange rules); *See also* **Exhibits B, F, & G)**

In the instant case, no allegation of fraud was alleged, and none found. (*See* **Exhibit C**)

Therefore, Hale cannot recover for the violation of an exchange rule or rules of the NASD.

62.     As explained by the court in *Klock v. Lehman Brothers Kuhn Loeb Inc.* 584 F.

Supp. 210, 217 (S.D.N.Y. 1984), in finding "no persuasive demonstration of congressional

intent to create a federal right of action under the rules at issue," the court noted the

following factors:

> (1) the statutory bases for the NYSE and NASD Rules, see 15 U.S.C. §§
> 78f(b)(5) and (6) and 78o-3(b)(6) and (7), do not confer any rights or proscribe
> any conduct by exchange or association members;
>
> (2) there is apparently no mention of this subject in the legislative history;
>
> (3) there are several express provisions in the Act creating private remedies
> under specified circumstances, suggesting that the failure to provide for
> private actions for violation of exchange or association rules was not an
> oversight; and,
>
> (4) the statutory scheme provides for self-regulation and enforcement by
> exchanges and associations, suggesting that Congress has selected this as the
> exclusive means of enforcement.
>
> (citations omitted)

63.     In view of the foregoing, a cause of action for breach of contract based on a

violation of exchange and self-regulatory organization's rules was without any basis in law

or fact. Accordingly, on the face of the Award, the Panel made a gross error of judgment in

law and gross mistake of fact in finding that optionsXpress was liable for breach of

contract, when no such allegation was even pled in Hale's complaint. (*See* **Exhibit A**)

**h.    *In light of the fact that Hale incurred virtually no damages in her Accounts, the
Panel made a gross mistake of fact in awarding Hale any compensatory damages.***

64.     As set forth above, Hale's combined equity in her Accounts following the

20

transfer to optionsXpress was $141,896.01.

65. The evidence was undisputed that Hale withdrew $30,728.47 from her Accounts, paid transaction fees of $13,045.90, and paid management fees to her Investment Adviser of $51,925.70, for a total of $95,700.07 in withdrawals and fees. In light of the $23,982 Hale received in rebates from her Investment Adviser and the $21,143.17 balance in her Accounts as of December 29, 2006, the month in which Hale filed her Arbitration Claim, Hale incurred losses totaling $1,070.71.

66. In light of the fact that the undisputed evidence confirmed, and the Panel had been informed, that there were virtually no losses, the Panel made a gross mistake of fact in awarding $175,000.00 in compensatory damages to Hale.

67. Furthermore, it should be unequivocal that the law requires that damages must be directly traceable to a breach and cannot be speculative, and that in the instant case the Award is simply irrational and contrary to common sense and accordingly, must be vacated. *Wallace v. Buttar*, 378 F.3d 182, and FN7 (2nd Cir. 2004) (holding that an award must be vacated when Arbitrators knew of well defined explicit law and refused to apply or ignored it); *See also Hardy v. Walsh Manning Securities, LLC*, 341 F.3d 126, 133 (2nd Cir. 2003) (finding logical impossibility of award warranted remand). *Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 330 F.3d 843, 847 (6th Cir. 2003) (vacatur of damages award upheld because award both exceeded the arbitrators' authority and manifestly disregarded the law by asserting jurisdiction over a nonparty); *See also Halligan v. Piper Jaffray Inc.*, 148 F.3d 197, 204 (2d Cir. 1998) ( court concluded where there was "overwhelming evidence" and the applicable law had been explained to the arbitrators, the arbitrators manifestly "ignored

the law or the evidence or both.").

68.    Hale had the duty to provide concrete evidence of a pecuniary loss and failure to do so mandates dismissal. *Lama Holding, 88 N,Y,2d 413 (1996); see also Tripi v. Prudential Securities, Inc.,* 303 F. Supp 2d 349, 353 (S.D.N.Y. 2003).

69.    Accordingly, on the face of the Award, Panel made a gross mistake of fact and manifestly disregarded the law in awarding $175,000.00 in compensatory damage s to Hale, who incurred losses totaling $1,070.71. compensatory damages to Hale.

WHEREFORE, optionsXpress, Inc., respectfully requests the entry of an order vacating the underlying Arbitration Award, and such further or alternative relief as the Court deems appropriate under the circumstances.

Respectfully submitted,

OPTIONSXPRESS, INC.

By: _____

One of Its Attorneys

Jeffry M. Henderson
Robert B. Christie
HENDERSON & LYMAN
175 West Jackson, Suite 240
Chicago, Illinois 60604
312-986-6960
Cook County ID No. 34832

Hillary Victor, Corporate Counsel
optionsXpress Holdings, Inc.
311 West Monroe Street, Suite 1000
Chicago, Illinois 60606
312-267-6627
Cook County ID No. 42588

22

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

OPTIONSXPRESS, INC.,

          Petitioner,

v.

LINDA HALE,

          Respondent.

Docket No. _____

## AMENDED APPLICATION EXHIBIT LIST

**Exhibit A**    Hale's Arbitration Claim

**Exhibit B**    optionsXpress Answer (*sans exhibits*)

**Exhibit C**    Arbitration Award

**Exhibit D**    Account Overview statement

**Exhibit E**    Fee Payment & Limited Trading Authorizations dated November 14, 2002 and November 15, 2002 ("POA")

**Exhibit F**    optionsXpress Brief in Support of its Motion to Dismiss

**Exhibit G**    optionsXpress Reply in Response to Claimant's Response to its Motion to Dismiss and Response to Claimant's Motion for Summary Judgment (*sans exhibits*)

**Exhibit H**    *Shwe Ming Chee, M.D. v. Marine Midland Bank, N.A.*, 1991 U.S. Dist. LEXIS 1151 at *10-11 (E.D.N.Y. Jan. 29, 1991

**Exhibit I**    *T-Bill Option Club v. Brown & Co. Sec. Corp.*, 1994 U.S. App. LEXIS 11976 * 12 (7th Cir. May 23, 1999)

**Exhibit J**    Partial Hearing Transcript for August 6, 2007

**Exhibit K**   Partial Hearing Transcript for August 7, 2007

**Exhibit L**   Chicago Board Options Exchange ("CBOE") Rule 9.7

**Exhibit M**   National Association of Securities Dealers (NASD) Rule 2860(b)(16)

**Exhibit N**   Partial Hearing Transcript for August 8, 2007

# EXHIBIT A



**LAW OFFICES OF NEIL B. SOLOMON, ESQ.**
**4174 St. Lukes Lane**
**Jupiter, FL, 33458**
**(561) 762-4991**
neilbsolomonesq@gmail.com

## VIA ELECTRONIC FILING

December 2, 2006

Director of Arbitration
One Liberty Plaza
165 Broadway
27th Floor
New York, NY 10006

**Re:**    **Statement of Claim on Behalf of Ms. Linda Hale Against OptionsXpress, Inc.**

Dear Sir or Madam:

Please accept this letter as the Statement of Claim of my client, Ms. Linda Hale, against OptionsXpress, Inc. ("OX").

Ms. Hale lost her **entire liquid net worth** in her two OX accounts. Speculative options trading accounted for virtually all of Ms. Hale's losses. OX had a duty to refuse to allow Ms. Hale to engage in speculative options trading because it was unsuitable for her. OX's reckless decision to allow Ms. Hale to gamble away all of her money was the direct -- and predictable -- cause of her losses.

