CASE NO. _O8CV0179_____

ATTACHMENT NO. _____

EXHIBIT _Exhibit F_____

TAB (DESCRIPTION) _____

# EXHIBIT F

**IN ARBITRATION BEFORE**
**THE NATIONAL ASSOCIATION OF SECURITIES DEALERS**

| | | |
|---|---|---|
| LINDA HALE | ) | |
| Claimant, | ) | |
| | ) | |
| v. | ) | 06-05183 |
| | ) | |
| OPTIONSXPRESS, INC. | ) | |
| Respondent. | ) | |

## OPTIONSXPRESS' BRIEF IN SUPPORT OF ITS MOTION TO DISMISS CLAIMANT'S STATEMENT OF CLAIM

optionsXpress, Inc. ("optionsXpress") denies that it is obligated to Claimant in any amount or under any theory, whether expressly pled or not. There is no legal basis whatsoever for Claimant's Statement of Claim ("Claim"), and accordingly, her Claim should be dismissed. In support of its Motion to Dismiss, optionsXpress states as follows:

Claimant's Claim misses three critical ingredients to survive a motion to dismiss: (1) Claimant does not have a legal theory under which optionsXpress had a duty to provide to her the services she alleges optionsXpress did not provide to her; (2) Claimant does not allege a recommendation was made to her by optionsXpress to buy or sell a particular security that was not suitable; and (3) Claimant does not provide a theory by which she can bring a private cause of action.

In a nondiscretionary account, a broker-dealer is entrusted only with completing the security transactions ordered by the customer. Claimant asserts that optionsXpress should have provided her with services that are not provided in a nondiscretionary, much less, self-directed online account. As a self-directed investor at an online self-directed firm, Claimant was responsible for making all trading decisions based on whatever information she thought she needed. In fact, Claimant assumed the contractual obligation to do so by entering into the User Agreement (**Exhibit 8**) and Limited Trading Authorization (**Exhibit 4**). See optionsXpress' Motion to Dismiss, Answer, and Affirmative Defenses ("optionsXpress' Motion to Dismiss") at 3.

Claimant alleges that regardless of the orders she placed, optionsXpress should not have permitted her to place certain options strategies in her self-directed accounts. However, optionsXpress had no such legal duty to act as warden for Claimant's self-directed nondiscretionary account. To state a claim for suitability, Claimant must plead that the broker made a recommendation. Claimant cannot and did not so plead.

Finally, there is no private cause of action for violation of self regulatory organization rules.

Accordingly, Claimant's Claim must be dismissed because: (1) she can plead no set of facts entitling her to relief, and (2) her Claim fails to state a claim as a matter of law.

## STANDARD

In ruling on a motion to dismiss, the Panel need not accept as true "unsupported conclusions of fact." First Inc. Funding Corp. v. Federal Ins. Co., 284 F.3d 799, 804 (7th Cir. 2002) (dismissing complaint). The Panel may grant a motion to dismiss when it appears that plaintiff cannot prove any set of facts entitling her to relief. Id. "The requirement to draw reasonable inferences is not an invitation to irrational, plaintiff-friendly speculation." Lazard Debt Recovery GP v. Weinstock, 864 A.2d 955, 964 (Del. Ch. 2004). Claimant can prove no set of facts entitling her to relief, even when such facts are liberally construed in her favor, and accordingly, the Panel may and should grant optionsXpress' Motion to Dismiss.

**ARGUMENT**

I. **AS A MATTER OF LAW, OPTIONSXPRESS OWES NO DUTY TO PROHIBIT CLAIMANT FROM TRADING IN HER ONLINE SELF-DIRECTED NONDISCRETIONARY TRADING ACCOUNT.**

To withstand a motion to dismiss, Claimant's Claim must allege the existence of a legal duty or standard of care owed to her by optionsXpress, breach of that duty, and a causal relationship between the breach of duty and certain actual injury or loss sustained by the plaintiff. Hills v. Bridgeview Little League Ass'n, 195 Ill. 2d 210, 228 (2000). Without a legal duty owed, a negligence claim fails. Eisenberg v. Wachovia Bank, N.A., 301 F.3d 220, 224 (4th Cir. 2002). For a legal duty to be established, a party must owe another a duty of care. Id. Whether a duty of care exists is a question of law. Bajwa v. Metropolitan Life Insurance Co., 208 Ill. 2d 414, 422 (2004).

Courts have continuously refused to impose a duty on broker-dealers to supervise and monitor the investment orders of their self-directed customers. Chee v. Marine Midland Bank, N.A., 1991 WL 15301 *4 (E.D.N.Y. 1991) (noting an "even greater reason to reject monitoring in the case of discount brokers whose admitted function is not to give advice so investors can save money on commissions"); see also Armstrong v. McAlpin, 699 F.2d 79, 91 (2d Cir.1983); see also Cumis Ins. Soc'y, Inc. v. E.F. Hutton & Co., 457 F.Supp. 1380, 1386-87 (S.D.N.Y.1978) (rejecting a similar claim).

In fact, courts have dismissed claims not anchored to an established legal duty. Drage, v. First Concord Secs., Inc., 707 N.Y.S.2d 782, 787 (Sup. Ct. 2000) (plaintiffs did not allege facts sufficient to show any duty of care); Rosengard v. McDonald, 562 N.E.2d 583, 586-87 (Ill. App. 1990) (no duty of care owed by broker-dealer to purchaser); Press v. Chemical Investment Servs. Corp., 166 F.3d 529, 536 (2d Cir. 1999) (duty is limited to the affairs entrusted to the broker – execution of the customer's order, and that duty terminates once the order is executed).

It is settled law that broker owes its nondiscretionary client only limited duties. Id.; See also Independent Order of Foresters v. Donald, Lufkin, & Jenrette, Inc., 157 F.3d 933, 940-41 (2d Cir. 1998). Those duties are:

    1) to execute all trades requested by the customer Id.; and
    2) to obtain authorization for all purchases and sales, Conway v. Icahn & Co., 16 F.3d 504, 510 (2d Cir. 1994); and
    3) to execute those orders within a reasonable time. Robinson v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 337 F. Supp. 107, 111 (N.D. Ala. 1971), aff'd, 453 F.2d 417 (5th Cir. 1972).

optionsXpress has no legal or contractual duty to act as warden for Claimant's online, nondiscretionary, self-directed account, and did not undertake to do so. In fact, the User Agreement places the responsibility on Claimant to determine whether the trades she placed in her account were suitable for her. optionsXpress' Motion to Dismiss at 3.

The law governing the duties of a broker to its nondiscretionary account holders has been clear since the early 1900s:

- A broker's duty is to buy for the customer the stocks the customer indicates, hold, and close those positions upon notification by the customer. When the transaction is complete, the broker's undertaking is complete. The risk is borne by the customer who profits from the success of the trade or loses when it fails. Richardson v. Shaw, 209 U.S. 365 (1908); see also Restatement of Agency, 2d § 108.
- "[W]here the customer maintains a nondiscretionary account, the broker's duties are quite limited [to execution and related matters]." Independent Order of Foresters, 157 F.3d at 940-41.
- A broker assumes no obligations over a nondiscretionary account beyond the duty to faithfully execute transactions ordered by the customer. Caravan Mobile Home Sales, Inc. v. Lehman Bros. Kuhn Loeb, Inc., 769 F.2d 561, 567 (9th Cir. 1985).

- A "broker-dealer operating a nondiscretionary account has no duty to determine the suitability of a customer's trades or to prevent the customer from losing money." Tatum v. Legg Mason Wood Walker, Inc., 83 F.3d 121, 123 (5th Cir. 1996).
- A discount broker owes no duty except that it may not misrepresent facts. First Union Discount Brokerage Services, Inc. v. Milos, 717 F.Supp. 1519 (S.D. Fla. 1989), aff'd 997 F.2d 835 (11th Cir.).
- Where a customer maintains a nondiscretionary account, the firm's only duty is not to execute unauthorized transactions. See Leboce, S.A. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 709 F.2d 605, 607 (9th Cir. 1983).
- In a nondiscretionary account, the broker's duty is "only to fulfill the mechanical, ministerial requirements of the purchase or sale of the security or future contracts on the market." Robinson, 337 F.Supp. at 111 (quoting Walston & Co. v. Miller, 410 P.2d 658, 661 (1966)).
- A broker's duty in relation to a nondiscretionary account is complete, and his authority ends, when the purchase or sale has been made and accounted for. Robinson, 337 F.Supp. at 111; see also Leib v. Merrill Lynch, Pierce, Fenner & Smith, 461 F.Supp. 951, 953 (E.D.Mich.1978).

Claimant does not, and cannot allege that optionsXpress failed to provide her with the execution and account-information services it was duty-bound to provide. Claimant, however, seems to desire that optionsXpress disregard that duty to follow her instructions, and instead she seems to require that the firm prevent her from executing the trades she ordered. Certainly, optionsXpress had no duty to prevent this Claimant from trading the options that she transferred from her former broker to optionsXpress and continued trading – for four years.

Claimant seems to allege optionsXpress had a further duty to prevent her from proceeding with the trading decisions she made in her self-directed account because all of her own decisions were unsuitable for her. The law does not impose such a duty on self-directed nondiscretionary accounts of member firms. To so permit would result in a windfall to Claimant. Because optionsXpress owed no duty, this Claim must be dismissed.

II.   **BECAUSE OPTIONSXPRESS MAKES NO RECOMMENDATIONS, CLAIMANT'S SUITABILITY CLAIM SHOULD BE DISMISSED.**

optionsXpress makes no recommendations, and Claimant agreed in her User Agreement. optionsXpress' Motion to Dismiss at 3. Explicitly, and throughout its website, optionsXpress' informs both visitor and customers accessing their accounts and placing orders, that optionsXpress:
- "makes no investment recommendations. . ."
- does not recommend buying or selling any particular security

Without a recommendation, Claimant's Claim for unsuitable investments fails.

It is well settled that a firm does not undertake suitability obligations to a customer where it simply executes orders. Courts have generally declined to hold broker-dealers accountable for the suitability of an unsolicited order from a customer. Suitability obligations exist only when a broker-dealer makes a recommendation to a customer. Where no recommendations are made, a claim for unsuitability fails as a matter of law.

A suitability determination is required only when there is a recommendation. Parsons v. Hornblower & Weeks-Hemphill, Noyes, 447 F Supp 482 (1977, M.D.N.C.), aff'd 571 F2d 203 (4th Cir. 1978). A broker simply effecting a trade initiated by a customer, without a related "recommendation", is not required to perform a suitability analysis. In re Thomas E. Warren, III, 51 S.E.C. 1015, 1019 n. 19, 1994 SEC LEXIS 508 (1994) (holding that suitability claims were not supported because the record does not contain any evidence that Warren "recommended the transactions that were effected in these accounts"), aff'd, 69 F.3d 549 (10th Cir. 1995) (table format); see also Altschul v. PaineWebber, Jackson & Curtis, 518 F. Supp. 591, 594 (S.D.N.Y. 1981) (granting defendant's motion for summary judgment on churning and suitability claims based on plaintiff's failure to object to the trading in the account in light of forty years of

3

securities investment experience, review of confirmations and monthly statements, and awareness of the broker's actions and the amount of commissions generated).

Moreover, a customer's prior intent to engage in particular investment strategy precludes broker liability for executing trades in furtherance of that strategy. Keirnan v Homeland, Inc., 611 F2d 785 (9th Cir. 1980).

Claimant fails to plead that optionsXpress made any recommendations because she cannot. Therefore, her allegation that the option orders she placed were unsuitable for her, and optionsXpress is therefore liable, has no merit. As a matter of law, no liability may attach to optionsXpress. This Claim should be dismissed.

### III.    BECAUSE NO PRIVATE CAUSE OF ACTION LIES FOR ALLEGED SELF REGULATORY ORGANIZATION ("SRO") RULE VIOLATIONS, THIS CLAIM SHOULD BE DISMISSED.

Claimant's allegations of SRO rule violations should be dismissed as a matter of law. Claimant appears to rely on self regulatory organization suitability rules in stating her claim. A breadth of case law states that violations of SRO rules, including the NASD "suitability" rule, do not give rise to a private cause of action. Claimant's claims for violations of industry rules should be dismissed as a matter of law.

A private right of action may be implied only where Congress intends to create such a cause of action. The United States Supreme Court decided two cases that have been interpreted as precluding the implication of a private cause of action for violation of exchange and NASD rules. Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 15 (1979); Touche Ross & Co. v. Redington, 442 U.S. 560, 575-76 (1979). The Court in Touche Ross determined Congress' intent by examining the language of the statute, the legislative history of the statute, and the overall statutory scheme. Touche Ross, at 568-73.

