# EXHIBIT 1



IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

OPTIONSXPRESS, INC.,

        Petitioner,

    v.

LINDA HALE,

        Respondent.

Docket No. _____

07CH25396

## APPLICATION TO
## VACATE ARBITRATION AWARD

Petitioner optionsXpress, Inc., through its attorneys and pursuant to section 12 of the Illinois Uniform Arbitration Act, 710 ILCS 5/12, requests the entry of an order vacating the Arbitration Award dated August 13, 2007, in favor of respondent Linda Hale and against petitioner optionsXpress, Inc. in the FINRA arbitration, *Hale v. optionsXpress, Inc.*, FINRA Case No. 06-5183.[1]

### I. The Parties

1.    Petitioner optionsXpress, Inc. ("optionsXpress") is a corporation and registered as a broker-dealer with the Securities Exchange Commission and with various self-regulatory organizations, and is primarily engaged in the self-directed retail brokerage business.

---

1 On July 30, 2007, the New York Stock Exchange dispute resolution body, NYSE Dispute Resolution, and the National Association of Securities Dealers' dispute resolution body, NASD Dispute Resolution (hereinafter, the "NASD"), combined operations under Financial Industry Regulatory Authority ("FINRA"). Pursuant to FINRA's rules, matters commenced under the NASD rules, as was the case with the instant matter, would be adjudicated under the Rules of the NASD Dispute Resolution in force at the time of the merger.

2.    Respondent Linda Hale ("Hale") is an individual, who resides in Fort Lauderdale, Florida.

3.    Non-party Tim Wise ("Wise"), is an individual, who, at all times relevant, was the confidant and personal investment adviser of Hale. Wise had over twenty years experience in the financial markets, and as of the commencement of the underlying hearing, the NASD had no public record of any disciplinary history concerning Wise.

## II. Procedural History

4.    On or about December 2, 2006, Hale commenced an arbitration action with the NASD by filing an arbitration claim against optionsXpress (the "Claim"). A true and correct copy of Hale's Arbitration Claim is attached hereto as **Exhibit A**. In her Claim, Hale failed to state or allege any specific cause of action, but made a number of allegations concerning optionsXpress' alleged "reckless decision to allow Ms. Hale [to] engage in speculative options trading strategies [sic]." (*See* **Exhibit A**) Hale sought compensatory damages of $200,000, $1,000,000 in punitive damages, attorneys' fees, and costs in her Claim against optionsXpress.

5.    On February 7, 2007, in response to her Claim, optionsXpress filed its Answer, which contained a motion to dismiss (the "Answer"). OptionsXpress' motion to dismiss was subsequently denied by the Panel on June 29, 2007. A true and correct copy of optionsXpress Answer is attached hereto as **Exhibit B**.

6.    A four-day arbitration hearing in the underlying matter was commenced on August 6, 2007, before a FINRA appointed panel of three arbitrators (the "Panel").

7.    On August 13, 2007, the Panel entered an arbitration award (the Award"). A

2

true and correct copy of the Award is attached hereto as **Exhibit C**. The Panel awarded $175,000 to Hale and against optionsXpress as a result of the Panel's finding of liability for suitability, breach of contract, failure to supervise, and negligence, and denied Hale's request for punitive damages, attorneys' fees, and costs.

8.    Petitioner optionsXpress' filing of its Application to Vacate Arbitration Award (Application) is timely. Pursuant to section 12 of the Illinois Uniform Arbitration Act, 710 ILCS 5/12, a party has 90 days from receipt of the Award to file a petition in a court of competent jurisdiction to vacate the Award.

### III. Factual Background[2]

9.    As an online self-directed retail brokerage firm, the accounts of optionsXpress' customers are self-directed – that is, optionsXpress makes no recommendations to its customers and its customers typically place their respective orders to buy or sell stock, options, or other securities electronically, via the internet. (*See* **Exhibit B**) As such, optionsXpress does not solicit customer orders, does not provide customer with tax, accounting, or specific market advice. *Id.* In essence, optionsXpress provides execution and ministerial services to its customers, as was the case with Hale.