OX cannot deny that it has a duty to refuse to allow certain investors to speculate with options– even if such investors indicate that they desire to engage in speculative options trading. OX **admits** as much on its website. OX's self-admitted duty directly flows from the NASD's and CBOE's options rules. Ms. Hale was the prototypical investor that these rules were designed to protect.

At the time that Ms. Hale opened both of her OX accounts she specifically informed OX that the cash and securities that she deposited represented her **entire liquid net worth**. Ms. Hale further indicated that she was approaching retirement age; had a modest income and had limited investment experience, especially with respect to options trading.

Despite these undisputed facts, OX approved and allowed Ms. Hale to engage in a variety of types of options trading including, but not limited to, buying uncovered put and call options. Given that approximately 80% of options expire worthless it is not surprising that buying uncovered puts and calls is considered as risky as gambling. It is reckless to allow any person to gamble away their **entire liquid net worth**. In light of Ms. Hale's

age, income and lack of options trading experience, OX's decision to allow her to gamble with, and lose, all of her money is shocking.

Making this case even more egregious than the undisputed facts above, is the undisputed fact that *the vast majority of Ms. Hale's options trading losses occurred in her IRA account.* Most major broker-dealers (and many other broker-dealers) prohibit speculative options trading in IRA accounts.[1] The reason that the largest firms (and many others) do not allow their customers to gamble with options at all in their IRA accounts -- let alone with most of their liquid net worth -- is because *retirement money* should not be exposed to the hideous risk inherent in speculative options trading.

We anticipate that while OX might concede that buying put and calls is speculative it will argue that it had no duty to prohibit a competent adult from speculating with her money if that is what she desires. OX's own written words and the NASD's and CBOE's options rules fully rebut that specious argument. Indeed, a FAQ and answer from OX's website states:

> FAQ: Do you allow options trading in optionsXpress IRAs?

> Yes, we *allow* prudent trading of options in IRAs *based on an investor's individual suitability* (emphasis added).

OX's answer conclusively proves the following dispositive point: it was OX's duty – <u>not</u> Ms. Hale's – to decide whether options trading was suitable for Ms. Hale. OX breached the self-admitted duty that it owed to Ms. Hale. OX should not "allow" investors such as Ms. Hale to engage in speculative options trading period. OX's decision to "allow" Ms. Hale to put her **<u>entire liquid net worth</u>** at risk – most of which was her *retirement money* – was unconscionable.

OX's self-admitted duty to "allow" only "prudent" options trading flows directly from the NASD's and CBOE's options rules. Recognizing that options trading is highly speculative, these rules impose heightened duties on broker-dealers in deciding whether to "allow" investors to trade options (as compared to their duties with respect to stock accounts). Indeed, the NASD has separate and distinct options suitability rules which hold broker-dealers to a higher standard in making *their* decision whether to "allow" investors to trade options and if so, what type of options trading is "prudent." *See* CBOE Rule 9.7; CBOE 9.8; NASD Rule 2860(16)(C); NASD IM-2860-2.[2]

Ms. Hale's losses from options trading were approximately $200,000. Ms. Hale opened two OX accounts: an IRA account (account nos. 4097-8278 and 5AD6-LM1) (the "IRA

---

[1] Some of these firms allow non-speculative options strategies such as covered calls, protective puts and collars.

[2] Due the speculative nature of options trading, the NASD and CBOE rules also require broker-dealers to monitor trading in options accounts more closely than investing in stock accounts. *Id.* OX breached this duty.

Account") and a Trust account (account nos. 4097-8276 and 5AD6-LL1)[3] (the "Trust Account"). Ms. Hale funded her IRA Account with cash and securities valued at approximately $130,000. Ms. Hale funded the Trust Account with cash and securities valued at approximately $30,000. In sum, Ms. Hale deposited approximately $160,000 into her OX accounts. Her OX accounts are now virtually worthless as a direct and predictable result of OX's reckless decision to allow Ms. Hale engage in speculative options trading strategy. Ms. Hale's losses on speculative options trading, however, are greater than $160,000 because Ms. Hale realized $40,000 in profits on the stocks – not options – that she transferred to OX.

In sum, Ms. Hale was a novice investor, nearing retirement, with a modest income. Yet OX allowed her to trade puts and calls with her **entire liquid net worth**. As a direct – and predictable – result of OX's decision to allow her to gamble away all of her money she now faces an uncertain future.

Based on the above, Ms. Hale requests that the Panel award her: 1) $200,000+ in actual damages; 2) punitive damages of at least $1,000,000; 3) attorney's fees; 4) costs; and 5) forum fees. In addition, Ms. Hale intends to request that the Panel make a regulatory referral to the NASD and/or CBOE.

Sincerely,

**[NBS]**

Neil B. Solomon

cc: Ms. Linda Hale

---

[3] Apparently, the account numbers were changed at the time that OX switched clearing firms.

# EXHIBIT B

**IN ARBITRATION BEFORE
THE NATIONAL ASSOCIATION OF SECURITIES DEALERS**

LINDA HALE                    )
      Claimant,          )
               )
     v.                     )          06-05183
               )
OPTIONSXPRESS, INC.          )
      Respondent.        )

## OPTIONSXPRESS' MOTION TO DISMISS, STATEMENT OF ANSWER AND AFFIRMATIVE DEFENSES TO CLAIMANT'S STATEMENT OF CLAIM

Except as expressly admitted below, optionsXpress, Inc. ("optionsXpress") denies, generally and specifically, all allegations in Claimant's statement of claim ("Claim"), and denies that it is obligated to Claimant in any amount or under any theory, whether expressly pled or not. There is no legal basis whatsoever for this Claim, and accordingly, this Claim should be dismissed.

## BACKGROUND OF THE PARTIES

optionsXpress is an NASD member firm that provides a customized interface for online trading of stocks and options to its self-directed retail customers located throughout the United States and the world. optionsXpress has developed and maintains a website that permits customers to place orders for their accounts and manage their accounts electronically, via the internet. As a web-based discount brokerage firm, optionsXpress does not solicit customer orders, does not provide customers with tax, legal, or accounting advice, and does not discuss specific market strategies with, nor recommend securities to its customers.