The statutory scheme contemplates self-regulation and enforcement of the rules by exchanges and associations, suggesting that Congress intended such self-regulation to be the only means of enforcement. See Juster v. Rothschild, Unterberg, Towbin, 554 F.Supp. 331, 333 (S.D.N.Y.1983). The NASD rules at issue in Claimant's Claim are not directly enacted by Congress but are adopted by the NASD acting on the authority of Congress – and not designed solely for the direct protection of investors. Shahmirzadi v. Smith Barney, Harris Upham & Co., Inc., 636 F.Supp 49 (D.D.C. 1985) (Congress did not intend to delegate the authority to create private causes of action to NASD). Under the clear weight of authority, there is no private cause of action for alleged violations of NASD's suitability rule. Thompson v. Smith Barney, Harris Upham & Co., 709 F.2d 1413, 1419 (11th Cir. 1983) (no private right of action for violation of the NASD "suitability" rule); Jablon v. Dean Witter & Co., 614 F.2d 677, 679-81 (9th Cir. 1980); Shull v. Dain, Lakman & Quail, Inc., 561 F.2d 152, 159 (8th Cir.1977); Kaufman v. Magid, 539 F.Supp. 1088, 1098-99 (D. Mass. 1982) (no private right of action under certain rules of the Chicago Board of Options Exchange); Hayden v. Walston & Co., 528 F.2d 901 (9th Cir. 1975); Finne v. Dain Bosworth, Inc., 648 F. Supp. 337, 342 (D. Minn. 1986); Cummings v. A.G. Edwards & Co., 637 F. Supp. 132, 134 (M.D. La. 1986); Carroll v. Bear, Stearns & Co., 416 F.Supp. 998 (S.D.N.Y. 1976); Thompson v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 401 F.Supp. 111 (W.D.OK 1975); Piper, Jaffray & Hopwood, Inc. v. Ladin, 399 F.Supp. 292 (S.D. Iowa 1975); Wells v. Blythe & Co., Inc., 351 F.Supp. 999 (N.D.CA. 1972); Mercury Investment Co. v. A. G. Edwards & Sons, 295 F.Supp. 1160 (S.D.TX 1969). Lefkowitz v. Smith Barney, Harris Upham & Co., Inc., 804 F.2d 154 (1st Cir. 1986).

There is no reason to depart from this well settled precedent. This Claim should be dismissed as a matter of law.

### CONCLUSION

Claimant executed a User Agreement that expressly provides that optionsXpress undertakes no obligation to provide advice and vests Claimant with responsibility for her trading decisions including determining whether the trades she placed were suitable for her. She should not now be able to claim that optionsXpress should have provided her with the very services she chose not to receive. Moreover,

optionsXpress does not, and its website explicitly states that it does not, make recommendations. Without pleading the essential element of a "recommendation", a suitability claim fails as a matter of law. To find that Claimant states a Claim as a matter of law, or to hold optionsXpress liable is to impose new common law obligations that are inconsistent with the volume of existing federal and state regulations and rules promulgated by the SEC, NASD and stock exchanges.

For the foregoing reasons, optionsXpress respectfully requests that the Panel:

a)    Deny all relief requested by Claimant in her Claim;
b)    Dismiss the Claim in its entirety, with prejudice;
c)    Award optionsXpress fees, costs, and reasonable attorney's fees in connection with defending this Claim; and
d)    Grant such other, further and different relief as the Panel deems just and proper.

Respectfully Submitted:
optionsXpress, Inc.

By: _____

Hillary Victor
Corporate Counsel
optionsXpress Holdings, Inc.
39 S. LaSalle Street, Suite 220
Chicago, IL 60603
Tel: (312)267-6627
Fax: (312)220-7069
hvictor@optionsxpress.com

5

# EXHIBIT G

**IN ARBITRATION BEFORE**
**THE NATIONAL ASSOCIATION OF SECURITIES DEALERS**

| | | |
|---|---|---|
| LINDA HALE | ) | |
| Claimant, | ) | |
| | ) | |
| v. | ) | 06-05183 |
| | ) | |
| OPTIONSXPRESS, INC. | ) | |
| Respondent. | ) | |

## OPTIONSXPRESS' REPLY BRIEF IN RESPONSE TO CLAIMANT'S RESPONSE TO ITS MOTION TO DISMISS AND RESPONSE TO CLAIMANT'S MOTION FOR SUMMARY JUDGMENT

Respondent optionsXpress, Inc. ("optionsXpress") respectfully submits this reply in support of its Motion to Dismiss Claimant's Statement of Claim ("Claim") and in response to Claimant's Motion for Summary Judgment on the issue of Liability ("Claimant's Motion"). In fact, Claimant's Brief in Response to optionsXpress Motion to Dismiss ("Response") is devoid of any law addressing or contradicting the controlling law set forth in optionsXpress' Brief in Support of its Motion to Dismiss ("optionsXpress' Brief"). Claimant's efforts to reiterate her view of the facts does not plead the elements necessary to save her Claim, which clearly fails as a matter of law. Claimant's attempt to craft its Response as a motion for summary judgment fails for the same reasons – the Claim fails to plead the elements essential to state a cause of action. Without pleading the elements necessary to state a claim, Claimant's Motion must fail.

## PRELIMINARY STATEMENT

The Panel may grant a motion to dismiss when it appears that Claimant cannot prove any set of facts entitling her to relief. First Inc. Funding Corp. v. Federal Ins. Co., 2002 WL 467111 at *3 (7th Cir. Mar. 28, 2002) (dismissing complaint). In order to withstand a motion to dismiss, a complaint must allege facts sufficiently setting forth the essential elements of the cause of action. Lucien v. Preiner, 967 F.2d 1166, 1168 (7th Cir.), cert. denied, 506 U.S. 893, 113 S.Ct. 267 (1992).

## ARGUMENT

Claimant's crafting of purported facts fails to overcome the fatal deficiencies underlying her claim. optionsXpress will not belabor the Panel by reiterating the case law cited and arguments set forth in optionsXpress' Brief, which Claimant's Response fails to address.

Instead, optionsXpress asks the Panel to grant optionsXpress' Motion to Dismiss, deny Claimant's Motion, and exercise its authority to dismiss Claimant's Statement of Claim as a matter of law. Sheldon v. Vermonty, 269 F.3d 1202 (10th Cir. 2001) and Warren v. Tacher, 114 F. Supp.2d 600 (W.D. Ky 2000).

In summary, as a matter of law, as cited in optionsXpress' Brief, Claimant's Claim misses three critical ingredients to survive a motion to dismiss and precludes her from summary judgment on a claim that should not survive:

I. Claimant's negligence theory fails because, as a matter of law, no duty is owed to this claimant to provide to her the services she alleges optionsXpress did not provide to her.

II. Claimant's suitability claim fails since Claimant does not, and cannot, allege that optionsXpress made a recommendation to her to buy or sell a particular security.

III. Claimant does not provide a theory by which she can bring a private cause of action for an alleged rule violation.

There is no reason to depart from the well-settled precedent on point. This Claim should be dismissed as a matter of law and Claimant's Motion on the issue of liability should be denied as without merit.



I.   **Claimant's recitation of purported "facts" does not cure her failure to plead the necessary elements for her claim to survive.**

Claimant chose to trade options in her account. Claimant was approved for stock, bond, mutual fund, and certain option trading strategies. optionsXpress did not ask Claimant to trade at optionsXpress, did not solicit Claimant to trade options, and did not prevent her from trading stocks, bonds or mutual funds. Claimant's attempt to blame optionsXpress for her choice does not cure her (1)failure to plead a duty as a matter of law; (2) failure to plead a recommendation to buy or sell a particular security; or (3) inability to bring an action for an alleged SRO rule violation for which no private right of action exists. Claimant utterly fails to plead, and cannot plead, the elements necessary to state a cause of action. Accordingly, Claimant's Claim should be dismissed as a matter of law and Claimant's Motion should be denied.

Claimant attempts to blame optionsXpress, which we assume is because she failed to read the OCC document she now relies upon in her Response. The OCC document focuses on an investor's responsibility and provides a disclosure of risk to that investor. Somehow, Claimant misconstrues the document as a document conveying rights upon her – a purpose for which it was not intended. Claimant fails to inform the Panel that upon opening her account, she represented to optionsXpress that she "received, read and underst[ood] "Characteristics and Risks of Standardized Options" delivered by optionsXpress as issued by the Options Clearing Corporation ("OCC")." *See* User Agreement at Appendix B. Claimant was also provided access to this "ultimate authority" of the risks associated with standardized options in a "succinctly stated" format on the home page of optionsXpress' website where a link is prominently placed for ease of customer access at all times. *See* Response at 1 and 2. Claimant's attempt to manufacture a duty, premised on the disclosure document to investors explaining an investor's responsibility fails as a matter of law. Claimant's failure to read or understand the OCC document, in light of her representation to the contrary, does not convey a right upon Claimant nor does it plead the elements essential to her Claim. Certainly, Claimant's Motion should be denied since she cannot plead a duty as a matter of law, and optionsXpress' Motion to Dismiss should be granted.

II.   **Claimant's Response and Motion evidences her continuing attempt to blame someone else for her choices.**

Claimant attempts to blame optionsXpress for her failure to exercise the responsibility for her trading decisions, including determining whether the trades she placed were suitable for her. *See* User Agreement and optionsXpress' Brief at 4. Claimant's attempt to rely on optionsXpress' informational FAQ's regarding assignment of an initial trading level should be disregarded because a recommendation to buy or sell a particular security is required to state a claim for suitability. Reliance on informational FAQ's relating to assignment of an initial trading level does not relate to, nor allege, a recommendation by optionsXpress to buy or sell a particular security. optionsXpress undertakes no obligation to provide advice and vests Claimant with responsibility for her trading decisions including determining whether the trades she placed were suitable for her. *See* User Agreement and optionsXpress' Brief. Claimant's Motion should be denied and optionsXpress' Motion to Dismiss granted accordingly.

Claimant's attempt to blame optionsXpress for her choice to direct optionsXpress to "pay management fees directly" to Mr. Wise "from [her] account" without any "responsibility to calculate or verify fees", as set forth in the Limited Trading Authorization ("LTA"), is ludicrous. Claimant paid fees to Mr. Wise, and optionsXpress simply honored Claimant's direction to it. Had optionsXpress failed to honor Claimant's direction, Claimant may have a claim, but that is not the case. Mr. Wise is not an employee, agent, or independent contractor of optionsXpress. Claimant found Wise on her own initiative and enjoyed a personal relationship with Mr. Wise extending beyond her account at optionsXpress. In fact, the personal relationship between Claimant and Mr. Wise is continuing as this Reply Brief is written.

optionsXpress feels badly that Ms. Hale's income has suffered due to the failing real estate market, but optionsXpress, on information and belief, a "deep-pocket", should not be her ticket to income due to choices she made and now regrets. In light of the LTA, her written direction to optionsXpress, and her continuing personal relationship with Mr. Wise, Claimant's assertion that optionsXpress allowed Wise to "steal" from her is wholly unfounded, shocking and outright appalling. Perhaps, Claimant should read the

2

plain language of the LTA she provided to optionsXpress and directed that it follow.

Mr. Wise was Claimant's agent and Claimant paid Mr. Wise – optionsXpress simply honored Claimant's direction. Even these facts do not (1) plead a duty under the law; (2) plead a recommendation to buy or sell a particular security; or (3) create a private right of action for an alleged violation of an SRO rule where no such right exists. Therefore, Claimant's Motion should be denied and optionsXpress' Motion to Dismiss Claimant's Claim as a matter of law should be granted.

## CONCLUSION

Claimant fails to, and cannot, plead any duty under the law. Moreover, optionsXpress does not make recommendations, and without pleading the essential element of a "recommendation", a suitability claim fails as a matter of law. Finally, to impose liability on optionsXpress where no private right of action exists imposes new common law obligations that are inconsistent with existing federal and state regulations and rules promulgated by the SEC, NASD and stock exchanges. Without pleading the underlying elements necessary to state a claim, Claimant's Motion cannot be granted, and optionsXpress' Motion to Dismiss should be granted.

For the foregoing reasons, optionsXpress respectfully requests that the Panel:

a) Deny all relief requested by Claimant in her Claim;
b) Deny Claimant's Motion for Summary Judgment;
c) Grant optionsXpress' Motion to Dismiss as a matter of law;
d) Dismiss the Claim in its entirety, with prejudice;
e) Award optionsXpress fees, costs, and reasonable attorney's fees in connection with defending this Claim; and
f) Grant such other, further and different relief as the Panel deems just and proper.

Respectfully Submitted:
optionsXpress, Inc.