*a.    Hale opened her online self-directed Accounts with optionsXpress.*

10.    On November 14, 2002, optionsXpress was electronically provided with two

---

2  Citations to the Record with be formatted as "Tr. (-date-) at ___," e.g. Tr. (8/10/07) at 10, for citations to the transcript of the proceeding, "OX Ex. ___," for citations to optionsXpress' exhibits produced at the underlying hearing, and "LH Ex. ___," for citations to Linda Hale's exhibits produced at the underlying hearing. The transcripts to the arbitration hearing are being prepared but were not available as of the date of the filing of this Application. Accordingly, Petitioner intends to file an amended application with citation to the Record upon receipt of the transcripts.

on-line account applications including certain information about Hale and affirmatively agreeing to optionsXpress' "Terms and Conditions" and other agreements, which would govern the activity in her accounts ("Application"). The Applications were electronically sent to and received by optionsXpress for the purpose of opening Hale's self-directed options trading accounts on behalf of her living trust and her IRA (the "Accounts"). (OX Ex. 2-3) After submitting the information and agreement to the "Terms and Conditions" and other agreements which would govern the activity of her online self-directed accounts with optionsXpress, an Account Overview was generated for the Accounts, which Hale signed, confirming the accuracy of the summarized information electronically submitted to optionsXpress in the Application and her agreement to the optionsXpress "Terms and Conditions" and other agreements ("Account Overview(s)"). A true and correct copy of the Account Overview(s) is attached hereto as **Exhibit D**. On November 15, 2002, Hale forwarded each of the signed Account Overviews to optionsXpress together with other documents detailed below. Hale completed and submitted to optionsXpress, both her Trust and IRA Applications via the internet and her signed Account Overviews without assistance or advice from optionsXpress.

11.    Based upon the financial information and investment objectives provided by Hale, and the transfer of open option positions from her predecessor trading firm to optionsXpress, optionsXpress determined that Hale was qualified to trade securities and options, and approved her Accounts to trade options.

12.    The account numbers for Hale's living trust and IRA accounts were 4097-8276 and 4097-8278, respectively. Those accounts numbers were changed in August 2004 to

4

5AD6-LL1 and 5AD6-LM1, respectively.  (OX Ex. 5 & 8)

13.    In its application forms, optionsXpress listed four investment objectives that a customer may consider and select: speculation, aggressive growth, growth, and income. Hale indicated in her Applications that speculation was the investment objective for both of her Accounts.

14.    Upon opening her Accounts with optionsXpress, Hale entered into and agreed to the terms of optionsXpress User/Customer Agreement  (the "Customer Agreement"), and confirmed her agreements by submitting the Account Overview(s).  (OX Ex. 2-3)

15.    At all times relevant, Section 14 of the Customer Agreement provided, in part, as follows:

> You understand that we, through our web site, *provide no tax, legal or investment advice of any kind,* nor do we give advice or offer any opinion with respect to the nature, potential value or suitability of any particular securities transaction or investment strategy. . . .  Any investment you make will be *based solely on your own evaluation* of your financial circumstances and investment objectives and the suitability for you of any security or any investment or trading strategy.

(emphasis added)

16.    Section 14 of the Customer Agreement was consistent with optionsXpress status as an online discount broker.

**b.    *Hale appointed an investment adviser as her agent.***

17.    The day after submitting her Applications to optionsXpress on November 14, 2002, and together with her signed Account Overviews confirming the information submitted in her Applications and agreement to optionsXpress' "Terms & Conditions" and

5

other Agreements, Hale also provided optionsXpress with a power of attorney for each of her Accounts, titled <u>Fee Payment & Limited Trading Authorization</u> which were dated November 14, 2002 and November 15, 2002, respectively (the "POAs"). A true and correct copy of the POAs are attached hereto as **Exhibit E**.