Claimant is a self-directed customer of optionsXpress initiating stock and options transactions on a strictly unsolicited basis and at her own discretion, responsibility, and risk. On November 14, 2002, Claimant provided optionsXpress with her self-directed cash and option IRA and Trust Account Applications ("Applications") declaring "speculation" as her investment objective, and her signed acknowledgement that she had read, understood and agreed to be bound by optionsXpress' User/ Customer Agreement - Terms and Conditions ("User Agreement"). **Exhibit 1.**

Claimant transferred from Deutsche Bank to optionsXpress option and stock positions to open her IRA and Trust accounts ("Accounts"). The Accounts were valued at $141,896.01 at the end of the month of December 2002, the month in which the transfer occurred ("Opening Value"). **Exhibit 2.** Claimant previously traded options, was transferring in option positions and requested cash and option accounts declaring her investment objectives as speculation, and optionsXpress approved Claimants' accounts for level 2 trading[1]. **Exhibit 3** (providing a matrix of trading levels for cash and options accounts opened by optionsXpress). Along with her Applications, Claimant provided optionsXpress with a Fee Payment & Limited Trading Authorization ("LTA") for a third party, Mr. Tim Wise ("Wise"), authorizing Wise to trade her

---

[1] Level 2 trading allows Claimant to order opening and closing sales of put and call equity and index options, covered call writing, short stock sales, trading of stocks, bonds and mutual funds. That is all she was permitted to do – and Claimant concedes these are non-speculative option strategies.

account and otherwise act in the same manner and with the same force and effect as Claimant. **Exhibit 4.**

Over the course of activity in her Accounts, Claimant paid Wise management fees of $51,925.70 from her Accounts. **Exhibit 5.** In addition, Claimant withdrew $30,728.47 from her Accounts and incurred transaction fees of $13,045.90. **Exhibit 6.** Claimant currently maintains a balance of $17,473.04 in her Accounts, and an open option position of 32 contracts of Gen-Probe Incorporated (GPRO) February 2007 55 calls. **Exhibit 7.** Claimant seeks $200,000 in purported "losses" together with "punitive damages of at least "$1,000,000", fees, costs, and regulatory referral against optionsXpress for acting in accordance with the trading decisions she ordered for her Account.

## ANSWER

The Panel has the authority, and optionsXpress requests, that the Panel dismiss this Claim for failure to state a cause of action as a matter of law. In the alternative, optionsXpress denies any liability to Claimant in any amount or under any theory, whether expressly pled or not. Further, optionsXpress denies, generally and specifically, all material allegations set forth in the Claim, as detailed herein.

## ARGUMENT

Claimant seeks to blame optionsXpress for obeying the trading decisions she ordered in her self-directed Accounts. From the moment she transferred her option positions from Deutsche Bank to her optionsXpress Accounts, Claimant continued to purchase and sell put and call equity and index options, trade covered calls, protective puts and collars. Despite twice acknowledging that she "fully understands that option trading has a number of inherent risks. . . and [that she] is fully prepared financially to undertake such risks," Claimant asserts that optionsXpress should bear the responsibility for purported losses resulting from her trading decisions. Exhibit 4. It seems fairly obvious that it would be unreasonable to blame optionsXpress for permitting Claimant to engage in a pattern of self-directed options trading that began before she transferred her option positions to optionsXpress. Yet, Claimant's Statement of Claim attempts to do just that.

Claimant's allegation that she lost her "entire liquid net worth" blatantly disregards the $95,700.07 in debits and withdrawals from her account and the $17,473.04 that currently remains of the $141,896.01 Opening Value. Surely, Claimant is not seeking to hold optionsXpress liable for fees she chose to pay Wise, or the funds she withdrew from her accounts.

The Claimant tells a colorful tale of a "near retiree" "gambling" "away all of her money" and her "entire liquid net worth" because "reckless[ly]" optionsXpress did not stop her from her own "speculative" trading mania. This tale is nothing more than an attempt to blame someone else for her own choices. Although her Claim attempts to allege unsuitability, negligence, and violations of SRO Rules, her allegations are simply inapplicable to her self-directed account. Explicitly, optionsXpress makes no recommendations, and Claimant agreed. This Claim should be dismissed as a matter of law.

## THE USER AGREEMENT AND LTA BETWEEN CLAIMANT AND OPTIONSXPRESS BAR CLAIMANT'S REQUEST FOR RELIEF AND WARRANT DISMISSAL OF THIS CLAIM

Claimant ignores the specific and controlling language of the User Agreement that she entered into with optionsXpress. For each of her Accounts, Claimant acknowledged that she read, understood, and agreed to be bound by the User Agreement. **Exhibit 8.** In so doing, Claimant agreed that:

- optionsXpress does not provide advice or offer opinions regarding value or suitability of any particular securities transaction or investment strategy. (Exhibit 8 at Section 14).
- options contain a high degree of risk, and are often speculative in nature, and she is prepared to undertake the risk and withstand any losses, including in her IRA. (Exhibit 8, Appendix B, Sections 1 and 10).
- the authority she gave to Wise was at her sole risk. (Exhibit 8 at Section 15).
- she is responsible for reviewing and objecting to statements and confirmations within 48 hours. (Exhibit 8 at Sections 24 – 25).
- she is responsible for evaluating her own investment decisions, financial circumstances, and determining the suitability of her trades and strategy. (Exhibit 8 at Section 14).
- she is responsible for her decisions and she will not hold optionsXpress liable for losses incurred by her as a result. (Exhibit 8 at Section 16).

Claimant also ignores the language of the LTA (Exhibit 4) she provided to optionsXpress. In that LTA, Claimant:

- agrees to indemnify and hold optionsXpress harmless.
- ratifies and confirms transactions placed by Wise in her Accounts.
- agrees that she understands the inherent risks in option trading, and warrants her preparation to take short-term profits or losses.
- recognizes that optionsXpress provides no investment advice, is not responsible for investigating and selecting Wise, and confirms that Wise is not affiliated with, controlled, or employed by optionsXpress.
- agrees that optionsXpress has no duty to supervise or monitor trading by her or Wise and that she is responsible for reviewing and monitoring trading in her Accounts.

Claimant ignores her obligations and duties she agreed to uphold in both the User Agreement and LTA, and instead, in contravention of each of the above-cited provisions, seeks to hold optionsXpress liable.

There can be no dispute that Claimant agreed that she is responsible for, and agreed to indemnify and hold harmless optionsXpress from, claims and actions – including this Claim. Even if she argues she did not place the trades, Wise did[2], the effect under the LTA is the same. Claimant controlled the decisions made for her Accounts. Pursuant to the terms of her User Agreement and LTA, this Claim should be dismissed.

---

[2] Perhaps Claimant has filed her action against the wrong respondent. As Claimant's agent and attorney-in-fact for the Accounts, optionsXpress reserves the right to bring a Third-Party Claim against Wise in connection with this Claim.

## OPTIONSXPRESS OWED NO DUTY TO BAR CLAIMANT FROM TRANSFERRING IN OR CONTINUING TO TRADE OPTIONS.

optionsXpress owed Claimant no duty supervise, restrict or prohibit her from transferring option positions into her self-directed Accounts.  optionsXpress owed Claimant no duty to refuse to execute orders she placed.  In fact, had it done so, that refusal may have subjected it to a different complaint. An ongoing suitability requirement is unsupported as a matter of law.
Moreover, as further detailed below, suitability determinations on trades require recommendations – which Claimant agrees -- optionsXpress does not make.  (Exhibit 8 at Section 14).

optionsXpress has no duty to prohibit a customer from opening an account and trading that account as she wishes within the assigned trading level.  Certainly, optionsXpress had no duty to prevent this Claimant from trading the options that she transferred from her former broker to optionsXpress and continued trading – for four years.

There is a volume of case law on point.  It is well settled that a firm ordinarily has no duty to monitor suitability for a self-directed nondiscretionary account, or to give advice to such a customer on an ongoing basis.  A nondiscretionary customer by definition keeps control over the account and has full responsibility for trading decisions. Without a duty, a negligence claim fails.