By: _____

Hillary Victor
Corporate Counsel
optionsXpress Holdings, Inc.
39 S. LaSalle Street, Suite 220
Chicago, IL 60603
Tel: (312)287-6627
Fax: (312)220-7069
hvictor@optionsxpress.com

3

# EXHIBIT H

LEXSEE 1991 U.S. DIST. LEXIS 1151

SHWE MING CHEE, M.D., individually and as trustee of SHWE MING CHEE
PHYSICIAN P.C. EMPLOYEES' PENSION TRUST, Plaintiffs, v. MARINE
MIDLAND BANK, N.A., OVEST BROKERAGE SERVICE, DIVISION OF
MARINE MIDLAND SECURITIES, INC., OVEST FINANCIAL SERVICES, INC.,
OVEST SECURITIES, INC., Defendants

No. 88 Civ. 0557 Consolidated with Nos. 88 Civ. 0673, 88 Civ. 0813, 88 Civ. 1808, 88
Civ. 1867, 88 Civ. 2145

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW
YORK

*1991 U.S. Dist. LEXIS 1151; Fed. Sec. L. Rep. (CCH) P95,806*

**January 29, 1991, Decided**
**January 29, 1991, Filed**

**JUDGES:** [*1] Jack B. Weinstein, United States District Judge.

**OPINION BY:** WEINSTEIN

**OPINION**

Memorandum and Order

These consolidated cases are before the court on defendants' motion for summary judgment. For the reasons stated, the motion for summary judgment must be granted.

The plaintiffs are five physicians and a pension trust. They lost money during the October 1987 stock market crash by engaging in high risk options trading at the direction of their independent investment adviser, Dr. George S. Lin. Dr. Lin is without assets.

Plaintiffs' claims resemble those of many other disappointed investors who experienced significant gains during the 1980s only to have those gains wiped out in the 1987 crash. They have sued the only solvent defendants available to them, OvestMarine Brokerage Service ("OvestMarine"), a division of Marine Midland Securities, Inc. ("Marine Securities"), the discount brokerage service at which the options accounts were maintained, and Marine Midland Bank, N.A. ("Marine Midland"), its

corporate parent, (collectively "Marine")

The complaints allege violations of all relevant federal securities statutes, the Employee Retirement Income Security Act ("ERISA"), *29 U.S.C. §§ 1001 et seq.*, the Racketeer [*2] Influenced and Corrupt Organizations Act ("RICO"), *18 U.S.C. 1961 et seq.* and various state laws. Plaintiffs maintain that they were not aware of the risks of options trading, that their accounts were traded excessively, that trading options were unsuitable for investors in their situation, and that their pension trust agreements prohibited the trading of options.

The assets of OvestMarine's predecessor, Ovest Financial Services, were purchased by Marine Securities on March 3, 1987. Marine did not assume any liabilities upon purchase. An order granting partial summary judgment was entered on December 22, 1988 for all acts occurring prior to March 3, 1987. Ovest Financial Services and Ovest Securities have not been served nor have they appeared.

Each of the plaintiffs executed Trading Authorization forms which provided Dr. Lin with full trading authority, including the authority to trade on margin. The Trading Authorizations provided in pertinent part that plaintiffs appointed

George Lin (whose signature appears below as his

1991 U.S. Dist. LEXIS 1151, *2; Fed. Sec. L. Rep. (CCH) P95,806

agent and attorney in fact to buy, sell (including short sales) and trade in stocks, bonds and any other securities and/or commodities and or contracts relating [*3] to the same on margin or otherwise . . . . The [plaintiff] agrees to indemnify and hold [OvestMarine] harmless from and to pay [OvestMarine] promptly on demand any and all losses . . . . In all such purchases sales or trades [OvestMarine is] authorized to follow the instructions of George Lin . . . .

All the plaintiffs also signed Options Information and Agreement Forms ("Options Forms") that granted Dr. Lin the authority to trade options. These Options Forms also included representations that the plaintiff

received from [OvestMarine] the most recent [Options Clearing Corporation] OCC prospectus and any supplement. [Plaintiff has] read and understands the information contained in that prospectus and affirms] specifically the following disclosures . . . . That both the purchase and the writing of options contracts involve a high degree of risk, are not suitable for many investors and, accordingly, should be entered into only by investors who understand the nature and extent of their rights and obligations and are fully aware of the inherent risk involved. . . . That [plaintiff] should not purchase any option unless [plaintiff is] able to sustain a total loss of the premium and transaction [*4] costs . . . . [Plaintiff has] noted particularly those sections of the OCC prospectus which summarize the risk factors involved in options trading and [Plaintiff has] determined that in view of my financial situation and investment objectives options trading is not unsuitable for me. . . .

OvestMarine made no recommendations regarding particular securities, trading strategies or markets in general. It did not have authority to trade for any of the plaintiffs' accounts. The plaintiffs dealt with OvestMarine exclusively through Dr. Lin and all transactions in plaintiffs' accounts were requested by Dr. Lin.

Dr. Lin was not employed by, nor did he receive compensation from, Marine. There is no evidence that OvestMarine exercised any control over Dr. Lin or the plaintiffs' accounts. In his deposition dated October 14, 1988, Dr. Lin testified that he was responsible for all investment decisions:

Q. Did these discount brokers that you dealt with for your clients ever offer investment advise [sic] or make recommendations concerning stocks?

A. No, they don't on any individual stocks.

Q. Deal with Ovest; did Ovest ever recommend an individual stock or option to you.

A. No.

Q. Did they ever [*5] give you any investment advice in terms of buying or selling particular securities?

A. No.

Q. Did they ever give you any investment advice in terms of investing in markets, particular markets?

A. No.

Q. Is it fair to say they gave you no investment advise [sic] whatsoever?

A. They don't give me any investment advice about any particular stocks, but they teach me a lot: how to cut down on the expenses, and to cut down on the prices that I give for the options.

. . .

Q. In an off the record discussion, Dr. Linn [sic] advised me that in placing orders with Ovest, on occasion he and the traders would discuss the state of the market, the liquidity of the market at the time; and that sometimes Ovest would make suggestions that the order be placed in a particular manner because of the state of the liquidity, is that correct?

A. At the particular place [price]?

Q. At the particular place [price]?

A. That's correct, sir.

Q. That was based upon their knowledge of the market at that time, is that correct?

A. That's correct.

Q. Just by way of making up an example, if you said you wanted to buy a particular option at the particular price, would they perhaps say to you, well, the spread between [*6] the bid and the asked is unusually high at the present time and maybe you ought to place an order in the middle?

Case 1:08-cv-00179 Document 1-2 Filed 01/08/2008 Page 15 of 66

Page 3

1991 U.S. Dist. LEXIS 1151, *6; Fed. Sec. L. Rep. (CCH) P95,806

A. That's correct.

Q. And see if the option

A. Would be executed.

Q. See if the order is executed at that price?

A. That's correct. Most of the time it is executed at the suggested price, but sometimes it didn't go through. . .

This testimony is further evidence of Marine's lack of involvement in Dr. Lin's or plaintiffs' investment decisions.

Summary judgement is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. It is sufficient if the moving party proves "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).*

Plaintiffs' various causes of action all require some proof that Marine acted improperly. Plaintiffs have failed to prove any wrongdoing on the part of the defendants. From all the available evidence, it appears that OvestMarine simply executed buy and sell orders at the request of Dr. Lin, an independent investment adviser who had full discretionary authority over the various accounts. In these circumstances, [*7] without any evidence to support some type of relationship between Marine and Dr. Lin, summary judgment is warranted.

To state a claim under Section 10(b), *15 U.S.C. § 78j(b),* and *Rule 10b-5, 17 C.F.R. § 240.10b-5,* the plaintiff "must allege that, in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's actions caused him injury." *See Bloor v. Carro, Spanbock, Londin, Rodman & Fass, 754 F.2d 57, 61 (2d Cir. 1985).*

Plaintiffs have admitted that the defendants made no oral misrepresentations and there are no allegations of written misrepresentations. The claims are based upon defendants' alleged failures to disclose the risks of options trading.

The Options Forms signed by plaintiffs belie their claims that they were unaware of the risks involved in trading options. All plaintiffs represented that they understood that the trading of options involved a "high degree of risk" and might result in "substantial financial losses." The plaintiffs also represented that options trading was not unsuitable for them.

There has been [*8] no evidence to support a finding that Marine acted with scienter. Defendants did not intend to deceive or to defraud the plaintiffs. They did not solicit any of the plaintiffs as clients and did not recommend any securities to Dr. Lin. OvestMarine simply filled orders as directed by Dr. Lin.

The defendants did not act recklessly by following Dr. Lin's instructions. The Trading Authorizations and Options Forms plainly contemplated an investment strategy that permitted Dr. Lin to make the investment decisions for plaintiffs; OvestMarine merely executed the transactions.

Plaintiffs have also claimed damages from the churning of their accounts in addition to the disclosure-based Section 10(b) and *Rule 10b-5* claims. Churning is synonymous for overtrading. It is imposed on persons who exercise discretionary authority or its equivalent over an account. *See, e.g., Armstrong v. McAlpin, 699 F.2d 79, 90-91 (2d Cir. 1983); Moscarelli v. Stamm, 288 F. Supp. 453 (E.D.N.Y. 1968).* A claim for churning requires "(1) that the trading in the account was excessive in light of [the plaintiff's] investment objectives, (2) that the broker exercised control over the account, and (3) that [*9] the broker acted with intent to defraud or with willful and reckless disregard for the interests of his client." *Moran v. Kidder Peabody & Co., 609 F. Supp. 661, 666 (S.D.N.Y. 1985), aff'd 788 F.2d 3 (2d Cir. 1986); see Frota v. Prudential-Bache Sec., Inc., 639 F. Supp. 1186 (S.D.N.Y. 1986).*

The elements of a churning claim are not present. Marine had no control over trading which "is a necessary prerequisite to liability for churning." *Rolf v. Blyth Eastman Dillon & Co., 424 F. Supp. 1021, 1040 (S.D.N.Y. 1977), aff'd in part, 570 F.2d 38 (2d Cir.), cert. denied, 439 U.S. 1039 (1978).* The defendants did not possess authority to trade in any of the accounts. Dr. Lin gave all trading instructions. There is no evidence that the defendants influenced the volume of trading.

In addition to alleging a primary violation of Section 10(b) and *Rule 10b-5,* plaintiffs have also claimed that Marine is liable under an aiding and abetting theory for

Case 1:08-cv-00178    Document 1-2    Filed 01/08/2008    Page 16 of 66

Page 4
1991 U.S. Dist. LEXIS 1151, *9; Fed. Sec. L. Rep. (CCH) P95,806

Dr. Lin's activities. To establish an aiding and abetting claim, plaintiffs must prove "(1) a securities law violation by a primary wrongdoer, (2) knowledge of the violation by the person sought to be charged, and (3) [*10] proof that the person sought to be charged substantially assisted in the primary wrongdoing." *Armstrong v. McAlpin, 699 F.2d 79, 91 (2d Cir. 1983)*; *IIT, An International Inv. Trust v. Cornfeld, 619 F.2d 909, 922 (2d Cir. 1980).*

Even assuming the plaintiffs could establish a primary violation of Section 10(b) or *Rule 10b-5* by Dr. Lin and that Marine provided substantial assistance, there has been no evidence that any of the defendants had knowledge of Dr. Lin's wrongdoing. Dr. Lin was authorized to trade the accounts. Account statements were mailed regularly to the plaintiffs. No complaints were made about account activity prior to the 1987 crash. There was simply no reason for the defendants to be on notice of any alleged impropriety.

Plaintiffs seek to impose a duty on brokers to monitor the independent investment decisions of their clients. Similar policy-based claims have been rejected. *See Cumis Ins. Soc'y. Inc. v. E.F. Hutton & Co., 457 F. Supp. 1380, 1386-87 (S.D.N.Y. 1978)* (no aiding and abetting liability where brokerage firm lacked knowledge of investment adviser's wrongdoing); *see also Armstrong v. McAlpin, 699 F.2d 79, 91 (2d Cir. 1983)* ("We [*11] are not prepared to hold that a broker who merely executes an investment manager's orders for improper purchases or sales can be held liable as an aider and abettor of the investment manager . . . ."). There is even greater reason to reject monitoring liability in the case of discount brokers whose admitted function is *not* to give advice so investors can save money on commissions.

The plaintiffs also allege that the defendants are liable as a "controlling person" of Dr. Lin's actions under Section 20(a) of the Exchange Act, *15 U.S.C. § 78t(a) (1988).* A prerequisite for controlling person liability is proof of a relationship which gives the controlling person direct or indirect influence over the policy and decision-making process of the controlled person. In addition, the controlling person must be a culpable participant in the activities of the controlled person that are claimed to violate the securities laws. *See Gordon v. Burr, 506 F.2d 1080, 1085 (2d Cir. 1974)*; *Lanza v. Drexel & Co., 479 F.2d 1277, 1299 (2d Cir. 1973).*

Plaintiffs cannot prove that any of the defendants directly or indirectly controlled Dr. Lin's actions. Dr. Lin

was not employed by defendants [*12] nor did he receive any compensation from them. There is no evidence that Marine influenced Dr. Lin's trading decisions. Dr. Lin's deposition testimony reveals that he received, at most, some technical advice which enabled him to have orders filled at prices more advantageous to the plaintiffs. There is no evidence of any culpable conduct on the part of the defendants.