18.    Under the POAs, Hale appointed Tim Wise ("Wise") as her agent and adviser, and provided Wise with the "discretion, power and authority to purchase and/or sell options contracts . . . and to make agreements relating to same." (*See* **Exhibit E**) At all times relevant, Wise operated as an exempt investment adviser.

19.    The POAs further provided that optionsXpress was "directed to follow the instructions of [Wise], who shall be solely responsible for suitability of Investments, timing of purchases of sales and all related matters." (*See* **Exhibit E**)

20.    Wise was not an employee, broker, or independent contractor of optionsXpress. Wise was an independent third party account controller known by Hale long before opening the Accounts with optionsXpress.

21.    Wise was an agent of Hale, and, pursuant to the terms of the POAs, Hale authorized optionsXpress to "pay management fees directly" from the Accounts to Wise, and Hale notified optionsXpress that it could "rely on the invoices submitted by [Wise], and optionsXpress [would] have no responsibility to calculate or verify fees so invoiced as [she had] that responsibility." (*See* **Exhibit E**)

22.    At no time did Hale ever revoke the POAs given to Hale.

c.    *Hale transferred her accounts, including her options positions, from Wall St. Access, a registered broker-dealer, to optionsXpress.*

6

23.    Prior to opening her Accounts with optionsXpress, Hale had maintained other securities and options trading accounts as far back as February 2000, with broker-dealers DLJ Direct Inc., CSFB direct Inc., and Wall St. Access, where Wise also acted as an agent, adviser and third party account controller for which Hale paid Wise. (OX Ex. 11-15)

24.    On December 4, 2002, Hale transferred her stock and options positions held at Wall St. Access to her Accounts with optionsXpress. At the end of December 2002, her Accounts had a combined equity value of $141,896.01. (OX Ex. 5 & 8)

25.    During the course of the next four years, Hale withdrew $30,728.48 from her Accounts, paid transaction fees of $13,045.90, and paid management fees to Wise of $51,925.70, for a total of $95,700.07 in withdrawals and fees.[3] (OX Ex. 5 & 8)

26.    By December 29, 2006, the same month Hale filed her Arbitration Claim with the NASD, the value of Hale's Accounts totaled $21,143.17. Accordingly, after accounting for Hale's withdrawals from her Accounts and the payment of transaction and management fees, Hale's actual loss in her Accounts totaled no more than $25,052.77. Furthermore, after accounting for the $23,982 in rebates to Hale, Hale incurred virtually no losses in her Accounts.[4]

## IV. ARGUMENT AND AUTHORITIES FOR APPLICATION TO VACATE AWARD

### a.    The Court has jurisdiction over this matter and Hale.

27.    At all times relevant, there was in effect in the State of Illinois a provision of

---

3    During optionsXpress cross-examination of Hale at the hearing, Hale admitted that $23,982 of the management fees she paid to Wise from her IRA were rebated to her by Wise. Hale also admitted that the rebate was a scheme that she and Wise had created to allow Hale to withdraw money from her IRA account without paying the required penalty to the IRS for early withdrawal.

4    Hale's losses on the date she filed her Complaint were $1,070.77.

law commonly called the Illinois Arbitration Act (the "Act"), 710 ILCS 5/1 *et seq*. Section 16 of the Act provided, in part, as follows:

> The term "court" means any circuit court of this State. The making of an agreement described in Section 1 providing for arbitration in this State confers jurisdiction on the court to enforce the agreement under this Act and to enter judgment on an award thereunder.

710 ILCS 5/16.

28.    At all times relevant, the parties agreed to arbitrate any dispute between them pursuant to Section 43 of the Customer Agreement, which was appropriately titled as "Arbitration Provisions."

29.    Pursuant to Section 43 of the Customer Agreement, Hale agreed "to arbitrate all such controversies before the NASD in Chicago, Illinois." Accordingly, this Court has subject matter jurisdiction in this matter.