Claimant alleges that all of her own decisions were unsuitable and optionsXpress should be liable.  The law does not impose such a duty on self-directed accounts of member firms.  To so permit would result in a windfall to Claimant.  Because optionsXpress owed no duty, this Claim must be dismissed.

## BECAUSE OPTIONSXPRESS MAKES NO RECOMMENDATIONS, CLAIMANT'S SUITABILITY CLAIM SHOULD BE DISMISSED.

optionsXpress makes no recommendations, and Claimant agreed.

It is well settled that a firm does not undertake suitability obligations to a customer where it merely executes orders.  Generally, courts have declined to hold broker-dealers accountable for the suitability of an unsolicited order from a customer.  Suitability obligations exist only when a broker-dealer makes a recommendation to a customer.  Where no recommendations are made, a claim for unsuitability fails as a matter of law.

Claimant fails to plead that optionsXpress made any recommendations because she cannot.  Therefore, her allegation that the option orders she placed were unsuitable for her has no merit. As a matter of law, no liability may attach to optionsXpress.  This Claim should be dismissed.

## BECAUSE NO PRIVATE CAUSE OF ACTION LIES FOR ALLEGED SRO RULE VIOLATIONS, THIS CLAIM SHOULD BE DISMISSED.

Claimant's allegations of SRO rule violations should be dismissed as a matter of law.  A volume of case law states that violations of SRO rules, including the NASD "suitability" rule, does not give rise to a private cause of action.  There is no reason to depart from this well settled precedent.  This Claim should be dismissed as a matter of law.

4

## AFFIRMATIVE DEFENSES

Alternatively, Claimant sets forth the following affirmative defenses:

**FIRST AFFIRMATIVE DEFENSE (FAILURE TO STATE A CLAIM)**
Claimant has not and cannot plead any set of facts entitling her to relief. As a matter of law, her Claim must be dismissed.

**SECOND AFFIRMATIVE DEFENSE (FAULT OF CLAIMANT)**
If Claimant suffered or sustained any loss, injury, damage or detriment, the same was directly and proximately caused by and contributed to by the acts, omissions, activities, failures, conduct, carelessness, recklessness and/or negligence of Claimant, and not by optionsXpress.

**THIRD AFFIRMATIVE DEFENSE (FAULT OF OTHERS)**
If Claimant suffered or sustained any loss, injury, damage or detriment, the same was directly and proximately caused and contributed to by the conduct, acts, omissions, activities, carelessness, recklessness, negligence, and/or intentional misconduct of other third parties -- including Wise -- and not by optionsXpress. Based on the foregoing, optionsXpress reserves the right to bring a Third-Party Claim against Wise in connection with this Claim.

**FOURTH AFFIRMATIVE DEFENSE (RATIFICATION)**
Claimant's failure timely to object constitutes ratification, and each transaction is enforceable against her.

**FIFTH AFFIRMATIVE DEFENSE (INTERVENING ACTS)**
The damages complained of are the result of the intervening actions of others and are not proximately caused by the actions or omissions of optionsXpress.

**SIXTH AFFIRMATIVE DEFENSE (CAUSATION)**
The Claim fails to show that any alleged acts or omissions of optionsXpress caused the injuries or damages alleged by Claimant.

**SEVENTH AFFIRMATIVE DEFENSE (FAILURE TO MITIGATE DAMAGES)**
Claimant has failed, in whole or in part, to mitigate her alleged damages.

**EIGHTH AFFIRMATIVE DEFENSE (WAIVER)**
Claimant has waived any and all claims, rights and demands she makes by failing to review and object to the activity giving rise to her claims.

**NINTH AFFIRMATIVE DEFENSE (ESTOPPEL)**
Claimant's claims are barred by the equitable doctrine of estoppel.

**TENTH AFFIRMATIVE DEFENSE (LACHES)**
Claimant's claims are barred by the equitable doctrine of laches.

**ELEVENTH AFFIRMATIVE DEFENSE (NO DUTY)**
Claimant's claims arise from activities in self-directed brokerage Accounts for which she assumes full responsibility, and over which optionsXpress has no discretion.

**TWELVETH AFFIRMATIVE DEFENSE (NO DAMAGES)**
Claimant did not incur any damage or loss as a result of any act or conduct by optionsXpress.

**THIRTEENTH AFFIRMATIVE DEFENSE (SPECULATIVE DAMAGES)**
Any alleged damage or loss would be speculative at best.

**FOURTEENTH AFFIRMATIVE DEFENSE (UNJUST ENRICHMENT)**
Claimant would be unjustly enriched if allowed to recover on this Claim.

**FIFTEENTH AFFIRMATIVE DEFENSE (BREACH OF CONTRACT)**
Claimant breached her User Agreement and LTA with optionsXpress. Therefore, Claimant cannot seek relief from optionsXpress.

**SIXTEENTH AFFIRMATIVE DEFENSE (HOLD HARMLESS/ NO LIABILITY)**
Claimant seeks relief from optionsXpress when she agreed, in her User Agreement and LTA, to indemnify and hold optionsXpress harmless from the very losses she seeks to recover.

## CONCLUSION

There should be no dispute that Claimant's action is harassment litigation to, on information and belief, extract a settlement from a "deep pocket". Nevertheless, Claimant continues to blame someone else for the losses that she incurred instead of the truly responsible party – herself.

It is beyond dispute that Claimant did not lose money because optionsXpress allowed the Accounts to be opened. Claimant lost money because she paid management fees, made withdrawals, and paid transaction fees for the trades that she placed, some of which ultimately were unsuccessful. The math is straightforward, and reveals that Claimant's alleged losses are attributable to her.

It is unfortunate that in hindsight, Claimant regrets the activity that she engaged in, but that does not make optionsXpress liable. Claimant's bears responsibility for the activity in her self-directed Accounts.

For the foregoing reasons, optionsXpress respectfully requests that the Panel:

a) Deny all relief requested by Claimant in her Claim;
b) Dismiss the Claim in its entirety, with prejudice;
c) Award optionsXpress fees, costs, and reasonable attorney's fees in connection with defending this Claim; and
d) Grant such other, further and different relief as the Panel deems just and proper.

Respectfully Submitted:
optionsXpress, Inc.

By: _____

Hillary Victor
Corporate Counsel
optionsXpress Holdings, Inc.
39 S. LaSalle Street, Suite 220
Chicago, IL 60603
Tel: (312)267-6627
Fax: (312)220-7069
hvictor@optionsxpress.com

# EXHIBIT C

# Award
## FINRA Dispute Resolution

In the Matter of the Arbitration Between:

Name of the Claimant
Linda Hale

Case Number: 06-05183

Name of the Respondent
optionsXpress, Inc.

Hearing Site: Boca Raton, Florida

Nature of the Dispute: Customer vs. Member.

## REPRESENTATION OF PARTIES

For Linda Hale, hereinafter referred to as "Claimant": Neil B. Solomon, Esq., Neil B. Solomon, P.A., Jupiter, Florida.

For optionsXpress, Inc., hereinafter referred to as "Respondent": Hillary A. Victor, Esq., optionsXpress Holdings, Inc., Chicago, Illinois and Jeffry M. Henderson, Esq., Chicago, Illinois.