Plaintiffs claims under Section 15(c) of the Securities Exchange Act of 1934, *15 U.S.C. § 78o(c)*, and *Section 17(a)* of the Securities Act of 1933, *15 U.S.C. § 77q(a)*, are dismissed for failure to state a claim. The Court of Appeals for the Second Circuit has held that no private right of action exists under Section 15(c). *See Asch v. Phillips, Appel & Walden, Inc., 867 F.2d 776 (2d Cir.), cert. denied, 110 S. Ct. 114 (1989).* The continued existence of a private right of action under *Section 17(a)* in the Second Circuit is doubtful. *See Wexner v. First Manhattan Co., 902 F.2d 169, 173-4 (2d Cir. 1990)* ("It is apparent that the vitality of our holding in *Kirshner* is in doubt, and the existence of a private right of action under *Section 17(a)* is in need of reexamination.")

In light of the Second Circuit's [*13] position, the overwhelming number of district courts in the Southern and Eastern Districts of New York have found that no private right of actions exists under *Section 17(a)*. *See, e.g., Dymm v. Cahill, 730 F. Supp. 1245, 1257--59 (S.D.N.Y. 1990)*; *Deutsch v. Integrated Barter Int'l Inc., 700 F. Supp. 194, 201-02 (S.D.N.Y. 1988)*; *Cohen v. Goodfriend, 665 F. Supp. 152, 156 (E.D.N.Y. 1987)*; *Ackerman v. Clinical Data, Inc., [1985-1986]Fed. Sec. L. Rep. (CCH) para. 92,207 (S.D.N.Y. 1985)*; *see also In re Washington Public Power Supply System Sec. Litig., 823 F.2d 1349 (9th Cir. 1987) (en banc)* (holding no private right of action under *Section 17(a)*). In the instant case, it is not necessary to find that no private right of action exists under *Section 17(a)* because no violation can be shown.

Plaintiffs' ERISA claims proceed from the assumption that Marine was a fiduciary under ERISA. A person is a fiduciary to the extent he or she exercises any discretionary authority, renders investment advice for a fee or other compensation, or has any discretionary authority or discretionary responsibility in the administration of the plan. *See 29 U.S.C. § 1002(21)(A)* [*14] *(1988).* A fiduciary is personally liable for any losses resulting from a breach of his or her duties. *See 29*

1991 U.S. Dist. LEXIS 1151, *14; Fed. Sec. L. Rep. (CCH) P95,806

*U.S.C. § 1109 (1988).*

None of the factors which would support a finding that the defendants were fiduciaries under ERISA exists with respect to any of the plaintiffs. Only Dr. Sin had discretionary authority over the accounts, and he made all investment decisions. Brokers are not fiduciaries under these circumstances. *See Farm King Supply, Inc. v. Edward D. Jones & Co., 884 F.2d 288 (7th Cir. 1989)* (finding broker that recommended investments to the trustees not a fiduciary under ERISA).

Even if Marine were considered fiduciaries, an exception to *Section 1109* exists for brokerage firms that only execute trades and do not give investment advice. *See 29 C.F.R. § 2510.3-21(d)(1) (1990).* The broker/dealer exception facilitates investing in securities. Defendants would meet the criteria for the broker/dealer exception. They only provided Dr. Sin technical information on the liquidity of the markets he chose to invest in. This is not the type of investment advice that creates liability under ERISA.

Plaintiffs RICO claims are without merit. In the November 15, 1988 [*15] hearing on the original summary judgment motion, the court directed the plaintiffs to replead their RICO claims with respect to the "enterprise" requirement. The amended complaints suffer from the same defects on the "enterprise" requirement as their predecessors. There has been no evidence to support the existence of the predicate acts, a scheme to defraud or mail fraud.

Plaintiffs' state law claims for breach of fiduciary duty, fraud, conspiracy and negligence are an attempt to replead securities fraud. There has been no evidence presented to support any of these claims.

OvestMarine has asserted counterclaims against four of the plaintiffs for the margin deficits plus interest in their respective accounts. Attorneys fees are also sought pursuant to the indemnification provision in the Trading Authorizations. Liability for the margin deficits is not disputed. OvestMarine is entitled to judgment in the deficit amounts subject to verification.

The indemnification provisions are not sufficient to provide liability for defendants' attorneys fees. A "higher level of specificity is required when attorneys' fees are being assessed against a plaintiff suing for securities fraud." *Zissu* [*16] *v. Bear, Stearns & Co., 805 F.2d 75, 80 (2d Cir. 1986).* As in *Zissu*, the plaintiffs agreed to indemnify OvestMarine against "all losses" arising from the debit balance. This general provision does not meet the required level of specificity to include a claim for attorneys fees.

Defendants shall submit an appropriate judgment within ten days. Should the parties not agree on the appropriate sum due from plaintiffs, the matter will be referred to the Magistrate Judge for computation. Fees and disbursements are awarded defendants.

So Ordered.

# EXHIBIT I

LEXSEE 1994 U.S. APP. LEXIS 11976

**T-BILL OPTION CLUB, Plaintiff-Appellant, v. BROWN & COMPANY
SECURITIES CORPORATION, Defendant-Appellee.**

No. 92-2737

**UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT**

*1994 U.S. App. LEXIS 11976*

**January 14, 1994, Argued
May 23, 1994, Decided**

**NOTICE:**    [*1] UNPUBLISHED ORDER NOT TO
BE CITED PER SEVENTH CIRCUIT RULE 53.

**SUBSEQUENT HISTORY:**    Reported in Table Case
Format at: *23 F.3d 410, 1994 U.S. App. LEXIS 17988.*

**PRIOR HISTORY:**    Appeal from the United States
District Court for the Northern District of Illinois, Eastern
Division. No. 88 C 8461. James B. Parsons, Judge.

**DISPOSITION:**    AFFIRMED.

**JUDGES:** Before Hon. WILLIAM J. BAUER, Circuit
Judge, Hon. JOHN L. COFFEY, Circuit Judge, Hon.
KENNETH F. RIPPLE, Circuit Judge

**OPINION**

ORDER

The plaintiff, T-Bill Option Club ("T-Bill"), brought
an action for breach of contract and breach of fiduciary
duty in Illinois state court against the defendant, Brown
& Company Securities Corporation ("B&C"). Following
removal to federal court, based on the diversity of
citizenship of the parties, *see 28 U.S.C. § 1332(a)(1)*, the
case was submitted to a jury. It returned a verdict in favor
of defendant B&C on both causes of action, and the
district court entered judgment accordingly. T-Bill now
appeals. For the reasons that follow, we affirm.

I

BACKGROUND

T-Bill is an Illinois general partnership which, at the
time of the events in this lawsuit, traded in stock options
and other securities. T-Bill's managing partner, Sheldon
Pollack, is an experienced options trader who made all
investment    decisions    for    T-Bill.    [*2]    B&C,    a
Massachusetts corporation located in Boston, is a
discount brokerage firm. The relationship between T-Bill
and B&C arose in 1984 when Mr. Pollack responded to a
B&C advertisement in Barron's and opened a
nondiscretionary account for T-Bill with B&C. [1] The fact
that the account was nondiscretionary meant that T-Bill,
through Mr. Pollack, would make its own investment
decisions; B&C would give no investment advice. [2]

[1]    The advertisement stated in part:

> There are two kinds of investors.
> Those with experience. And those
> searching for it.
>
> If you are one of the few with
> experience, one of the few who
> doesn't need his hand held, Brown
> and Company can offer you
> margin and commission rates that
> are lower than you might think
> possible.
>
> . . . .
>
> We can offer such savings by
> dealing only with investors who
> make their own investment
> decisions. And don't need someone
> to make decisions for them.

Def. Exh. 1.

2    The Customer's Agreement provided that B&C would "not offer or provide any opinions, judgment or information concerning the nature, value, potential or suitability of any investment." Pl. Exh. 1, P 19.

[*3]  B&C has a maintenance requirement: A customer must maintain with B&C, either in the form of cash or marketable securities, a deposit amount equal to a certain percentage of the value of the securities held in the customer's main trading account. Maintenance requirements allow a customer to purchase a greater amount of securities with a given amount of capital than the customer could purchase in a cash-only account. *See generally Schenck v. Bear, Stearns & Co., 484 F. Supp. 937, 939-40 (S.D.N.Y. 1979)*. A customer's buying power is therefore determined by the maintenance reserve. If the maintenance reserve consists of marketable securities, fluctuations in the value of the equity will affect the level of the maintenance account. For example, if the stock prices drop, the maintenance level will drop and more maintenance collateral will be required.

The issue in this case concerns the maintenance requirement in T-Bill's account with B&C and the stock market's sharp decline in October 1987. That month culminated in what is said to have been the worse day in the market's history--Black Monday, October 19, 1987. [3] As a result, the value of the securities [*4] in T-Bill's maintenance account dropped below B&C's requirements, thereby creating a maintenance deficiency. On October 22, 1987, B&C telephoned Mr. Pollack to inform him that the T-Bill account had a deficit balance. In response, Mr. Pollack ordered the account closed and tendered $ 162,961 to B&C to correct T-Bill's account deficit.

3    *See* Lawrence J. De Maria, *Stocks Plunge 508 Points, A Drop of 22.6%; 604 Million Volume Nearly Doubles Record,* N.Y. Times, Oct. 20, 1987, at A1 ("Stock market prices plunged in a tumultuous wave of selling yesterday, giving Wall Street its worst day in history and raising fears of a recession.").

In August 1988, T-Bill filed a two-count complaint against B&C. It alleged breach of contract and breach of fiduciary duty and sought $ 474,000 damages. T-Bill claimed that B&C knew T-Bill's account was deficient as many as ten days before B&C gave T-Bill notice of the

deficiency, and that B&C therefore had a duty to inform T-Bill of the deficiency well before October 22, 1987. T-Bill [*5] asserted that, if B&C had notified it in timely fashion, the account would have been closed to preserve the equity that remained in the account.

The case proceeded to trial. Both parties relied on B&C's brochure, [4] among other material, in addressing whether B&C had either a contractual or a fiduciary duty to give T-Bill a "margin call," the industry term for notification of a maintenance deficiency, and, if B&C had any such duty, whether B&C breached it. Both parties presented expert testimony on the subject of maintenance requirements and margin calls. On June 24, 1992, a jury returned a verdict in favor of B&C on both the contract and fiduciary duty counts, and the district court entered judgment accordingly.

4    A typical excerpt relied upon by T-Bill reads:

> Our traders have access to on-line terminals and can give you account status and history, buying power and money balances as well as the latest quotes, market data and Dow Jones News.

Pl. Exh. 4, at 2. A typical excerpt relied upon by B&C reads:

> Our approach is not for everyone. Our clients expect us to provide up-to-date account and market information and to execute their orders as efficiently and inexpensively as possible. They do not expect us to provide investment advice and guidance.

Pl. Exh. 4, at 5.

[*6]  II

DISCUSSION

On appeal, T-Bill raises two issues. First, although it does not challenge the judgment with respect to the breach of contract count, T-Bill submits that the district court's jury instructions on the fiduciary duty count were erroneous as a matter of law and warrant reversal. Second, T-Bill asserts that the district court abused its discretion in allowing B&C's proffered expert to testify

as an expert under *Federal Rule of Evidence 702*. We shall address each issue in turn.

A. *Jury Instructions*

The district court instructed the jury on the fiduciary duty count with instructions which read, in part, as follows:

> To find in favor of T-Bill on this claim, therefore, you must determine whether there was a fiduciary relationship, whether defendant breached it, and what, if any, damages resulted.

> If you find that the T-Bill account was totally nondiscretionary and that all investment decisions were to be made by T-Bill alone without any advice from defendant, then you may find that there was no fiduciary duty, and find in favor of the defendant and against plaintiff, T-Bill.

Tr. 1483. T-Bill noted its objection to this instruction. [5] During the course [*7] of deliberation, the jury requested clarification on the fiduciary duty issue:

> If we believe that [B&C] . . . has no responsibility to T-Bill for investment decisions regardless of any other responsibilities they might have, e.g., notification of account deficiency, should we find in favor of defendant[?]

Tr. 1481. The jury also asked the court to define "investment decisions" as used in the court's instructions. Although the district court did not define "investment decisions" for the jury, it gave a follow-up instruction to answer the jury's question on the fiduciary duty issue:

> If you should find that the T-Bill account was totally nondiscretionary both within the terms of the contract and in the relationship that developed between the parties in that all decisions relating to or having bearing upon the investments were to be made by T-Bill alone without or irrespective of any advice, suggestions or warnings from the defendant, then you should find that there was no fiduciary relationship between the parties and find on this issue accordingly.