30.    Furthermore, pursuant to Section 43 of the Customer Agreement, Hale gave her "consent to the jurisdiction of the State of Illinois over [her] individually." Accordingly, this Court has personal jurisdiction over Hale in this matter.

b.    ***The standard applied to an Application to vacate an arbitration award.***

31.    At all times relevant, Section 12 of the Act provided a statutory basis for vacating an arbitration award. 710 ILCS 5/12.

32.    In addition to the statutory basis for vacating an award under 710 ILCS 5/12, Illinois Court have also held that an award may be vacated as a result of an arbitrator's gross error of judgment in law or a gross mistake of fact if those mistakes or errors are apparent upon the face of the award. *Garver v. Ferguson*, 76 Ill. 2d 1 at 10-11 (1979).

33.    In the instant case, based on the record and applicable law, it is apparent on the face of the award that the Arbitration Panel made a gross error of judgment in law and/or gross mistake of fact in arriving at their finding that optionsXpress was liable for failure to supervise, suitability, negligence, and breach of contract.

34.    In summary, and as more fully set forth below, with regard to failure to supervise, suitability, negligence, and breach of contract, the Panel was informed and supplied with a plethora of case law confirming that:

• optionsXpress had no duty as a matter of law to monitor or supervise Hale's self-directed Accounts to determine the suitability of the investments entered in her Accounts. (*See* **Exhibit B**, and optionsXpress Brief in Support of its Motion to Dismiss and optionsXpress Reply in Response to Claimant's Response to its Motion to Dismiss and Response to Claimant's Motion for Summary Judgment, which are attached hereto as **Exhibits F** and **G**, respectively).

• optionsXpress had no duty to determine the suitability of the investments made in her Accounts. *Id.*

• in the absence of any duty, there can be no finding of negligence as a matter of law. *Id.*

• a violation of an exchange rule or NASD rule does not constitute a private cause of action for damages. *Id.*

In fact, at no time during the proceeding was the panel ever provided with any conflicting or contradicting case law by Claimant. The foregoing notwithstanding, in each instance and with respect to each of the referenced claims, the Panel blatantly ignored the well

9

settled law, and as a result made a gross error in law or fact which is apparent on the face of the Award.

35.    In addition, based on the proofs, the compensatory damage award of $175,000 was a patently gross mistake of fact, in view of the fact that Hale lost virtually no money in her Accounts.

c.    *The Panel made a gross error of judgment in law and gross mistake of fact in finding optionsXpress liable for failure to supervise and suitability because optionsXpress had no duty to supervise or determine the suitability of investments made in Hale's self-directed Accounts.*

36.    There is no dispute that Hale's Accounts were self-directed and that she retained an independent investment adviser, who was not an employee, broker, or independent contractor of optionsXpress, to advise her on her behalf. Moreover, Hale stipulated at hearing that not a single trade placed in her Accounts was recommended by optionsXpress and that optionsXpress makes no recommendations.

37.    Because Hale's Accounts were self-directed, optionsXpress had no duty to supervise or monitor those Accounts for the suitability of Hale's investments.

38.    It has long been the rule that a broker-dealer has no duty to supervise and monitor the investments made in a self-directed account, especially when the customer has retained an investment adviser to use his discretion in placing trades in the account. *See Cumis Ins. Soc'y. Inc. v. E.F. Hutton & Co.,* 457 F. Supp. 1380, 1390 (S.D.N.Y. 1978)(finding that placing a burden on a broker to monitor an investment adviser's activities "would be more than burdensome; it would be ethically unsound"). In the instant case, the Panel was supplied with an undisputed breadth of case law regarding the absence of any suitability or supervision duty at various stages of the proceeding, and Hale never submitted any

10

authority to the contrary or disputed its authority. (*See* **Exhibits B, F, & G**) Again, the Panel blatantly ignored the well-settled and undisputed body of law, and as a result grossly erred in their judgment of the law in finding that optionsXpress was liable under a suitability theory.