## CASE INFORMATION

Statement of Claim filed on or about: December 2, 2006.
Claimant signed the Uniform Submission Agreement: December 3, 2006.
Motion to Dismiss and Statement of Answer filed by Respondent on or about: February 7, 2007.
Respondent signed the Uniform Submission Agreement: February 7, 2007.
Brief in Support of its Motion to Dismiss filed by Respondent on or about: May 15, 2007.
Response to Motion to Dismiss and Motion for Summary Judgment with respect to Liability filed by Claimant on or about: June 4, 2007.
Motion for Witness Affidavits and/or Telephonic Testimony filed by Respondent on or about: July 30, 2007.
Response to Motion for Witness Affidavits and/or Telephonic Testimony filed by Claimant on or about: July 31, 2007.
Motion for Reconsideration of Respondent's Motion for Witness Affidavits and/or Telephonic Testimony filed by Claimant on or about: August 3, 3007.
Response to Claimant's Motion for Reconsideration of Respondent's Motion for Witness Affidavits and/or Telephonic Testimony filed by Respondent on or about: August 3, 2007.
Motion to Add Additional Evidence filed by Claimant on or about: August 10, 2007.
Motion to Bar and Strike and for Other Relief filed by Respondent on or about: August 10, 2007.

FINRA Dispute Resolution
Arbitration No. 06-05183
Award   Page 2

## CASE SUMMARY

Claimant asserted the following causes of action: 1) suitability; 2) breach of contract; 3) failure to supervise; and, 4) negligence. The causes of action relate to options trading of various unspecified securities in Claimant's accounts.

Unless specifically admitted in its Answer, Respondent denied the allegations made in the Statement of Claim and asserted various affirmative defenses. In addition, Respondent filed a Motion to Dismiss alleging that Claimant held a self-directed account.

## RELIEF REQUESTED

Claimant requested compensatory damages in the amount of $200,000.00, punitive damages of at least $1,000,000.00, attorney's fees, costs and forum fees.

Respondent requested that the Statement of Claim be denied and dismissed in its entirety, with prejudice, and an award of fees, costs and reasonable attorney's fees, and such other, further and different relief as this Panel deemed just and proper.

## OTHER ISSUES CONSIDERED AND DECIDED

On June 29, 2007, the Panel issued an Order that denied Respondent's Motion to Dismiss and Claimant's Motion for Summary Judgment.

On August 1, 2007, the Panel issued an Order that granted Respondent's Motion for Witness Affidavits however, the Panel stated that if, at any time during the evidentiary hearing, it appears that any witness included in Respondent's motion has knowledge of any fact in controversy, Respondent shall make that witness available for telephonic testimony.

On August 3, 2007, the Panel issued an Order that granted Claimant's Motion for Reconsideration of Respondent's Motion for Witness Affidavits and/or Telephonic Testimony. The Panel reconsidered its previous ruling and determined that one particular witness in Respondent's motion must appear in-person.

On August 10, 2007, the Panel met in a deliberation conference and determined that Claimant's Motion to Add Additional Evidence and Respondent's Motion to Bar and Strike and for Other Relief are both denied.

The parties have agreed that the Award in this matter may be entered in counterpart copies or that a signed handwritten Award may be entered.

## AWARD

After considering the pleadings, the testimony and evidence presented at the hearing, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

FINRA Dispute Resolution
Arbitration No. 06-05183
Award   Page 3

Respondent is found liable for Claimant's claims of suitability, breach of contract, failure to supervise and negligence and shall pay to Claimant compensatory damages in the amount of $175,000.00.

Claimant's requests for punitive damages and attorney's fee are denied.

Any and all claims for relief not specifically addressed herein, including Respondent's request for attorneys' fees, are denied.

## FEES

Pursuant to the Code of Arbitration Procedure (the "Code"), the following fees are assessed:

### Filing Fees
FINRA Dispute Resolution will retain or collect the non-refundable filing fees for each claim:
> Initial claim filing fee                                    = $ 500.00

### Member Fees
Member fees are assessed to each member firm that is a party in these proceedings or to the member firm(s) that employed the associated person(s) at the time of the event(s) giving rise to the dispute. Accordingly, Respondent is a party and a member firm.

| | |
|---|---|
| Member surcharge | = $ 2,800.00 |
| Pre-hearing process fee | = $  750.00 |
| Hearing process fee | = $ 5,000.00 |
| Total Member Fees | = $ 8,550.00 |

### Adjournment Fees
Adjournments granted during these proceedings for which fees were assessed:

No requests for adjournments were filed in this matter.

### Three-Day Cancellation Fees
Fees apply when a hearing on the merits is postponed or settled within three business days before the start of a scheduled hearing session:

No cancellation fees were assessed in this matter.

### Injunctive Relief Fees
Injunctive relief fees are assessed to each member or associated person who files for a temporary injunction in court. Parties in these cases are also assessed arbitrator travel expenses and costs when an arbitrator is required to travel outside his or her hearing location and additional arbitrator honoraria for the hearing for permanent injunction. These fees, except the injunctive relief surcharge, are assessed equally against each party unless otherwise directed by the panel.

No injunctive relief fees were incurred during this proceeding.

FINRA Dispute Resolution
Arbitration No. 06-05183
Award   Page 4

## Forum Fees and Assessments

The Panel has assessed forum fees for each session conducted. A session is any meeting between the parties and the arbitrators, including a pre-hearing conference with the arbitrators, that lasts four (4) hours or less. Fees associated with these proceedings are:

| | | | |
|---|---|---|---|
| Two (2) Pre-hearing sessions with the Panel @ $1,200.00/session | | | = $  2,400.00 |
| Pre-hearing conferences: | April 25, 2007 | 1 session | |
| | June 27, 2007 | 1 session | |
| | | | |
| Eight (8) Hearing sessions with the Panel @ $1,200.00/session | | | = $  9,600.00 |
| Hearing Dates: | August 6, 2007 | 2 sessions | |
| | August 7, 2007 | 2 sessions | |
| | August 8, 2007 | 2 sessions | |
| | August 9, 2007 | 2 sessions | |
| Total Forum Fees | | | = $12,000.00 |

The Panel has assessed $6,000.00 of the forum fees to Claimant.
The Panel has assessed $6,000.00 of the forum fees to Respondent.

## Administrative Costs

Administrative costs are expenses incurred due to a request by a party for special services beyond the normal administrative services. These include, but not limited to, additional copies of arbitrator awards, copies of audio transcripts, retrieval of documents from archives, interpreters, and security.

No administrative costs were incurred during this proceeding.

## Fee Summary

Claimant is solely liable for:

| | |
|---|---|
| Initial Filing Fee | = $     500.00 |
| Forum Fees | = $  6,000.00 |
| Total Fees | = $  6,500.00 |
| Less payments | = $  1,700.00 |
| Balance Due FINRA Dispute Resolution | = $  4,800.00 |

Respondent is solely liable for:

| | |
|---|---|
| Member Fees | = $  8,550.00 |
| Forum Fees | = $  6,000.00 |
| Total Fees | = $ 14,550.00 |
| Less payments | = $  8,550.00 |
| Balance Due FINRA Dispute Resolution | = $  6,000.00 |

All balances are payable to FINRA Dispute Resolution and are due upon receipt pursuant to Rule 10330(g) of the Code.