Tr. 1514-15. Again T-Bill noted its objection. Soon after the court gave the jury this instruction, the jury returned a verdict [*8] for B&C on both the contract and fiduciary duty counts.

> 5 Although T-Bill apparently tendered alternate instructions, *see* Tr. 1406, it does not refer to them in its brief. Moreover, because no reporter was present at the instructions conference, the proposed instructions are not contained in the record on appeal. *Cf. Smith v. Great American Restaurants, Inc.*, 969 F.2d 430, 436 (7th Cir. 1992). It is, of course, the obligation of a party objecting to jury instructions on the ground that a modification is necessary also to tender correct instructions to the court. *See Rufolo v. Midwest Marine Contractor, Inc.*, 6 F.3d 448, 449 n.1 (7th Cir. 1993), *vacated and remanded on other grounds*, 62 U.S.L.W. 3704 (U.S. April 25, 1994) (93-764).

T-Bill submits that the district court's instructions essentially required the jury to find that no fiduciary duty existed. Because both parties had agreed that T-Bill's account with B&C was [*9] nondiscretionary, T-Bill maintains that the use of the phrase "should find" in the second instruction in place of the phrase "may find" in the first instruction precluded the jury from finding in favor of T-Bill. Moreover, T-Bill asserts that even the court's original instruction was erroneous because it failed to inform the jury of the fact-specific nature of a fiduciary duty under Illinois law. *See Burdett v. Miller*, 957 F.2d 1375, 1381 (7th Cir. 1992) (stating that "fiduciary duties are sometimes imposed on an ad hoc basis").

In response, B&C contends that T-Bill's assumption in its opening brief that Illinois law applies to the fiduciary duty count is mistaken. Rather, B&C asserts, because the choice-of-law provision in the Customer Agreement [6] states that Massachusetts law governs the enforcement of the parties' agreement, Massachusetts law controls on the issue of fiduciary duty, just as it did on the contractual claim. Under Massachusetts law, B&C states, it is clear that investment relationships, whether discretionary or not, do not give rise to a fiduciary duty. *See Lefkowitz v. Smith Barney, Harris Upham & Co., Inc.*, 804 F.2d 154, 155 (1st Cir. 1986) [*10] (stating that "a simple stockbroker-customer relationship does not

constitute a fiduciary relationship in Massachusetts"). Thus, according to B&C, the district court should have directed a verdict against T-Bill on the issue of fiduciary duty. B&C argues that, in any event, the jury instructions reflected Illinois law. However, B&C states, because T-Bill had conceded that its B&C account was nondiscretionary, the district court's own instructions demonstrate that a verdict should have been directed against T-Bill under Illinois law, too.

> 6    The Customer Agreement states: "This agreement and its enforcement shall be governed by the laws of Massachusetts." Pl. Exh. 1, P 16.

We are inclined to agree with T-Bill that the choice-of-law provision in the Customer Agreement covered only claims concerning that agreement, not all other claims arising between the two parties. *Cf. Griswold v. E.F. Hutton & Co., Inc., 622 F. Supp. 1397, 1403 (N.D. Ill. 1985)* (stating that a choice-of-law provision [*11] in a "Client Agreement" did not apply to a dispute concerning a release the parties had executed). We need not delve into the matter deeply, however, because, even assuming *arguendo* that Illinois law applies, the jury instructions on fiduciary duty were not erroneous as a matter of law, much less sufficiently prejudicial to warrant reversal. *See Mayall v. Peabody Coal Co., 7 F.3d 570 (7th Cir. 1993)* (stating that we seek "'only to determine if the instructions as a whole were sufficient to inform the jury correctly of the applicable law'") (citation omitted); *Littlefield v. McGuffey, 954 F.2d 1337, 1344 (7th Cir. 1992)* (stating that "reversal is mandated only 'if the jury's comprehension of the issues is so misguided that a litigant is prejudiced'") (citation omitted). [7]

> 7    *See also Doe v. Burnham, 6 F.3d 476, 479 (7th Cir. 1993)* (stressing that "our review of jury instructions is limited").

In *Burdett v. Miller, 957 F.2d 1375, 1381 (7th Cir. 1992)* [*12] (applying Illinois law), we stated that "the relation between an investment advisor and the people he advises" is not one of the *"categories* of relations in which fiduciary duties are imposed." Yet a broker does serve as an agent for its customer and therefore usually bears a fiduciary duty at least with respect to some aspect of their relationship. *Martin v. Heinold Commodities, Inc., 117 Ill. 2d 67, 510 N.E.2d 840, 844, 109 Ill. Dec. 772 (Ill. 1987).* However, this means only that a broker is an agent whose "fiduciary duty is limited to actions

occurring within the scope of his agency." *Id. at 845.* The scope of the duty "owed by a broker carrying a nondiscretionary account for a customer is an exceedingly narrow one, consisting at most of a duty to properly carry out transactions ordered by the customer." *Index Futures Group, Inc. v. Ross, 199 Ill. App. 3d 468, 557 N.E.2d 344, 348, 145 Ill. Dec. 574 (Ill. App. 1990).* [8]

> 8    *See also Refco, Inc. v. Troika Inv. Ltd., 702 F. Supp. 684, 687 n.9 (N.D. Ill. 1988)* ("Even in the most limited type of agency--the nondiscretionary account where the broker is simply called on to carry out its principal's orders--the concept of faithfulness to duty (what the law labels a "fiduciary" duty) operates to preclude the agent's dealing to its own advantage rather than its principal's.").

> T-Bill's emphasis in this case on demonstrating that T-Bill and B&C had a fiduciary relationship, therefore, goes only halfway toward making its case. As Justice Frankfurter stated in another context, "to say that a man is a fiduciary only begins the analysis; it gives direction to further inquiry. To whom is he a fiduciary? What obligations does he owe as a fiduciary?" *SEC v. Chenery Corp., 318 U.S. 80, 85-86, 87 L. Ed. 626, 63 S. Ct. 454 (1943).*

[*13] In this case, T-Bill has not alleged any impropriety concerning any transactions it ordered B&C to execute. Nonetheless, it submits that the jury instructions were erroneous because they did not allow the jury to base its decision on the specific facts in this case which T-Bill claims demonstrate the existence of a fiduciary obligation. *See Burdett, 957 F.2d at 1381* (stating that "fiduciary duties are sometimes imposed on an ad hoc basis"). We do not agree. In relationships falling outside the per se categories of relationships in which fiduciary duties are imposed, a plaintiff is entitled to a fact-specific instruction on fiduciary duty only "when there is a special confidence reposed on one side and a resulting superior knowledge and influence on the other." *A.T. Kearney, Inc. v. INCA Int'l, Inc., 132 Ill. App. 3d 655, 477 N.E.2d 1326, 1332, 87 Ill. Dec. 798 (Ill. App. 1985).* [9] Except for its duty to execute faithfully the transactions T-Bill ordered, B&C did not occupy a position of special trust or confidence; indeed, it appears that this is precisely why T-Bill opened an account with [*14] B&C in the first place. Mr. Pollack, T-Bill's

managing partner, was an experienced and sophisticated investor who had not relied upon B&C for any unsolicited advice or information, market-related or otherwise, during the course of their relationship. Rather, the record plainly shows that, as a matter of practice, Mr. Pollack kept abreast of all market and account information on a virtual daily basis. [10] We do not believe that the principles governing the Illinois law of fiduciary relationships permit the conclusion that a contractual obligation to maintain a margin account to facilitate a nondiscretionary trading account--an obligation which the jury found was not breached--constitutes an independent fiduciary obligation. In any event, the district court's follow-up instruction, which focused not only on the terms of the contract but also on "the relationship that developed between the parties," adequately addressed the matter.

> 9    See also Santa Claus Indus. v. First Nat'l Bank, 216 Ill. App. 3d 231, 576 N.E.2d 326, 331, 159 Ill. Dec. 657 (Ill. App. 1991) ("Where the alleged [fiduciary] relationship does not exist as a matter of law, the plaintiff must plead facts from which a fiduciary relationship arises."); Pommier v. Peoples Bank Marycrest, 967 F.2d 1115, 1119 (7th Cir. 1992) ("There are relationships which give rise to a fiduciary duty as a matter of law, such as attorney-client. . . . It is possible that the particular circumstances surrounding a relationship will make it a fiduciary relationship, even if the general class of . . . relationships is not.").

[*15]

> 10    The situation is similar to that in Refco, Inc. v. Troika Investment Ltd., 702 F. Supp. 684 (N.D. Ill. 1988) (applying Illinois law) which also concerned events from October 1987. In Refco, the plaintiff had sued the defendant for a debit balance in the defendant's nondiscretionary futures trading account with the plaintiff. The defendant asserted a counterclaim based in part on the plaintiff's breach of fiduciary duty in failing to notify the defendant of the plaintiff's margin requirements. Disapproving the defendant's attempt to "invoke generalized fiduciary notions for its own benefit," the district court stated that "at most [the plaintiff] had a duty to make sure the [defendant's] transactions were duly carried out." Id. at 687. The district court therefore found that the plaintiff did not have a duty to inform the

defendant of its margin requirement. Id. at 687-88.

We therefore cannot conclude that the jury instructions constituted reversible error. Indeed, because the nondiscretionary [*16] nature of the account was not disputed, and because no other facts allowed a reasonable inference as to the existence of a fiduciary relationship, we agree with B&C that the district court should have directed a verdict in B&C's favor on the issue of fiduciary duty. [11] B&C did not owe T-Bill a fiduciary duty to notify T-Bill immediately of T-Bill's maintenance deficiency.

> 11    Cf. Shearson Hayden Stone, Inc. v. Leach, 583 F.2d 367, 371-72 (7th Cir. 1978) (holding that, because sophisticated investor who had nondiscretionary account with broker alleged no facts that gave rise to a fiduciary relationship, "the district court properly refused to instruct the jury on such a relationship").

## B. B&C's Expert Witness

Finally, T-Bill submits that the district court erred in allowing B&C's proffered expert witness, Mark Duffey, to testify as an expert on options and margin rules and regulations pursuant to Federal Rule of Evidence 702. [12] T-Bill asserts that Duffey was not qualified to testify [*17] on these matters as an expert. Because a district court has "broad discretion to determine whether a proffered expert is qualified to testify," we shall reverse the district court's admission of Duffey's expert testimony "only upon a clear showing of abuse of discretion." Spray-Rite Serv. Corp. v. Monsanto Co., 684 F.2d 1226, 1241 (7th Cir. 1982), aff'd, 465 U.S. 752, 79 L. Ed. 2d 775, 104 S. Ct. 1464 (1984). [13]

> 12    Rule 702 provides:
>
> > If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

13   *See also Jones v. Hamelman, 869 F.2d 1023, 1027-28 (7th Cir. 1989); Kelsay v. Consolidated Rail Corp., 749 F.2d 437, 448 (7th Cir. 1984).*

[*18] T-Bill concedes that Duffey's qualifications as an expert included, among other things, a two-year term as Director of Compliance of the Chicago Board of Options Exchange, where he supervised the checking of brokers' margin requirements, and various other positions in which he dealt with margin and maintenance requirements. Nonetheless, T-Bill asserts that, because Duffey has never received any formal education in the field and has never previously testified as an expert in a case involving maintenance requirements, the district court abused its discretion in allowing him to testify. We do not agree. First, *Rule 702* lists several ways in which a person can be qualified as an expert, and the rule lists those ways in the disjunctive. *See Fed. R. Evid. 702* (stating that "a witness qualified as an expert by knowledge, skill, experience, training, or education, may

testify") (emphasis added). Under the "liberal standard" of *Rule 702*, we cannot say that Duffey was sufficiently lacking in knowledge, skill, or experience with the concept and requirement of maintenance to permit us to conclude that the district court abused its discretion. *See AMPAT/Midwest, Inc. Illinois Tool Works Inc., 896 F.2d 1035, 1045 (7th Cir. 1990);* [*19] *see also Tagatz v. Marquette Univ., 861 F.2d 1040, 1042 (7th Cir. 1988)* (stating that *Rule 702* is "latitudinarian"). Second, suffice it to say that it would be very difficult indeed for a proffered expert witness to give admissible expert testimony if *Rule 702* prohibited anyone from testifying as an expert who had never done so before.

Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED.

# EXHIBIT J

NASD DISPUTE RESOLUTION, INC.

ARBITRATION NO: 06-05183

August 6, 2007

Tapes 1 - 3

LINDA HALE,

VS.

OPTIONSXPRESS, INC.

APPEARANCES BY:

On behalf of the Claimants:

      Neil B. Solomon, Esq.
      (Neil B. Solomon, P.A.)