39.    The rule that a broker-dealer has no duty to supervise or monitor the activities in a self-directed account is even more compelling where the broker is a discount broker, as was the case in this matter. *See Shwe Ming Chee, M.D. v. Marine Midland Bank, N.A.,* 1991 U.S. Dist. LEXIS 1151 at *10-11 (E.D.N.Y. Jan. 29, 1991) (holding that "[t]here is even greater reason to reject monitoring liability [on a broker-dealer] in the case of discount brokers whose admitted function is *not* to give advice so investors can save money on commission") (emphasis in the original). A copy of the *Shwe Ming Chee, M.D. v. Marine Midland Bank, N.A.* decision is attached hereto as **Exhibit H**.

40.    Not only is there no duty, but as recognized by the court in *Unity House*, to impose the duty of suitability and supervision on a broker holding a self-directed account would be even more unwarranted in a case where the broker knows that an investment adviser is trading on behalf of another. *See Unity House, Inc. v. North Pacific Inv., Inc.,* 918 F. Supp. 1384, 1393 n.7 (D. Haw. 1996).

41.    Hale has never claimed that optionsXpress failed to fulfill its only duty to properly execute or carry out the orders placed in her Accounts. (*See* **Exhibit A**) Because Hale's accounts were self-directed, optionsXpress' duty to Hale was exceedingly narrow and limited to the execution of the orders that she, or her adviser, placed in her account. *T-Bill Option Club v. Brown & Co. Sec. Corp.,* 1994 U.S. App. LEXIS 11976 * 12 (7th Cir. May 23,

11

1999) (following the general rule that "[t]he scope of the duty 'owed by a broker carrying a nondiscretionary account for a customer is an exceedingly narrow one, consisting at most of a duty to properly carry out transactions ordered by the customer'"). A copy of the *T-Bill Option Club v. Brown & Co. Sec. Corp.* decision is attached hereto as **Exhibit I**. Again, the Panel was supplied with an undisputed body of case law at various stages of the proceeding in support of this position, and Hale never submitted any contrary authority. (*See* **Exhibits B, F, & G**)

42.    It is an undisputed fact that optionsXpress ascertained Hale's financial situation and investment objectives before approving her Accounts for options trading, that none of the trades placed in her Accounts were recommended by optionsXpress, and that the Accounts were self-directed. Based on the foregoing, the finding of liability by the Panel for suitability, which requires the finding of an unsuitable recommendation by optionsXpress regarding a particular trade, was a gross error in law and gross mistake of fact on the face of the Award.

43.    Accordingly, on the face of the Award, the Panel made a gross error of judgment in law and gross mistake of fact in finding that optionsXpress was liable for suitability or failure to supervise.

**d.    *The Panel made a gross error of judgment in law and gross mistake of fact in finding optionsXpress liable for negligence, because optionsXpress had no duty to supervise or monitor the investments placed in Hale's Accounts and no duty to determine the suitability of those investments.***

44.    It is well established that in order to prove a cause of action in negligence, a claimant must show that the broker owed her a duty, that the duty was breached, that she suffered damages, and that the broker's breach was the proximate cause of the injury.

12

*Martello v. Century Supply Co.*, 163 Ill. App. 3d 521, 523 (1987).

45.     In the instant case, optionsXpress supplied the panel with the breadth of case law confirming, as a matter of law, that optionsXpress had no duty to Hale other than to properly execute the orders placed in her Accounts – a duty that Hale has not claimed was breached. (*See* **Exhibits B, F, & G**) Claimant provided no authority or law contradicting or contesting this authority. Accordingly, it is axiomatic that the failure to prove the existence of a duty defeats a claim of negligence. *Id.* at 524 (finding that a plaintiff's failure to show a legal duty "obviates the need to address the issue of proximate cause").