FINRA Dispute Resolution
Arbitration No. 06-05183
Award   Page 5

## ARBITRATION PANEL

Kevin S. Doty, Esq.                    -        Public Arbitrator, Presiding Chairperson
Allen Robin                            -        Public Arbitrator
Bernard A. Taub                        -        Non-Public Arbitrator

### Concurring Arbitrators' Signatures

_Kevin S. Doty, Esq._
Public Arbitrator, Presiding Chairperson

_13 August 2007_
Signature Date

Allen Robin
Public Arbitrator

Signature Date

Bernard A. Taub
Non-Public Arbitrator

Signature Date

Date of Service (For FINRA Dispute Resolution office use only)

FINRA Dispute Resolution
Arbitration No. 06-05183
<u>Award    Page 5</u>

## <u>ARBITRATION PANEL</u>

Kevin S. Doty, Esq.                    -        *Public Arbitrator, Presiding Chairperson*
Allen Robin                            -        *Public Arbitrator*
Bernard A. Taub                        -        *Non-Public Arbitrator*

### <u>Concurring Arbitrators' Signatures</u>

_____
Kevin S. Doty, Esq.                             _____
Public Arbitrator, Presiding Chairperson        Signature Date


*Allen Robin* (signature)
_____
Allen Robin                                     *August 13, 2007*
Public Arbitrator                               _____
                                                Signature Date


_____
Bernard A. Taub                                 _____
Non-Public Arbitrator                           Signature Date


_____
Date of Service (For FINRA Dispute Resolution office use only)

FINRA Dispute Resolution
Arbitration No. 06-06163
Award   Page 6

# ARBITRATION PANEL

Kevin S. Doty, Esq.           -        Public Arbitrator, Presiding Chairperson
Allen Robin                    -        Public Arbitrator
Bernard A. Taub             -        Non-Public Arbitrator

Concurring Arbitrators' Signatures

_____
Kevin S. Doty, Esq.
Public Arbitrator, Presiding Chairperson

_____
Signature Date

_____
Allen Robin
Public Arbitrator

_____
Signature Date

_____
Bernard A. Taub
Non-Public Arbitrator

_____
Signature Date

_____
Date of Service (For FINRA Dispute Resolution office use only)

# EXHIBIT D

New Account - Overview

# ORIGINAL

Page 1 of 3

4097-8378



**Xpress New Accounts**
P.O. Box 2197 Chicago, IL 60690-2197

Make checks payable to
**optionsXpress**

**IRA Account Overview**

| | |
|---|---|
| Account Entity | traditional ira |
| Account type | cash & option |
| Name | Linda Hale |
| Mailing Address | 3500 GALT OCEAN DRIVE APT 2712 FORT LAUDERDALE, FL 33308 United States |
| Phone (day) | 954-942-6319 |
| E-mail | WISER47@PEOPLEPC.COM |
| Date of Birth | 9/27/1947 |
| Marital Status | divorced |
| Citizenship | citizen |
| SSN# | 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 |
| Passport# | |
| Trade stocks since | 2002 |
| Trade options since | 2002 |
| Liquid net worth | 50k to 100k |
| Net worth | 50k to 100k |
| Annual Income | 25k to 50k |

LEVEL 2

11/14/02

| | |
|---|---|
| Employment Status | employed |
| Employer | EASTSIDE PROPERTIES |
| Occupation | REAL ESTATE AGENT |
| Tax bracket | 16 to 30% |
| Dependants | 0 |
| Username | LINDAHALEIRA |

My investment objectives include: speculation.

I am not employed by a registered broker dealer.

Options Agreement Terms: I represent that I am aware of the inherent risks associated with options trading and that I am financially able to bear such risks and withstand options trading losses. I have read and understood the Terms and Conditions that govern this Options Account and the special risk statement for uncovered option writers, where applicable, and agree to be bound by them as currently in effect and as amended from time to time. I have also fully read and understood the disclosure document entitled Characteristics and Risks of Standardized Options issued by the Options Clearing Corporation and delivered to me by OptionsXpress either electronically or in hard copy. "Agreement to "Terms and Conditions": I (or we) hereby request that optionsXpress, Inc., (optionsXpress) open an account as indicated above, and I acknowledge that I have read and understood both the "Terms & Conditions" agreement that governs this account and all agreements regarding use of data and exchange quotes, and I agree to be bound by these agreements as currently in effect and as amended from time to time and posted on the optionsXpress website. I have legal capacity to enter into and be bound by this legal contract. I agree to promptly advise optionsXpress in writing of any change in my residential, employment, and financial or legal status. I EXPRESSLY ACKNOWLEDGE THAT I AM SOLELY RESPONSIBLE FOR ALL INVESTMENT DECISIONS MADE REGARDING MY ACCOUNT, AND THAT optionsXpress DOES NOT MAKE RECOMMENDATIONS REGARDING INVESTMENTS, TAXES, OR LEGAL MATTERS. I understand that my account is governed by a pre-dispute arbitration clause contained in optionsXpress "Terms and Conditions". Substitute IRS Form w-9: Under penalties of perjury, I certify that: 1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and 2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and 3. I am a U.S. person (including a U.S. resident alien).
I understand the eligibility requirements for the type of IRA deposit I am establishing, and I state that I do qualify to make the deposit. I have received a copy of the Adoption Agreement, Plan Agreement, Financial Disclosure and Disclosure Statement. I understand that the terms and conditions that apply to this Individual Requirement Account are contained in this Adoption Agreement and Plan Agreement. I agree to be bound by these terms and conditions. Within seven days from the date I open this IRA, I may revoke it without penalty by making or delivering a written notice to the Custodian.
I assume complete responsibility for:
1. Determining whether I am eligible to make an IRA contribution each year.
2. Ensuring that all contributions I make are within the limits set forth by the tax laws.
3 The tax consequences of any contribution (including rollover contributions) and distributions.

X  ___Linda Ann Hale___
**CUSTOMER SIGNATURE**

SEC Rule 14B-1(C) Election:  You are instructing Legent Clearing Corp. to disclose your name, address and security position to requesting companies in which you hold securities.  If you consent to disclose your identity to requesting companies for your account please initial below.  For your protection, the Rule prohibits the requesting company in which you hold securities from using the information provided for any purpose other then communicating directly with you.

Money Market Sweep
Authorization: I/We authorize the initial investment of funds between this account and the money market account selected below, if this is left blank, we will default to Government.
[ ] Not Interested
[ ] Primary
[ ] Government
Cust. Initial

Customer Initials  I consent to disclose my identity to requesting companies.