On behalf of the Respondent:

      Hillary Victor, Esq.

      Panel Members:

      Kevin S. Doty, Esq., Chairperson
      Allen Robin, Public Arbitrator
      Bernard A. Taub, Industry Arbitrator

              G & L TRANSCRIPTION, INC.
              4801 NORTHWEST 27TH AVENUE
              BOCA RATON, FLORIDA  33434

                 (561) 998-1981


created using
BCL easyPDF
Printer Driver

1    suitability. Well, there are two different
2    suitability obligations when you have options as
3    opposed to stock and they're in the rules. NASD Rule
4    2860(b) 16 which was the top -- this is the NASD up
5    here and this is OptionsXpress.
6       Now that rule, the NASD rule talks about
7    approving or disapproving customers before they trade
8    options based on their financial situation,
9    experience, and other things. An option firm before
10   they allow anybody to any kind of options or the
11   protocol buying calls, any type of options trader had
12   a gatekeeper duty to say, hey wait a minute, this
13   type of options trading is the only type we allow
14   for, if any. So that's the suitability obligation
15   before we even get to whether there were any
16   recommendations. There were not recommendations
17   here. We are not here saying anybody from
18   OptionsXpress recommended that Ms. Hale buy options
19   in her IRA. That's not the duty what we're talking
20   about because options are so much more risky than
21   stocks. We're talking about a suitability obligation
22   before anybody -- trade out.
23      In fact, OptionsXpress in their own compliance
24   manual, at least two prior versions to the current
25   one, talks about suitability with respect to options


created using
BCL easyPDF
Printer Driver

in two different places. One place refers to recommendations, the other place talks about the criteria for opening an account. So they even acknowledge in their own compliance manuals two different suitability obligations when it comes to options. I want to make that clear to the panel. We don't want to get confused.

The recommendation suitability obligation is 2860(b) 19 as opposed to (b) 16 that has nothing to do with this case because we stipulate on the record OptionsXpress made no specific recommendations from any specific transaction. What OptionsXpress didn't know is they authorized Ms. Hale to buy puts and calls after OptionsXpress reviewed her suitability information, financial background, and experience, and said, okay, you can buy options in your IRA even though it was all the money she had in the world. Here specifically OptionsXpress is broadcasting to the general public promising and advertising on their website that they will do a suitability, their words not mine, analysis, and after such a analysis they will decide whether to allow somebody to do prudent trading of options in their IRA. That is what they broadcast to the general public on their website. Advertising -- website is considered advertising,

# EXHIBIT K

1

NASD DISPUTE RESOLUTION, INC.

ARBITRATION NO:  06-05183

August 7, 2007

Tapes  3 - 5


LINDA HALE,

VS.

OPTIONSXPRESS, INC.


APPEARANCES BY:

On behalf of the Claimants:

    Neil B. Solomon, Esq.
    (Neil B. Solomon, P.A.)


On behalf of the Respondent:

    Hillary Victor, Esq.
    Jeffry Henderson, Esq.


    Panel Members:

    Kevin S. Doty, Esq., Chairperson
    Allen Robin, Public Arbitrator
    Bernard A. Taub, Industry Arbitrator


G & L TRANSCRIPTION, INC.
4801 NORTHWEST 27TH AVENUE
BOCA RATON, FLORIDA  33434

(561) 998-1981


created using
BCL easyPDF
Printer Driver

1     or perhaps it's white. Its just pass Page 24 of 24. You

2     have to look at something that says, IM2860- -- in opening

3     accounts; right?

4         A     Yes.

5         Q     Mr. Solomon directed your attention to

6     Subsection B2 of that; right?

7         A     Yes, he did.

8         Q     Does that say that OptionsXpress has entered --

9     in addition to a customers account records they maintain

10    experience of a person who -- trading authority?

11        A     Yes, it does.

12        Q     Did OptionsXpress maintain any kind of a record

13    of claimant's -- Mr. Wise's --

14        A     Yes, it did.

15        Q     Okay.

16        A     Mr. Wise opened the account some months prior to

17    Ms. Hale's accounts being opened and submitting

18    information about his own financial condition and his

19    trading history. Last night I was able to go on line and

20    look at these records which are readily available, and saw

21    that Mr. Wise had some 24 years of experience in options

22    going back to 1973. He showed that he had done somewhere

23    around 100 option trades per year, and this, although not

24    being the solo factor, certainly was one of the positive

25    determining factors in accepting Ms. Hale.

created using
BCL easyPDF
Printer Driver

1  Mr. Wise that identified commission rates -- sales account

2  -- do you recall that?

3      A    Yes.

4      Q    Was that a deal sheet?

5      A    No, it was not and it was requested to create a

6  summary of what Mr. Wise had and it was --

7      Q    This is Respondent's Exhibit 32 --

8      CHAIRMAN DOTY:  Let Mr. Solomon see it before you ask

9  any questions.  I'll ask, just to speed it along.  What

10 are we looking at?

11     MR. HENDERSON:  -- 9/28 --

12     CHAIRMAN DOTY:  All right.  Any objection, Mr.

13 Solomon?

14     MR. SOLOMON:  No sir.

15     CHAIRMAN DOTY:  All right.  It will be admitted as

16 Respondent's 32.  You may continue.

17     MR. SOLOMON:  Oh actually, I'm sorry.  I object to

18 9.7 and 9 -- I don't object if that's the rule.  I will it

19 again that we're not saying that the recommendation Rule

20 9.9 there is no obligation in this case and the only

21 suitability obligation we are talking about at the time

22 the account is open which Mr. Stern acknowledged

23 OptionsXpress does have.

24     MR. HENDERSON:  -- is --

25     CHAIRMAN DOTY:  And I agree that that was the -- that



created using
BCL easyPDF
Printer Driver

1  is the stipulation and that is where we're headed.  So

2  please limit your questions to 9.7.

3      MR. SOLOMON:  Thank you, sir.

4      **(Respondent's Exhibit 32, admitted into evidence.)**

5      Q    (BY MR. HENDERSON):  For -- purposes, Mr. Stern,

6  a letter claims that OptionsXpress -- Rule 9.7 and in

7  front of you you see the Rule 9.7.  Are you familiar with

8  -- Rule 9.7(a)?

9      A    Yes, I am.

10      Q    Is -- Rule 9.7(a) and (b) a federally -- a clone

11  of the NASD Rule 2860(b)16?

12      A    Yes, it is.

13      Q    If you look at 9.7(a), what does 97(a) require

14  that a member firm such as OptionsXpress do in connection

15  with an option account approval rule?

16      A    It says that the account has to be approved --

17      Q    What does 9 -- say?  What does 9 -- require that

18  you do before its either approved --

19      A    That's -- submitting the -- information --

20  decision as to appropriate --

21      Q    Does it also require you to ascertain the

22  customers --

23      A    Yes.

24      Q    Is that similar if not identical to the part of

25  2860(b)16?


created using
BCL easyPDF
Printer Driver

1       A    And if the statement was -- statement included -

2   -

3       Q    So if the statement was included from the

4   previous firm, you'd look at that too but you wouldn't go

5   back and call the other firm and get previous statements

6   for that; correct?

7       A    --

8       Q    I don't know if you were here at the time but

9   there is a grid in the compliance manual that shows the

10  criteria that -- shows the criteria where someone like

11  yourself or Kevin Flynn is suppose to follow when

12  approving an account.  Are you familiar with the grid?

13      A    I'm familiar with the --  .

14      Q    -- Well, did you -- you probably know that

15  without having to look at it to determine what level to

16  choose; correct?

17      A    Yes, I also know it is a guideline.  It is not

18  firm facts.

19      Q    So if that guideline says there should be two

20  years of options experience, and it indicates here that my

21  client didn't have that two years, you could go outside

22  that guideline if necessarily; correct?

23      A    Right, we could.

24      Q    Based on what?

25      A    Any additional information we might get online.



created using
BCL easyPDF
Printer Driver

1    Q    Okay.  Do you do anything when you get an

2  account like this -- you said you got the LTA; right?

3    A    Yes.

4    Q    Before you approve the account?

5    A    I believe it was in the account factor --

6    Q    That LTA indicating that Tim Wise to be -- had

7  trading discretion on the one hand, and not authorized to

8  withdrawal money, but on the other hand he was also termed

9  the advisor and was to get paid fees directly into his

10  account and Ms. Hale's account.  Are you aware of that?

11    A    I was aware of the LTA -- the third part --

12    Q    You knew his name at the time?

13    A    I'm not -- I can't recall.  I mean, I saw that

14  he was an advisor.  I look to see --

15    Q    Do you remember if you did?

16    A    What, if I --

17    Q    No, if you had information --

18    A    Yeah, I did.  It was in the -- he has an account

19  with OptionsXpress.  It's the administrative system --

20    Q    He had an account before Ms. Hale opened hers

21  then?

22    A    --

23    Q    Did you know what the relationship between Ms.

24  Hale and Mr. Wise was at the time?

25    A    Just what was stipulated on the third party that


created using
BCL easyPDF
Printer Driver

1    she requested that he be the advisor.

2       Q    Okay.  Isn't there a rule that requires that you

3    do a further investigation or that you learn what the

4    relationship is between the advisor and the person who is

5    advising the --

6       A    I'm not sure exactly which rule you're referring

7    to, but I --

8       Q    Sorry, I didn't mean to interrupt you.

9       A    I mean, I checked to see what his trading --

10   what his experience was --

11      Q    So you looked at his account --

12      A    Yes.

13      Q    So Kevin Flynn does that first probably.  He

14   does the exact same thing you do?

15      A    I believe so, yes.  We do the same process.  We

16   look at it --

17      Q    And then he passes it along to you?  You as his

18   boss have the final stamp of approval?

19      A    Correct.

20      Q    After that happens, could you describe the

21   duties -- can you describe what Kevin Flynn does on a day

22   to day basis with respect to supervising and dealing with

23   the accounts as compared to you?

24      A    At the time you didn't have -- you know, we're

25   not supervising these accounts, but we're supervising the


created using
BCL easyPDF
Printer Driver

# EXHIBIT L

## Rule 9.7. Opening of Accounts

(a) *Approval Required.* No member organization shall accept an order from a customer to purchase or write an option contract unless the customer's account has been approved for options transactions in accordance with the provisions of this rule.

(b) *Diligence in Opening Account.* In approving a customer's account for options transactions, a member organization shall exercise due diligence to learn the essential facts as to the customer and his investment objectives and financial situation, and shall make a record of such information which shall be retained in accordance with Rule 9.8. Based upon such information, the branch office manager or other Registered Options Principal shall approve in writing the customer's account for options transactions; provided, that if the branch office manager is not a Registered Options Principal, his approval shall within a reasonable time be confirmed by a Registered Options Principal.

(c) *Verification of Customer Background and Financial Information.* The background and financial information upon which the account of every new customer that is a natural person has been approved for options trading, unless the information is included in the customer's account agreement, shall be sent to the customer for verification within fifteen (15) days after the customer's account has been approved for options transactions. A copy of the background and financial information on file with the member organization shall also be sent to the customer for verification within fifteen (15) days after the member organization becomes aware of any material change in the customer's financial situation.

(d) *Agreements to Be Obtained.* Within 15 days after a customer's account has been approved for options transactions, a member organization shall obtain from the customer a written agreement that the account shall be handled in accordance with the Rules of the Exchange and the Rules of the Clearing Corporation and that such customer, acting alone or in concert with others, will not violate the position or exercise limits set forth in Rules 4.11 and 4.12.

(e) *Options Disclosure Documents to Be Furnished.* At or prior to the time a customer's account is approved for options transactions, a member organization shall furnish the customer with one or more current options disclosure documents in accordance with the requirements of Rule 9.15.

(f) Every member organization transacting business with the public in uncovered option contracts shall develop, implement and maintain specific written procedures governing the conduct of such business which shall include, at least, the following:

1. Specific criteria and standards to be used in evaluating the suitability of a customer for uncovered short option transactions;

2. Specific procedures for approval of accounts engaged in writing uncovered short option contracts, including written approval of such accounts by a Registered Options Principal;

3. Designation of the Senior Registered Options Principal and/or Compliance Registered Options Principal as the person responsible for approving accounts which do not meet the specific criteria and standards for writing uncovered short option transactions and for maintaining written records of the reasons for every account so approved;

4. Establishment of specific minimum net equity requirements for initial approval and maintenance of customer uncovered option accounts; and

5. Requirements that customers approved for writing uncovered short options transactions be provided with a special written description of the risks inherent in writing uncovered short option transactions, at or prior to the initial uncovered short option transaction. See Rule 9.15(c).

Amended May 1, 1973; January 3, 1975; March 26, 1980; October 19, 1982; June 21, 1989, effective March 1, 1990 (89-01).