46.     On the face of the Award, in view of the absence of any duty owed by optionsXpress to Hale, the Panel made a gross error of judgment in law and gross mistake of fact in finding that optionsXpress was liable for negligence.

e.     *The Panel made a gross error of judgment in law and a gross mistake of fact in finding optionsXpress liable for breach of contract, because there is no cause of action for a breach of an exchange or self-regulatory organization's rules.*

47.     In her Claim, Hale alleged that optionsXpress breached rules of the NASD and the Chicago Board Options Exchange ("CBOE"). Nowhere did Hale allege a breach of contract, or any of the elements of a breach. (*See* **Exhibit A**)

48.     Even if there was some theory to support a private right of action, and assuming for argument sake that Hale had alleged a breach of contract, and that Hale was a party to a contract between optionsXpress and a exchange or self regulatory organization, Hale would not be entitled to assert a private cause of action. It is well-settled law, and the Panel was supplied with an uncontradicted body of case law at various stages of the proceeding, that an investor generally does not have a private cause of action for a

13

violation of an exchange rule or rules of the NASD, absent a finding of fraud. *See Shull v.*

*Dain, Kalman & Quail, Inc.*, 561 F.2d 152, 160 (8th Cir. 1977); *See Spicer v. Chicago Bd. of*

*Options Exchange, Inc.*, 977 F.2d 255, 264 (7th Cir. 1992) (citing to *Buttrey v. Merrill Lynch,*

*Pierce, Fenner & Smith, Inc.*, 410 F.2d 135 (7th Cir. 1969) in holding that New York Stock

Exchange Rule 405 did not support a private right of action without a finding of fraud); *See*

*also* **Exhibits B, F, & G**)

49.      In the instant case, no allegation of fraud was alleged, and none found. (*See*

**Exhibit C**) Therefore, Hale cannot recover for the violation of an exchange rule or rules of

the NASD.

50.      In view of the foregoing, Hale's alleged cause of action for breach of contract

was without any basis in law or fact.  Accordingly, on the face of the Award, the Panel

made a gross error of judgment in law and gross mistake of fact in finding that

optionsXpress was liable for breach of contract, when no such allegation was even pled,

argued or supported as a matter of law. (*See* **Exhibit A**)

f.      *In light of the fact that Hale incurred virtually no damages in her Accounts, it was*
       *a gross mistake of fact to award Hale any compensatory damages.*

51.      As set forth above, Hale's combined equity in her Accounts following the

transfer to optionsXpress was $141,896.01.

52.      The evidence was undisputed that Hale withdrew $30,728.47 from her

Accounts, paid transaction fees of $13,045.90, and paid management fees to Wise of

$51,925.70, for a total of $95,700.07 in withdrawals and fees.  In light of the $23,982 Hale

received in rebates from Wise and the $21,143.17 balance in her Accounts as of December

29, 2002, Hale incurred virtually no loss in her Accounts.

53.     In light of the fact that the undisputed evidence confirmed, and the Panel had been informed, that there were virtually no losses, t the Panel made a gross mistake of fact in awarding $175,000.00 in compensatory damages to Hale.

54.     Accordingly, on the face of the Award, Panel made a gross mistake of fact in awarding compensatory damages to Hale.

WHEREFORE, optionsXpress, Inc., respectfully requests the entry of an order vacating the underlying Arbitration Award, and such further or alternative relief as the Court deems appropriate under the circumstances.

Respectfully submitted,

OPTIONSXPRESS, INC.

By: _____
One of Its Attorneys

Jeffry M. Henderson
Robert B. Christie
HENDERSON & LYMAN
175 West Jackson, Suite 240
Chicago, Illinois 60604
312-986-6960
Cook County ID No. 34832

Hillary Victor, Corporate Counsel
optionsXpress Holdings, Inc.
311 West Monroe Street, Suite 1000
Chicago, Illinois 60606
312-267-6627
Cook County ID No. 42588

15