[STK,CC,LPC]



optionsXpress **New Accounts**
P.O. Box 2197 Chicago, IL 60690-2197

4097-8876

Make checks payable to
**optionsXpress**

## Trust Account Overview

| | |
|---|---|
| Account Entity | trust |
| Account type | cash & option |
| Name | Linda Hale |
| Mailing Address | 3900 GALT OCEAN DRIVE APT 2712 FORT LAUDERDALE, FL 33308 United States |
| Phone (day) | 954-942-6319 |
| E-mail | WISER47@PEOPLEPC.COM |
| Date of Birth | 8/27/1947 |
| Marital Status | divorced |
| Citizenship | citizen |
| SSN# /Tax ID# | 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 |
| Passport# | |
| Trade stocks since | 2002 |
| Trade options since | 2002 |
| Liquid net worth | 50k to 100k |
| Net worth | 50k to 100k |
| Annual income | 25k to 50k |

| | |
|---|---|
| Trust name | LINDA ANN HALE REVOCABLE LIVING TRUST |
| Trustee 1 | LINDA ANN HALE |
| Trustee 2 | |

LEVEL 2
11/19/02

| | |
|---|---|
| Employment Status | employed |
| Employer | EASTSIDE PROPERTIES |
| Occupation | REAL ESTATE AGENT |
| Tax bracket | 15 to 30% |
| Dependents | 0 |

| | |
|---|---|
| Username | LINDAHALE |

My investment objectives include: speculation.

I am not employed by a registered broker dealer.

**Options Agreement Terms:** I represent that I am aware of the inherent risks associated with options trading and that I am financially able to bear such risks and withstand options trading losses. I have read and understood the Terms and Conditions that govern this Options Account and the special risk statement for uncovered option writers, where applicable, and agree to be bound by them as currently in effect and as amended from time to time. I have also fully read and understood the disclosure document entitled Characteristics and Risks of Standardized Options issued by the Options Clearing Corporation and delivered to me by OptionsXpress either electronically or in hard copy. "Agreement to "Terms and Conditions": I (or we) hereby request that optionsXpress, Inc., (optionsXpress) open an account as indicated above, and I acknowledge that I have read and understood both the "Terms & Conditions" agreement that governs this account and all agreements regarding use of data and exchange quotes, and I agree to be bound by these agreements as currently in effect and as amended from time to time and posted on the optionsXpress website. I have legal capacity to enter into and be bound by this legal contract. I agree to promptly advise optionsXpress in writing of any change in my residential, employment, and financial or legal status. I EXPRESSLY ACKNOWLEDGE THAT I AM SOLELY RESPONSIBLE FOR ALL INVESTMENT DECISIONS MADE REGARDING MY ACCOUNT, AND THAT optionsXpress DOES NOT MAKE RECOMMENDATIONS REGARDING INVESTMENTS, TAXES, OR LEGAL MATTERS. I understand that my account is governed by a pre-dispute arbitration clause contained in optionsXpress "Terms and Conditions". **Substitute IRS Form w-9:** Under penalties of perjury, I certify that: 1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and 2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and 3. I am a U.S. person (including a U.S. resident alien).

X _Linda Ann Hale_

**TRUSTEE SIGNATURE**                                        **CO-TRUSTEE SIGNATURE (if applicable)**

**SEC Rule 14B-1(C) Election:** You are instructing Legent Clearing Corp. to disclose your name, address and security position to requesting companies in which you hold securities. If you consent to disclose your identity to requesting companies for your account please initial below. For your protection, the Rule prohibits the requesting company in which you hold securities from using the information provided for any purpose other than communicating directly with you.

**Customer Initials** _____    I consent to disclose my identity to requesting companies.

**Money Market Sweep Authorization:** I/We authorize the initial investment of funds between this account and the money market account selected below. If this is left blank, we will default to Government.
[ ] Not Interested
[X] Primary
[ ] Government
        Cust. Initials ____

|STK|CC|LPC|

# EXHIBIT E



**Name:** LINDA ANN HALE REVOCABLE LIVING TRUST

**Account #** 4097-8278-1 ▮▮▮▮▮    9/21/2000

## FEE PAYMENT & LIMITED TRADING AUTHORIZATION

**Trading Authorization:** The undersigned ("Customer" or "I") hereby authorizes the person designated below as Customer's agent and attorney-in-fact ("Agent") with respect to Customer's Account ("Account") at optionsXpress, Inc. ("optionsXpress") to buy, sell (including short sales), exchange, convert, tender, trade or otherwise acquire or dispose of stocks, bonds and any other securities on margin or otherwise for Customer's Account.

This authorization also includes the discretion, power and authority to purchase and/or sell options contracts (exchange traded or over-the-counter, puts, calls, etc.), to open new option positions or close existing positions, to exercise options contracts, to sell options contracts either as a covered or uncovered writer, and to make agreements relating to the same.

Customer hereby agrees to indemnify and hold optionsXpress harmless from, and pay optionsXpress promptly on demand, any and all losses arising there from or debit balance due there on. In all such transactions, optionsXpress is authorized to follow the instructions of Agent in every respect concerning Customer's Account and, except as herein otherwise provided, Agent is authorized to act for Customer in the same manner and with the same force and effect as Customer might or could do with respect to such transactions, as well as with respect to all other things necessary or incidental thereto, except that Agent is not authorized to withdraw any money, securities, or other property either in the name of Customer or otherwise.

Customer hereby ratifies and confirms any and all transactions with optionsXpress heretofore or hereafter made by Agent on behalf of or for Customer's Account. In connection with this authorization of Agent, Customer represents and warrants that Customer is prepared to take short-term profits or losses, in the event of the above described options transactions. Customer understands that, due to the short-term nature of options, Agent may trade options to a greater degree than stocks and/or bonds and that Customer will be charged a commission each time a trade is effected. Customer further understands that option trading has a number of inherent risks connected there with and Customer is fully prepared financially to undertake such risks. Customer further understands that Agent may buy and sell securities for Agent's own account and/or act as agent for other persons in such transactions. Customer understands that the same security will not always be bought or sold for the same price for each account.

OptionsXpress is directed to follow the instructions of Agent, who shall be solely responsible for suitability of investments, timing of purchases and sales and all related matters. Customer agrees that the authorization and indemnity herein are in addition to (and in no way limit or restrict) any rights which optionsXpress may have under any other agreements between optionsXpress and Customer.

**Authorization to Pay Fees by Debit:** If I have indicated below that I wish optionsXpress, its agents or assigns to pay management fees directly to Advisor, I authorize optionsXpress to pay Advisor's management fees from my account, no more than monthly, to the extent that cash is available in the account, as invoiced by Advisor. optionsXpress, its agents or assigns, may rely on the invoices submitted by Advisor, and optionsXpress will have no responsibility to calculate or verify fees so invoiced as I have the responsibility.

**Role of optionsXpress and its clearing agent:** - I acknowledge and agree that:

> optionsXpress and/or its clearing agent will merely effect transactions as directed by Advisor;
> optionsXpress and/or its clearing agent will not give investment advice to me or to Advisor;
> I am responsible for investigating and selecting Advisor (and not optionsXpress or its clearing agent);

> Advisor is not affiliated with, controlled, or employed by optionsXpress or its clearing agent and neither optionsXpress nor its clearing agent have approved, recommended, or endorsed Advisor;

> optionsXpress and/or its clearing agent have no duty to supervise or monitor trading by Advisor in my Account. I am responsible for reviewing and monitoring trading in my account.

optionsXpress may send me written or electronic confirmations of my trades executed through optionsXpress, Inc. and written or electronic statements of all activity in my account. Statements will be sent monthly if my account is active and quarterly if my account is inactive. If Advisor or any of Advisor's employees is associated with a member of the National Association of Securities Dealers, Inc. NYSE or affiliates, optionsXpress is authorized to deliver information concerning my account, including duplicate confirmations and account statements, to such member upon written request.