# EXHIBIT M

## 2860. Options

(a) For purposes of this Rule, the term "option" shall mean any put, call, straddle or other option or privilege, which is a "security" as defined in Section 2(1) of the Securities Act of 1933, as amended, but shall not include any tender offer, registered warrant, right, convertible security or any other option in respect to which the writer is the issuer of the security which may be purchased or sold upon the exercise of the option.

### (b) Requirements

. . .

### (16) Opening of Accounts

#### (A) Approval Required

No member or person associated with a member shall accept an order from a customer to purchase or write an option contract relating to an options class that is the subject of an options disclosure document, or approve the customer's account for the trading of such option, unless the broker or dealer furnishes or has furnished to the customer the appropriate options disclosure document(s) and the customer's account has been approved for options trading in accordance with the provisions of subparagraphs (B) through (D) hereof.

#### (B) Diligence in Opening Accounts

In approving a customer's account for options trading, a member or any person associated with a member shall exercise due diligence to ascertain the essential facts relative to the customer, his financial situation and investment objectives. Based upon such information, the branch office manager or other Registered Options Principal shall specifically approve or disapprove in writing the customer's account for options trading; provided, that if the branch office manager is not a Registered Options Principal, account approval or disapproval shall within ten (10) business days be submitted to and approved or disapproved by a Registered Options Principal. A record of the information obtained pursuant to this subparagraph and of the approval or disapproval of each such account shall be maintained by the member as part of its permanent records in accordance with paragraph (b)(17).

#### (C) Verification of Customer Background and Financial Information

The background and financial information upon which the account of every new options customer that is a natural person has been approved for options trading, unless the information is included in the customer's account agreement, shall be sent to the customer for verification within fifteen (15) days after the customer's account has been approved for options trading. A copy of the background and financial information on file with a member shall also be sent to the customer for verification within fifteen (15) days after the member becomes aware of any material change in the customer's financial situation.

### (D) Account Agreement

Within fifteen (15) days after a customer's account has been approved for options trading, a member shall obtain from the customer a written agreement that the customer is aware of and agrees to be bound by the Rules of the Association applicable to the trading of option contracts and, if he desires to engage in transactions in options issued by The Options Clearing Corporation, that the customer has received a copy of the current disclosure document(s) required to be furnished under this subparagraph (16) and that he is aware of and agrees to be bound by the rules of The Options Clearing Corporation. In addition, the customer should indicate on such written agreement that he is aware of and agrees not to violate the position limits established pursuant to paragraph (b)(3) and the exercise limits established pursuant to paragraph (b)(4).

### (E) Uncovered Short Option Contracts

Each member transacting business with the public in writing uncovered short option contracts shall develop, implement and maintain specific written procedures governing the conduct of such business which shall include, at least, the following:

(i) Specific criteria and standards to be used in evaluating the suitability of a customer for writing uncovered short option transactions;

(ii) Specific procedures for approval of accounts engaged in writing uncovered short option contracts, including written approval of such accounts by a Registered Options Principal;

(iii) Designation of the Senior Registered Options Principal and/or Compliance Registered Options Principal as the person responsible for approving customer accounts that do not meet the specific criteria and standards for writing uncovered short option transactions and for maintaining written records of the reasons for every account so approved;

(iv) Establishment of specific minimum net equity requirements for initial approval and maintenance of customer accounts writing uncovered short option transactions; and

(v) Requirements that customers approved for writing uncovered short options transactions be provided with a special written statement for uncovered option writers approved by the Association that describes the risks inherent in writing uncovered short option transactions, at or prior to the initial writing of an uncovered short option transaction.

# EXHIBIT N

1

NASD DISPUTE RESOLUTION, INC.

ARBITRATION NO: 06-05183

August 8, 2007

Tapes 6 -7

LINDA HALE,

VS.

OPTIONSXPRESS, INC.

APPEARANCES BY:

On behalf of the Claimants:

      Neil B. Solomon, Esq.
      (Neil B. Solomon, P.A.)

On behalf of the Respondent:

      Hillary Victor, Esq.
      Jeffrey Henderson, Esq.

      Panel Members:

      Kevin S. Doty, Esq., Chairperson
      Allen Robin, Public Arbitrator
      Bernard A. Taub, Industry Arbitrator

G & L TRANSCRIPTION, INC.
4801 NORTHWEST 27TH AVENUE
BOCA RATON, FLORIDA  33434

(561) 998-1981

created using
BCL easyPDF
Printer Driver


1          Q    You've been in the business for how long?  In

2   the brokerage business and the financial business, how

3   long have you been doing this?

4          A    Since 1973.

5          Q    And you owned your own firm at one point?

6          A    Yes.

7          Q    What's the common understanding of what a

8   management fee is?  Is that based on what -- assets under

9   management like the example we've just used?

10         A    Yes.

11         Q    It's common in this day and age the management

12   fee based on assets under management usually 1% to 2%

13   give or take?

14         A    Yes, pretty reasonable.

15         Q    And that's in lieu of commission; correct?

16         A    Correct.

17         Q    And that's a fairly commonly understood term in

18   this business; correct.

19         A    Yes.

20         Q    So somebody with four years experience in the

21   business came in and said he didn't know what that was,

22   would you believe him?

23         A    Four years experience, no -- didn't know --

24         Q    Do you remember what your email address was in

25   November of 2002?

1    A    I'm not sure which one it was.

2    Q    Okay.  -- ask you to open to a certain tab, and

3    then we'll look at certain documents in a second; okay?

4    Let me ask you another question before we get to that.

5    Are you aware of what happened in the stock market

6    in general from the spring of 2000 to 2002?

7    A    Yes.

8    Q    What happened?

9    A    We were in a recession.

10    Q    Was there a crash?  Would you call it a crash?

11    A    --

12    Q    --

13    A    --

14    Q    Have you ever -- you've been doing this 30

15    years you said?  Thirty-five years?

16    A    32 years.

17    Q    There was a crash in '87 --

18    A    --

19    Q    Right, okay.  The crash from 2000 to 2002 was

20    on the news, it was all over the place; right?  It was

21    common knowledge that the market was in big trouble;

22    right?  The NASD went down over what 50%, 60% in less

23    than a year?

24    A    --

25    Q    Correct --

# EXHIBIT 2

options**Xpress**

Member NASD • SIPC

September 12, 2007

Ms. Michele Collins
FINRA Dispute Resolution
One Liberty Plaza
165 Broadway, 52nd Floor
New York, NY 10006
Facsimile (301) 527-4838
VIA Facsimile (w/o enclosures) and FedEx

      **RE:**    **Linda Hale v. optionsXpress, Inc.**
                **FINRA - DR Case No. 06-05183**

Dear Ms. Collins:

This letter notifies you that today optionsXpress, Inc., by its counsel, filed the enclosed Application to Vacate Arbitration Award rendered in the above-referenced matter.

Regards,

Hillary Victor
Corporate Counsel
optionsXpress Holdings, Inc.

Cc Via US Mail:

      Neil Solomon, Esq. (w/o enclosure), 4174 St. Lukes Lane, Jupiter, Florida 33458
      Jeffry Henderson (w/o enclosure), Henderson & Lyman, 175 West Jackson Boulevard, Suite 240, Chicago, IL 60604
      Robert B. Christie, (w/o enclosure) Henderson & Lyman, 175 West Jackson Boulevard, Suite 240, Chicago, IL 60604
      Ms. Rose Schindler, Vice President and Director FINRA Dispute Resolution. Boca Center Tower 1, 5200 Town
      Center Circle, Boca Raton, FL 33486

# EXHIBIT 3



neil solomon <neilbsolomonesq@gmail.com>

## Award
1 message

**neil solomon <neilbsolomonesq@gmail.com>**            **Thu, Sep 13, 2007 at 5:43 PM**
To: "hvictor@optionsxpress.com" <hvictor@optionsxpress.com>, bmoroff@optionsxpress.com
Cc: bonnie.simon@nasd.com

The deadline to pay the Award was yesterday. I have not received it. Accordingly, if I do not hear from you by tomorrow I will write to Michelle Collins at FINRA in New York informing her of same and requesting that FINRA initiate expedited suspension hearings pursuant to Rule 9554.

If you have filed a motion to vacate, I agree to accept service on behalf of Ms. Hale.

--
Neil B. Solomon
Neil B. Solomon, P.A.
4174 St. Lukes Lane
Jupiter, FL 33458
phone: 561-762-4991

# EXHIBIT 4

FILED by  *RB*  D.C.
ELECTRONIC

**Nov. 16, 2007**

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

# UNITED STATES DISTRICT COURT

### Southern District of Florida

Case Number: _____

# 07-81085-Civ-RYSKAMP/VITUNAC

LINDA HALE,

      Petitioner,

v.

OPTIONSXPRESS, INC.,

      Respondent.

_____/

## APPLICATION TO CONFIRM ARBITRATION AWARD

    Petitioner, LINDA HALE, moves pursuant to 9 U.S.C. § 9, to confirm an arbitration award entered in her favor against Respondent, OPTIONSXPRESS, INC., (the "Award") and to enter a final judgment on the Award.

## JURISDICTION

1.    This is a civil action in which this Court has jurisdiction pursuant to 28 U.S.C. § 1332. Specifically, Section 1332 provides that the district courts shall have original jurisdiction over all civil actions in which there is diversity of citizenship and the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.

2.    Petitioner, Linda Hale, is a citizen of the State of Florida.

3.    Respondent, optionsXpress, is Delaware corporation with its principal place of business in Chicago, Illinois, and therefore is a citizen of the States of Delaware and Illinois.

4.     Accordingly, complete diversity of citizenship exists under 28 U.S.C. § 1332(1) because this case is between citizens of different states.

5.     The Award orders Respondent to pay Ms. Hale $175,000. Therefore, the amount in controversy exceeds the jurisdictional threshold. A copy of the FINRA Dispute Resolution Award is attached as Exhibit A.

## VENUE

6.     The final hearing of the arbitration that resulted in the Award for Ms. Hale was conducted in Boca Raton, Florida.

7.     From its inception, the arbitration was administered by FINRA's office in Boca Raton, Florida.

8.     The parties agreement to arbitrate does not specify a particular court in which the Award is to be confirmed ("Judgment upon any award of the arbitrators may be entered in any court, state or federal, having jurisdiction thereof."). The relevant provision of the parties' arbitration agreement is attached as Exhibit B.

9.     As such, venue is proper in this Court pursuant to 9 U.S.C. § 9.

## MOTION TO CONFIRM AWARD

10.     Pursuant to 9 U.S.C. § 12, Respondent was required to serve a motion to vacate, modify or correct the Award no later than three months after the Award was filed or delivered.

11.     The Award was delivered on August 13, 2007. *See* Exhibit A at page 5.

12.     Respondent has not served a motion to vacate, modify or correct the Award.

13.    Because Respondent has not served a motion to vacate, modify or correct the Award within three months after the Award was filed or delivered, the Court must confirm the Award pursuant to 9 U.S.C. § 9.

## CONCLUSION

For the reasons set forth above, the Court must confirm the Award.

NEIL B. SOLOMON P.A.

By: _____

Neil B. Solomon, FBN 544973
4174 St. Lukes Lane
Jupiter, FL 33458
Tel: 561-762-4991
Fax: 561-626-2721
Email: neilbsolomonesq@gmail.com

*Attorney for PETITONER*

# Exhibit A

# Award

## FINRA Dispute Resolution

In the Matter of the Arbitration Between:

**Name of the Claimant**
Linda Hale

**Case Number:** 06-05183

**Name of the Respondent**
optionsXpress, Inc.

**Hearing Site:** Boca Raton, Florida

Nature of the Dispute: Customer vs. Member.

## REPRESENTATION OF PARTIES

For Linda Hale, hereinafter referred to as "Claimant": Neil B. Solomon, Esq., Neil B. Solomon, P.A., Jupiter, Florida.

For optionsXpress, Inc., hereinafter referred to as "Respondent": Hillary A. Victor, Esq., optionsXpress Holdings, Inc., Chicago, Illinois and Jeffry M. Henderson, Esq., Chicago, Illinois.

## CASE INFORMATION

Statement of Claim filed on or about: December 2, 2006.
Claimant signed the Uniform Submission Agreement: December 3, 2006.
Motion to Dismiss and Statement of Answer filed by Respondent on or about: February 7, 2007.
Respondent signed the Uniform Submission Agreement: February 7, 2007.
Brief in Support of its Motion to Dismiss filed by Respondent on or about: May 15, 2007.
Response to Motion to Dismiss and Motion for Summary Judgment with respect to Liability filed by Claimant on or about: June 4, 2007.
Motion for Witness Affidavits and/or Telephonic Testimony filed by Respondent on or about: July 30, 2007.
Response to Motion for Witness Affidavits and/or Telephonic Testimony filed by Claimant on or about: July 31, 2007.
Motion for Reconsideration of Respondent's Motion for Witness Affidavits and/or Telephonic Testimony filed by Claimant on or about: August 3, 3007.
Response to Claimant's Motion for Reconsideration of Respondent's Motion for Witness Affidavits and/or Telephonic Testimony filed by Respondent on or about: August 3, 2007.
Motion to Add Additional Evidence filed by Claimant on or about: August 10, 2007.
Motion to Bar and Strike and for Other Relief filed by Respondent on or about: August 10, 2007.