**Termination of Authority:** Customer further agrees that this authorization and indemnity shall remain in full force and effect until a written notice of revocation is received by optionsXpress at its main office in Chicago, Illinois, but such revocation shall not affect any liability in any way resulting from transactions initiated prior to such revocation.

**Indemnification:** I agree to indemnify and hold harmless optionsXpress and its clearing agent, their successors or affiliates, and their directors, officers, employees, and agents from and against all claims, actions, costs, and liabilities, including attorney's fees, arising out of or relating to:

> their reliance on this Fee Payment and Limited Trading Authorization

> their executions of Advisor's instructions.

*Nothing herein shall confer any rights to Advisor against optionsXpress or its clearing agent*

**Additional Terms:** This Agreement shall not be in effect until accepted by optionsXpress in Chicago, Illinois; shall be deemed to be made in Chicago, Illinois; shall be governed by the laws of the State of Illinois; and shall be binding upon Customer's heirs, successors, assigns, executors, administrators and conservators and shall inure to the benefit of optionsXpress successors, by merger, consolidation, name change or otherwise, and assigns, and optionsXpress may transfer Customer's Account to any such successors and assigns.

Initial as appropriate

X ___ I authorize optionsXpress to deduct my advisors fees from my account as directed by my Advisor.

X ___ I authorize optionsXpress to send duplicated confirmations and account statements to my Advisor.

| Advisor | | Account Holder | |
|---|---|---|---|
| Name | _TIM WISE_ | Holder Signature | X _____ |
| Signature | _Tim Wise_ | Co-holder Signature | _____ |
| Date | 11/14/2002 | Date | 11/14/2002 |



**Name:** L I N D A  A.  H A L E

**Account #** 4097-8278

## FEE PAYMENT & LIMITED TRADING AUTHORIZATION

**Trading Authorization:** The undersigned ("Customer" or "I") hereby authorizes the person designated below as Customer's agent and attorney-in-fact ("Agent") with respect to Customer's Account ("Account") at optionsXpress, Inc. ("optionsXpress") to buy, sell (including short sales), exchange, convert, tender, trade or otherwise acquire or dispose of stocks, bonds and any other securities on margin or otherwise for Customer's Account.

This authorization also includes the discretion, power and authority to purchase and/or sell options contracts (exchange traded or over-the-counter, puts, calls, etc.), to open new option positions or close existing positions, to exercise options contracts, to sell options contracts either as a covered or uncovered writer, and to make agreements relating to the same.

Customer hereby agrees to indemnify and hold optionsXpress harmless from, and pay optionsXpress promptly on demand, any and all losses arising there from or debit balance due there on. In all such transactions, optionsXpress is authorized to follow the instructions of Agent in every respect concerning Customer's Account and, except as herein otherwise provided, Agent is authorized to act for Customer in the same manner and with the same force and effect as Customer might or could do with respect to such transactions, as well as with respect to all other things necessary or incidental thereto, **except that Agent is not authorized to withdraw any money, securities, or other property either in the name of Customer or otherwise.**

Customer hereby ratifies and confirms any and all transactions with optionsXpress heretofore or hereafter made by Agent on behalf of or for Customer's Account. In connection with this authorization of Agent, Customer represents and warrants that Customer is prepared to take short-term profits or losses, in the event of the above described options transactions. Customer understands that, due to the short-term nature of options, Agent may trade options to a greater degree than stocks and/or bonds and that Customer will be charged a commission each time a trade is effected. Customer further understands that option trading has a number of inherent risks connected there with and Customer is fully prepared financially to undertake such risks. Customer further understands that Agent may buy and sell securities for Agent's own account and/or act as agent for other persons in such transactions. Customer understands that the same security will not always be bought or sold for the same price for each account.

OptionsXpress is directed to follow the instructions of Agent, who shall be solely responsible for suitability of investments, timing of purchases and sales and all related matters. Customer agrees that the authorization and indemnity herein are in addition to (and in no way limit or restrict) any rights which optionsXpress may have under any other agreements between optionsXpress and Customer.

**Authorization to Pay Fees by Debit:** If I have indicated below that I wish optionsXpress, its agents or assigns to pay management fees directly to Advisor, I authorize optionsXpress to pay Advisor's management fees from my account, no more than monthly, to the extent that cash is available in the account, as invoiced by Advisor. optionsXpress, its agents or assigns, may rely on the invoices submitted by Advisor, and optionsXpress will have no responsibility to calculate or verify fees so invoiced as I have the responsibility.

**Role of optionsXpress and its clearing agent:** - I acknowledge and agree that:

  ➤ optionsXpress and/or its clearing agent will merely effect transactions as directed by Advisor;
  ➤ optionsXpress and/or its clearing agent will not give investment advice to me or to Advisor;
  ➤ I am responsible for investigating and selecting Advisor (and not optionsXpress or its clearing agent);

11/30/07

> Advisor is not affiliated with, controlled, or employed by optionsXpress or its clearing agent and neither optionsXpress nor its clearing agent have approved, recommended, or endorsed Advisor;
> optionsXpress and/or its clearing agent have no duty to supervise or monitor trading by Advisor in my Account. I am responsible for reviewing and monitoring trading in my account.

optionsXpress may send me written or electronic confirmations of my trades executed through optionsXpress, Inc. and written or electronic statements of all activity in my account. Statements will be sent monthly if my account is active and quarterly if my account is inactive. If Advisor or any of Advisor's employees is associated with a member of the National Association of Securities Dealers, Inc. NYSE or affiliates, optionsXpress is authorized to deliver information concerning my account, including duplicate confirmations and account statements, to such member upon written request.

**Termination of Authority:** Customer further agrees that this authorization and indemnity shall remain in full force and effect until a written notice of revocation is received by optionsXpress at its main office in Chicago, Illinois, but such revocation shall not affect any liability in any way resulting from transactions initiated prior to such revocation.

**Indemnification:** I agree to indemnify and hold harmless optionsXpress and its clearing agent, their successors or affiliates, and their directors, officers, employees, and agents from and against all claims, actions, costs, and liabilities, including attorney's fees, arising out of or relating to:

> their reliance on this Fee Payment and Limited Trading Authorization

> their executions of Advisor's instructions.

*Nothing herein shall confer any rights to Advisor against* optionsXpress or its clearing agent.

**Additional Terms:** This Agreement shall not be in effect until accepted by optionsXpress in Chicago, Illinois; shall be deemed to be made in Chicago, Illinois; shall be governed by the laws of the State of Illinois; and shall be binding upon Customer's heirs, successors, assigns, executors, administrators and conservators and shall inure to the benefit of optionsXpress successors, by merger, consolidation, name change or otherwise, and assigns, and optionsXpress may transfer Customer's Account to any such successors and assigns.

initial as appropriate

X _____ I authorize optionsXpress to deduct my advisors fees from my account as directed by my Advisor.

X _____ I authorize optionsXpress to send duplicated confirmations and account statements to my Advisor.

| **Advisor** | | **Account Holder** | |
|---|---|---|---|
| Name | TIM WISE | Holder Signature | X _Linda Ann Vale_ |
| Signature | _Tim Wise_ | Co-holder Signature | |
| Date | 11/15/2002 | Date | 11/15/2002 |