FINRA Dispute Resolution
Arbitration No. 06-05183
Award   Page 2

## CASE SUMMARY

Claimant asserted the following causes of action: 1) suitability; 2) breach of contract; 3) failure to supervise; and, 4) negligence. The causes of action relate to options trading of various unspecified securities in Claimant's accounts.

Unless specifically admitted in its Answer, Respondent denied the allegations made in the Statement of Claim and asserted various affirmative defenses.  In addition, Respondent filed a Motion to Dismiss alleging that Claimant held a self-directed account.

## RELIEF REQUESTED

Claimant requested compensatory damages in the amount of $200,000.00, punitive damages of at least $1,000,000.00, attorney's fees, costs and forum fees.

Respondent requested that the Statement of Claim be denied and dismissed in its entirety, with prejudice, and an award of fees, costs and reasonable attorney's fees, and such other, further and different relief as this Panel deemed just and proper.

## OTHER ISSUES CONSIDERED AND DECIDED

On June 29, 2007, the Panel issued an Order that denied Respondent's Motion to Dismiss and Claimant's Motion for Summary Judgment.

On August 1, 2007, the Panel issued an Order that granted Respondent's Motion for Witness Affidavits however, the Panel stated that if, at any time during the evidentiary hearing, it appears that any witness included in Respondent's motion has knowledge of any fact in controversy, Respondent shall make that witness available for telephonic testimony.

On August 3, 2007, the Panel issued an Order that granted Claimant's Motion for Reconsideration of Respondent's Motion for Witness Affidavits and/or Telephonic Testimony. The Panel reconsidered its previous ruling and determined that one particular witness in Respondent's motion must appear in-person.

On August 10, 2007, the Panel met in a deliberation conference and determined that Claimant's Motion to Add Additional Evidence and Respondent's Motion to Bar and Strike and for Other Relief are both denied.

The parties have agreed that the Award in this matter may be entered in counterpart copies or that a signed handwritten Award may be entered.

## AWARD

After considering the pleadings, the testimony and evidence presented at the hearing, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

FINRA Dispute Resolution
Arbitration No. 06-05183
Award   Page 3

Respondent is found liable for Claimant's claims of suitability, breach of contract, failure to supervise and negligence and shall pay to Claimant compensatory damages in the amount of $175,000.00.

Claimant's requests for punitive damages and attorney's fee are denied.

Any and all claims for relief not specifically addressed herein, including Respondent's request for attorneys' fees, are denied.

## FEES

Pursuant to the Code of Arbitration Procedure (the "Code"), the following fees are assessed:

### Filing Fees
FINRA Dispute Resolution will retain or collect the non-refundable filing fees for each claim:
| | |
|---|---|
| Initial claim filing fee | = $ 500.00 |

### Member Fees
Member fees are assessed to each member firm that is a party in these proceedings or to the member firm(s) that employed the associated person(s) at the time of the event(s) giving rise to the dispute. Accordingly, Respondent is a party and a member firm.

| | |
|---|---|
| Member surcharge | = $ 2,800.00 |
| Pre-hearing process fee | = $   750.00 |
| Hearing process fee | = $ 5,000.00 |
| Total Member Fees | = $ 8,550.00 |

### Adjournment Fees
Adjournments granted during these proceedings for which fees were assessed:

No requests for adjournments were filed in this matter.

### Three-Day Cancellation Fees
Fees apply when a hearing on the merits is postponed or settled within three business days before the start of a scheduled hearing session:

No cancellation fees were assessed in this matter.

### Injunctive Relief Fees
Injunctive relief fees are assessed to each member or associated person who files for a temporary injunction in court. Parties in these cases are also assessed arbitrator travel expenses and costs when an arbitrator is required to travel outside his or her hearing location and additional arbitrator honoraria for the hearing for permanent injunction. These fees, except the injunctive relief surcharge, are assessed equally against each party unless otherwise directed by the panel.

No injunctive relief fees were incurred during this proceeding.

FINRA Dispute Resolution
Arbitration No. 06-05183
Award    Page 4

## Forum Fees and Assessments

The Panel has assessed forum fees for each session conducted. A session is any meeting between the parties and the arbitrators, including a pre-hearing conference with the arbitrators, that lasts four (4) hours or less. Fees associated with these proceedings are:

| | | |
|---|---|---|
| Two (2) Pre-hearing sessions with the Panel @ $1,200.00/session | | = $ 2,400.00 |
| Pre-hearing conferences:   April 25, 2007 | 1 session | |
|                   June 27, 2007 | 1 session | |
| | | |
| Eight (8) Hearing sessions with the Panel @ $1,200.00/session | | = $ 9,600.00 |
| Hearing Dates:      August 6, 2007 | 2 sessions | |
|                 August 7, 2007 | 2 sessions | |
|                 August 8, 2007 | 2 sessions | |
|                 August 9, 2007 | 2 sessions | |
| **Total Forum Fees** | | **= $12,000.00** |

The Panel has assessed $6,000.00 of the forum fees to Claimant.
The Panel has assessed $6,000.00 of the forum fees to Respondent.

## Administrative Costs

Administrative costs are expenses incurred due to a request by a party for special services beyond the normal administrative services. These include, but not limited to, additional copies of arbitrator awards, copies of audio transcripts, retrieval of documents from archives, interpreters, and security.

No administrative costs were incurred during this proceeding.

## Fee Summary

Claimant is solely liable for:

| | |
|---|---|
| Initial Filing Fee | = $    500.00 |
| Forum Fees | = $ 6,000.00 |
| Total Fees | = $ 6,500.00 |
| Less payments | = $ 1,700.00 |
| Balance Due FINRA Dispute Resolution | = $ 4,800.00 |

Respondent is solely liable for:

| | |
|---|---|
| Member Fees | = $ 8,550.00 |
| Forum Fees | = $ 6,000.00 |
| Total Fees | = $ 14,550.00 |
| Less payments | = $ 8,550.00 |
| Balance Due FINRA Dispute Resolution | = $ 6,000.00 |

All balances are payable to FINRA Dispute Resolution and are due upon receipt pursuant to Rule 10330(g) of the Code.

FINRA Dispute Resolution
Arbitration No. 06-05183
<u>Award    Page 5</u>

## <u>ARBITRATION PANEL</u>

| | | |
|---|---|---|
| *Kevin S. Doty, Esq.* | - | *Public Arbitrator, Presiding Chairperson* |
| *Allen Robin* | - | *Public Arbitrator* |
| *Bernard A. Taub* | - | *Non-Public Arbitrator* |

### <u>Concurring Arbitrators' Signatures</u>

_____/s/_____
Kevin S. Doty, Esq.
Public Arbitrator, Presiding Chairperson

08/13/07_____
Signature Date


_____/s/_____
Allen Robin
Public Arbitrator

08/13/07_____
Signature Date


_____/s/_____
Bernard A. Taub
Non-Public Arbitrator

08/11/07_____
Signature Date


_____08/13/07_____
Date of Service (For FINRA Dispute Resolution office use only)

FINRA Dispute Resolution
Arbitration No. 06-05183
Award    Page 5

## ARBITRATION PANEL

Kevin S. Doty, Esq.                            -          Public Arbitrator, Presiding Chairperson
Allen Robin                                    -          Public Arbitrator
Bernard A. Taub                                -          Non-Public Arbitrator

### Concurring Arbitrators' Signatures

_(signature)_                                             _13 August 2007_
Kevin S. Doty, Esq.                                       Signature Date
Public Arbitrator, Presiding Chairperson


Allen Robin                                               Signature Date
Public Arbitrator


Bernard A. Taub                                           Signature Date
Non-Public Arbitrator


Date of Service (For FINRA Dispute Resolution office use only)

FINRA Dispute Resolution
Arbitration No. 06-05183
Award   Page 5

## ARBITRATION PANEL

Kevin S. Doty, Esq.               -          Public Arbitrator, Presiding Chairperson
Allen Robin                       -          Public Arbitrator
Bernard A. Taub                   -          Non-Public Arbitrator

**Concurring Arbitrators' Signatures**

_____
Kevin S. Doty, Esq.                          _____
Public Arbitrator, Presiding Chairperson     Signature Date

_____
Allen Robin                                  _August 13, 2007_
Public Arbitrator                            Signature Date

_____
Bernard A. Taub                              _____
Non-Public Arbitrator                        Signature Date

_____
Date of Service (For FINRA Dispute Resolution office use only)

FINRA Dispute Resolution
Arbitration No. 06-05183
Award   Page 5

# ARBITRATION PANEL

| | | |
|---|---|---|
| Kevin S. Doty, Esq. | - | Public Arbitrator, Presiding Chairperson |
| Allen Robin | - | Public Arbitrator |
| Bernard A. Taub | - | Non-Public Arbitrator |

## Concurring Arbitrators' Signatures

_____
Kevin S. Doty, Esq.
Public Arbitrator, Presiding Chairperson

_____
Signature Date

_____
Allen Robin
Public Arbitrator

_____
Signature Date

_____
Bernard A. Taub
Non-Public Arbitrator

_____
Signature Date

_____
Date of Service (For FINRA Dispute Resolution office use only)

and other software, and modems) and telephone or alternative services required for accessing and using the web site or related services, and for all communications service fees and charges incurred by you in accessing our web site or related services.

**43. Limitations, Restrictions and Termination of Services**
You are authorized to use materials which are made available by optionsXpress for your own needs only, and you are not authorized to resell access to any such materials or to make copies of any such materials for sale or use to and by others without the written permission of a duly authorized officer of optionsXpress. You will not delete copyright or other intellectual property rights notices from printouts of electronically accessed materials.

**44. Liability for Costs of Collection and Arbitration**
You agree to pay and shall be liable for the costs and expenses of collection of a debit balance or any unpaid deficiency in your Account with us, including, but not limited to, attorney's fees, court costs and any other costs incurred or paid by us. This liability shall include fees and expenses, including attorney's fees, for any arbitration brought or other proceeding against you by us or brought against us by you where such arbitration results in a finding in our favor. You agree that we may, in our sole discretion, use and share any information about you, whether provided by you to us or otherwise acquired by us in the course of business, in furtherance of collection of losses or debts owed to us or in prevention of future losses.

**45. Investor Education and Protection**
Under the Public Disclosure Program, the NASD provides certain information regarding the disciplinary history of NASD members and their associated persons in response to written inquiries, electronic inquiries or telephone inquiries via NASD Regulation's toll-free telephone number, 1-800-289-9999. Additional information may be obtained from the NASD Regulation web site at http://www.nasdr.com/. An investor brochure describing the Public Disclosure Program is available from optionsXpress.

**46. Arbitration Provisions**
You understand and agree to the following:

- **Arbitration is final and binding on the parties.**
- **The parties are waiving their right to seek remedies in court, including the right to a jury trial.**
- **Pre-arbitration discovery is generally more limited than and different from court proceedings.**
- **The arbitrators' award is not required to include factual findings or legal reasoning and any party's right to appeal or seek modification of rulings by the arbitrators is strictly limited.**
- **The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.**

**Agreement to Arbitrate Controversies:**
You agree that any and all controversies which may arise between you and optionsXpress or any of our officers, directors, employees, agents, subsidiaries or affiliates including but not limited to those involving transactions of any kind made on your behalf by, through or with optionsXpress, our officers, directors, employees, agents, subsidiaries or affiliates and the construction, performance or breach of this or any other agreement between you and us shall be determined by arbitration conducted before the NASD in accordance with its arbitration rules then in force. You specifically agree, however, as permitted by statute and/or regulation, to arbitrate all such controversies before the NASD in Chicago, Illinois.

You consent to jurisdiction by the NASD where any claim is initiated by us and against you. Judgment upon any award of the arbitrators may be entered in any court, state or federal, having jurisdiction thereof. No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until: (i) the class

# EXHIBIT 5



**Bank of America**

---

Business Economy Chk - 6009 : Check Image

Check Image:

NEIL B. SOLOMON, PA                    1042
561-752-4991
4174 SAINT LUKES LN
JUPITER, FL 33458-4331

DATE  11/16/07

PAY
TO THE
ORDER OF  United States Marshal              $ 250.00

Two Hundred Fifty + 00/100                    DOLLARS

Bank of America

FOR  Service

---

FRB CLEVELAND
> 041015724 <
PCC OTC
12/19/2007

---