UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

OPTIONSXPRESS, INC.,

               Petitioner,

      v.

LINDA HALE,

               Respondent.

Docket No. 08 CV 179

Virginia M. Kendall, Judge

## SECOND AMENDED APPLICATION TO
## VACATE ARBITRATION AWARD

Petitioner optionsXpress, Inc., through its attorneys and pursuant to section

12 of the Illinois Uniform Arbitration Act, 710 ILCS 5/12, requests the entry of an order

vacating the Arbitration Award dated August 13, 2007, in favor of respondent Linda Hale

and against petitioner optionsXpress, Inc. in the FINRA arbitration, *Hale v. optionsXpress,*

*Inc.*, FINRA Case No. 06-5183.[1]

### JURISDICTION
### Founded on Diversity of Citizenship and Amount

1.       This action was timely removed from the Circuit Court of Cook County,

---

[1]  On July 30, 2007, the New York Stock Exchange dispute resolution body, NYSE Dispute Resolution, and the National Association of Securities Dealers' dispute resolution body, NASD Dispute Resolution (hereinafter, the "NASD"), combined operations as the Financial Industry Regulatory Authority ("FINRA"). Pursuant to FINRA's rules, matters commenced under the NASD rules, as was the case with the instant matter, would be adjudicated under the Rules of the NASD Dispute Resolution in force at the time of the merger.

Illinois by the Respondent, pursuant to 28 U.S.C. § 1441.

2.     Petitioner is a corporation organized under the laws of the State of Delaware, with its principal place of business in Chicago, Illinois. Respondent is a citizen of the State of Florida.[2] The matter in controversy exceeds, exclusive of interest and costs, the sum specified by 28 U.S.C. § 1332.

### I. The Parties

3.     Petitioner optionsXpress, Inc. ("optionsXpress") is a corporation and registered as a broker-dealer with the Securities Exchange Commission and with various self-regulatory organizations, and is primarily engaged in the self-directed retail online discount brokerage business.

4.     Respondent Linda Hale ("Hale") is an individual, who resides in Fort Lauderdale, Florida.

5.     Non-party Tim Wise ("Wise"), is an individual, who, at all times relevant, was the confidant and personal investment adviser of Hale. Wise had over thirty years experience in the financial markets and over twenty years experience in trading options, and as of the commencement of the underlying hearing, the NASD had no public record of any disciplinary history concerning Wise. (**Exhibit O** at 142-43, partial transcript of August 8, 2007; **Exhibit L** at 18, partial transcript of August 7, 2007)

---

2   The Court should note that Hale's attorney, although located in the State of Florida, is licensed in the State of Illinois.

## II. Procedural History

6.    On or about December 2, 2006, Hale commenced an arbitration action with the NASD by filing an arbitration claim against optionsXpress (the "Claim"). A true and correct copy of Hale's Arbitration Claim is attached hereto as **Exhibit A**. In her Claim, Hale failed to state or allege any specific cause of action, but made a number of allegations concerning optionsXpress' alleged "reckless decision to allow Ms. Hale [to] engage in speculative options trading strategies [sic]." (*See* **Exhibit A**) Hale sought compensatory damages of $200,000, $1,000,000 in punitive damages, attorneys' fees, and costs in her Claim against optionsXpress.

7.    On February 7, 2007, in response to her Claim, optionsXpress filed its Answer, which contained a motion to dismiss (the "Answer"). OptionsXpress' motion to dismiss was subsequently denied by the Panel on June 29, 2007. A true and correct copy of optionsXpress Answer, *sans exhibits*, is attached hereto as **Exhibit B**.

8.    A four-day arbitration hearing in the underlying matter was commenced on August 6, 2007, before a FINRA appointed panel of three arbitrators (the "Panel").

9.    On August 13, 2007, the Panel entered an arbitration award (the "Award"), wherein the Panel found optionsXpress liable to Hale's on causes of action for suitability, breach of contract, failure to supervise, and negligence. A true and correct copy of the Award is attached hereto as **Exhibit C**. The Panel awarded $175,000 to Hale and denied Hale's request for punitive damages, attorneys' fees, and costs.

10.    Pursuant to section 12 of the Illinois Uniform Arbitration Act, 710 ILCS 5/12,

3

a party has 90 days from receipt of the Award to **file** (not serve) a petition in a court of competent jurisdiction to vacate the Award.

11.    Petitioner optionsXpress timely filed its Application to Vacate Arbitration Award (the "Application") on September 12, 2007.

### III. Factual Background[3]

12.    As an online self-directed retail brokerage firm, the accounts of optionsXpress' customers are self-directed – that is, optionsXpress makes no recommendations to its customers and its customers typically place their respective orders to buy or sell stock, options, or other securities electronically, via the internet.  (*See* **Exhibit B**)  As such, optionsXpress does not solicit customer orders, and does not provide customers with tax, accounting, or specific market advice.  *Id.*  In essence, optionsXpress provides execution and ministerial services to its customers, as was the case with Hale.

**A.**    ___*Hale's application to open her online self-directed Accounts with optionsXpress.*___

13.    On November 14, 2002, optionsXpress was electronically provided with two on-line account applications, which included certain information about Hale, under which Hale agreed to optionsXpress' "Terms and Conditions" and other agreements, which would govern the activity in her accounts (the "Applications").  The Applications were

---

3   Citations to the Record will be formatted as "Tr. (-date-) at ___," e.g. Tr. (8/10/07) at 10, for citations to the transcript of the proceeding, "OX Ex. ___," for citations to optionsXpress' exhibits produced at the underlying hearing, and "LH Ex. ___," for citations to Linda Hale's exhibits produced at the underlying hearing.

electronically sent to and received by optionsXpress for the purpose of opening Hale's self-directed options trading accounts on behalf of her living trust and her IRA (the "Accounts"). (OX Ex. 2-3) After submitting the information and agreement to the "Terms and Conditions" and other agreements which would govern the activity of her online self-directed accounts with optionsXpress, an Account Overview was generated for the Accounts, which Hale signed, confirming, in summary, the accuracy of the information electronically submitted to optionsXpress in the Application and her agreement to the optionsXpress "Terms and Conditions" and other agreements ("Account Overviews"). A true and correct copy of the Account Overviews is attached hereto as **Exhibit D**. On November 15, 2002, Hale forwarded each of the signed Account Overviews to optionsXpress together with other documents detailed below. Hale completed and submitted to optionsXpress, both her Trust and IRA Applications via the internet and her signed Account Overviews without assistance or advice from optionsXpress.

14.     In its application forms, optionsXpress listed four investment objectives that a customer may consider and select: speculation, aggressive growth, growth, and income. Hale indicated in her Applications that speculation was the investment objective for both of her Accounts.

15.     In submitting her application forms to optionsXpress, Hale entered into and agreed to the terms of the optionsXpress User/Customer Agreement (the "Customer Agreement"), and confirmed her agreements by submitting the Account Overviews. (OX Ex. 2-3) A true and correct copy of the Customer Agreement is attached hereto as **Exhibit**

5

E.

      16.    At all times relevant, Section 14 of the Customer Agreement provided, in

part, as follows:

> You understand that we, through our web site, *provide no tax, legal or investment advice of any kind,* nor do we give advice or offer any opinion with respect to the nature, potential value or suitability of any particular securities transaction or investment strategy. . . . Any investment you make will be *based solely on your own evaluation* of your financial circumstances and investment objectives and the suitability for you of any security or any investment or trading strategy.

(emphasis added)

B.    ***Hale appointed an investment adviser as her agent.***

      17.    The day after submitting her Applications to optionsXpress on November 14,

2002, and together with her signed Account Overviews confirming the information

submitted in her Applications and agreement to optionsXpress' "Terms & Conditions" and

other agreements, Hale also provided optionsXpress with a power of attorney for each of

her Accounts, titled <u>Fee Payment & Limited Trading Authorization</u> which were dated

November 14, 2002 and November 15, 2002, respectively (the "POAs"). A true and correct

copy of the POAs are attached hereto as **Exhibit F**.

      18.    Under the POAs, Hale appointed Tim Wise as her agent and adviser (the

"Investment Adviser"), and provided her Investment Adviser with the "discretion, power

and authority to purchase and/or sell options contracts . . . and to make agreements

relating to same." (*See* **Exhibit F**) At all times relevant, Hale's Investment Adviser

operated as an exempt investment adviser.

6

19.    The POAs further provided that optionsXpress was "directed to follow the instructions of [Hale's Investment Adviser], who shall be solely responsible for suitability of Investments, timing of purchases of sales and all related matters." (*See* **Exhibit F**)

20.    Hale's Investment Adviser was not an employee, broker, or independent contractor of optionsXpress. Hale's Investment Adviser was an independent third party account controller known by Hale long before opening the Accounts with optionsXpress.

21.    Hale's Investment Adviser had an active trading account open with optionsXpress at the time Hale submitted her account application to optionsXpress.

22.    In the Investment Adviser's application submitted to optionsXpress, the Investment Adviser provided information about his financial condition and trading history.

23.    In his application, Hale's Investment Adviser represented to optionsXpress that he had over thirty years of experience in the financial markets and over twenty years experience trading options. (**Exhibit O** at 142-43, partial transcript of August 8, 2007; **Exhibit L** at 18, partial transcript of August 7, 2007) In fact, Hale's Investment Adviser traded accounts for persons other than Hale, and received compensation for his services. Simply put, Hale's Investment Adviser was an industry professional.

24.    The Investment Adviser was an agent of Hale, and, pursuant to the terms of the POAs, Hale authorized optionsXpress to "pay management fees directly" from the Accounts to her Investment Adviser, and Hale notified optionsXpress that it could "rely on the invoices submitted by [her Investment Adviser], and optionsXpress [would] have no

responsibility to calculate or verify fees so invoiced as [she had] that responsibility." (*See* Exhibit F)

25.     At no time did Hale ever revoke the POAs that she signed giving her Investment Adviser authority to trade her Accounts held by optionsXpress.

C.     *optionsXpress review of Hale's application.*

26.     optionsXpress determined that Hale was qualified to trade options, and thus, approved her Accounts to trade options based on the following factors:

    i      The financial information and investment objectives provided by Hale in her Application;

    ii.     The fact that Hale had retained a professional investment adviser to manage her account;

    iii.    Her Investment Adviser had over 20 years experience in the financial markets; and

    iv.    Her Investment Adviser had managed the accounts that Hale intended to transfer to optionsXpress from her predecessor trading firm

27.     The account numbers for Hale's living trust and IRA accounts were 4097-8276 and 4097-8278, respectively.  Those accounts numbers were changed in August 2004 to 5AD6-LL1 and 5AD6-LM1, respectively.  (OX Ex. 5 & 8)

D.     *Hale transferred her accounts, including her options positions, from Wall St. Access, a registered broker-dealer, to optionsXpress.*

28.     Prior to opening her Accounts with optionsXpress, Hale had maintained other securities and options trading accounts as far back as February 2000, with broker-dealers DLJ Direct Inc., CSFB direct Inc., and Wall St. Access, where her Investment

8

Adviser also acted as an agent, adviser and third party account controller for which Hale paid the Investment Adviser.  (OX Ex. 11-15)

29.    On December 4, 2002, Hale transferred her stock and options positions held at Wall St. Access to her Accounts with optionsXpress.  At the end of December 2002, her Accounts had a combined equity value of $141,896.01.  (OX Ex. 5 & 8)

30.    During the course of the next four years, Hale withdrew $30,728.48 from her Accounts, paid transaction fees of $13,045.90, and paid management fees to her Investment Adviser of $51,925.70, for a total of $95,700.07 in withdrawals and fees.[4]  (OX Ex. 5 & 8)

31.    By December 29, 2006, the same month Hale filed her Arbitration Claim with the NASD, the value of Hale's Accounts totaled $21,143.17.  Accordingly, after accounting for Hale's withdrawals from her Accounts and the payment of transaction and management fees, Hale's actual loss in her Accounts totaled no more than $25,052.77.  Furthermore, after accounting for the $23,982 in rebates to Hale, Hale incurred <u>virtually no losses</u> in her Accounts.[5]

### IV. Argument And Authorities For Application To Vacate Award

A.    *Application of the Illinois Arbitration Act.*

32.    At all times relevant, the sole procedure to enforcing the parties' agreement,

---

4   During optionsXpress cross-examination of Hale at the hearing, Hale admitted that $23,982 of the management fees she paid to Wise from her IRA were rebated to her by Wise.  Hale also admitted that the rebate was a scheme that she and Wise had created to allow Hale to withdraw money from her IRA account without paying the required penalty to the IRS for early withdrawal.

5   Hale's losses on the date she filed her Complaint were $1,070.77.

pursuant to the unambiguous terms of the Customer Agreement, was through arbitration, which expressly provided that the enforcement of the Customer Agreement would be performed pursuant to Illinois Law.

33.    At all times relevant, the parties' Customer Agreement contained a arbitration provision, appropriately titled "Arbitration Provisions," hereinafter referred to as the "Arbitration Provision," which expressly provided that the "laws of the State of Illinois will govern the . . . enforcement of the terms of this agreement[6]

34.    Because a "federal court sitting in diversity [applies] state law to resolve substantive questions and federal law to resolve procedural and evidentiary issues," the interpretation of the Arbitration Provision is a substantive question that is decided under Illinois law.  *Bevolo v. Carter*, 447 F.3d 979, 982 (7th Cir. 2006)(citations omitted); *See also International Merger & Acquisition Consultants, Inc. v. ARMAC Enter., Inc.*, 531 F.2d 821, 824 (7th Cir. 1976)(holding that the interpretation of the terms of a contract is a substantive question to be decided by Illinois law).

---

6    At all times relevant, the Arbitation Provision provided, as follows:

**46. Arbitration Provisions**

Agreement to Arbitrate Controversies:
You agree that any and all controversies which may arise between you and optionsXpress or any of our officers, directors, employees, agents, subsidiaries or affiliates including but not limited to those involving transactions of any kind made on your behalf by, through or with optionsXpress . . . shall be determined by arbitration, [and the] laws of the State of Illinois will govern the interpretation and enforcement of the terms of this agreement, and you further consent to the jurisdiction of the State of Illinois over you individually. . . .

10

35.    Under Illinois law, the Illinois Arbitration Act, 710 ILCS 5/1 *et seq.*, shall apply to any arbitration agreement or arbitration provision that expressly provides that Illinois law shall apply. *See Tortoriello v. Gerald Nissan of N. Aurora, Inc.*, 7 Ill. Dec. 583, 2008 Ill. App. LEXIS 6 *22-23 (1st Dist. 2008 (following *Volt Info. Sci., Inc. v. Board of Tr. of the Leland Stanford Jr. Univ.*, 489 U.S. 468, 479 (1989), in finding that a choice of law provision in the an arbitration provision mandates the application of the Illinois Arbitration Act); *See also State Farm Mut. Auto. Ins. Co. v. George Hyman Constr. Co.*, 306 Ill. App. 3d 874, 880-81 (1999)(following *Volt*, and distinguishing *Mastrobuono v. Shearson Lehman Hutton, Inc.* 414 U.S. 52 (1995), in finding that the Illinois Arbitration Act applied to the arbitration provision based on the choice of law provision contained in the parties' agreement).

36.    As explained by the Supreme Court in *EEOC v. Waffle House*, 534 U.S. 279, 295 n.9 (2002), "[i]n *Mastrobuono* we reiterated that clear contractual language governs our interpretation of arbitration agreements, but the choice-of-law provision in that case was ambiguous, we read the agreement to favor arbitration under the FAA rules." There is <u>no ambiguity</u> in the choice-of-law provision in the instant case.

37.    As explained by the Court in *Edstrom Indus., Inc. v. Companion Life Ins. Co.*, 516 F.3d 546, 550  (7th Cir. 2008), "parties can opt out of the federal act, provided the state arbitration statute does not contain provisions that would undermine the federal act's aim of facilitating the resolution of disputes involving maritime or interstate commerce by arbitration."   As explained by the *Edstrom* court, the matter before it for review was a diversity suit, and thus was "governed by Wisconsin law." *Id.* at 548.

11

38.    In the instant case, the Arbitration Provision specifically provides that the enforcement of the Customer Agreement, which must be by arbitration, shall be in accordance with Illinois law.  The inclusion within the Arbitration Provision that Illinois law was to apply to the enforcement of the Customer Agreement clearly demonstrates the specific intent of the parties at the time the Customer Agreement was executed that the Illinois Arbitration Law, a substantive law of the State of Illinois would be applied in any dispute between the parties.  *See BEM I, L.L.C. v. Anthropologie, Inc.*, 2000 U.S. Dist. LEXIS 18360 at *19, No. 98 C 358 (N.D. Ill. Dec. 15, 2000)(citing S*tate Farm Mut. Auto. Ins. Co. v. George Hyman Constr. Co.*, 306 Ill. App. 3d 874,880-81 (1999)); *see also Walz v. Federal Ins. Co.*, 2004 U.S. Dist. LEXIS 22125 at *3, No. 04 C 2286 (N.D. Ill. Jul. 28, 2004)(holding that "[w]hen a choice of law provision or other indicia of which state's law applies to a contract is found <u>outside</u> the terms of an arbitration clause or agreement, the FAA applies unless the parties expressly specify that state law applies to the arbitration agreement")(emphasis added).

39.    The specific intent of the parties that the Illinois Arbitration Act would apply if further supported by the fact that the choice of law provision relied upon to enforce the Arbitration Provision is not found outside of the provision, and is an integral part of the Arbitration Provision.  Furthermore, as a diversity case, the suit is governed by Illinois law. *See Edstrom Indus., Inc.*, 516 F.3d at 548-50 (finding that because the action was a diversity suit and because the because the arbitration clause included a choice of law provision providing for state law to apply, "[w]e cannot think of any reason why the choice of law provision could not designate the governing substantive norms" – the use of a state's

arbitration act)    Accordingly, for all of the above reasons, the Illinois Arbitration Act applies in the instant case.

40.    At all times relevant, Section 1 of the Arbitration Act (the "Act"), 710 ILCS 5/1 provided, in part, that "[a] written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable and irrevocable save upon such grounds as exist for the revocation of any contract."    optionsXpress is unaware of any provision in the Act that would undermine the federal act's aim of facilitating the resolution of disputes involving maritime or interstate commerce by arbitration.

41.    The parties do not dispute that they agreed to arbitration their disputes.

42.    There should also be no dispute that the parties agreed that the enforcement of the Customer Agreement would be governed by Illinois Law, and it follows that the Illinois Arbitration Act applies to the enforcement of the Customer Agreement.

B.    _The standard applied to an Application to vacate an arbitration award._

43.    At all times relevant, Section 12(a) of the Act, 710 ILCS 5/12(a), provided five statutory basis for vacating an arbitration award, as follows:

(1)    the award was procured by corruption, fraud or other undue means;

(2)    there was evident partiality by an arbitrator appointed as a neutral or corruption in any one of the arbitrators or misconduct prejudicing the rights of any party;

(3)    the arbitrators exceeded their powers;

(4)    the arbitrators refused to postpone the hearing upon sufficient cause being shown therefor or refused to hear evidence material to the

controversy or otherwise so conducted the hearing, contrary to the provisions of Section 5, as to prejudice substantially the rights of a party; or

(5)    there was no arbitration agreement and the issue was not adversely determined in proceedings under Section 2 and the party did not participate in the arbitration hearing without raising the objection; but the fact that the relief was such that it could not or would not be granted by the circuit court is not ground for vacating or refusing to confirm the award.

44.    In the instant case, the arbitrators exceeded their powers because they entered an award in favor of Hale and against optionsXpress on issues that were no longer in dispute, because those issues were waived by Hale, and the parties' Arbitration Clause provided that only those issues in dispute were to be arbitrated.

45.    In the instant case, causes of action for suitability, breach of contract, failure to supervise, and negligence ruled upon by the Panel were expressly waived by Hale at the hearing and, and thus were no longer in dispute when the Panel entered its Award.

46.    In addition to the statutory basis for vacating an award under 710 ILCS 5/12, Illinois courts have also held that an award may be vacated as a result of an arbitrator's gross error of judgment in law or a gross mistake of fact if those mistakes or errors are apparent upon the face of the award. *Garver v. Ferguson*, 76 Ill. 2d 1 at 10-11 (1979). As explained by the court in *Quick & Reilly, Inc. v. Zielinski*, 306 Ill. App. 3d 93, 99 (1st Dist. 1999), "[w]hile general interpretations of the law by the arbitrators are not reviewable, if the arbitrators manifestly disregard what they know to be the law, such actions are reviewable."

14

47.     In the instant case, based on the record and applicable law, it is apparent on the face of the Award that the Arbitration Panel made a gross error of judgment in law and/or gross mistake of fact in arriving at their finding that optionsXpress was liable for failure to supervise, suitability, negligence, and breach of contract and for awarding compensatory damages of $175,000, despite the fact that Hale lost virtually no money in her Account.

48.     Thus, optionsXpress presents the Court with two basic grounds for vacating the Award, 1) that the arbitrators exceeded their powers in entering the award – a basis expressly provided under the Act, and 2) that the Panel made a gross error of judgment in law and/or gross mistake of fact in entering the Award – a basis provided under Illinois case law.

## C.     *The Award Should be Vacated Because the Panel Exceeded Their Powers.*

49.     At all times relevant, the Arbitration Provision contained in the parties' Customer Agreement provided, in part, that the parties "agree[d] that any and all controversies which may arise between [Hale] and optionsXpress . . . including but not limited to those involving transactions of any kind made on your behalf by, through or with optionsXpress . . . shall be determined by arbitration. . . ."

50.     Simply put, the parties agreed to arbitration only those issues that were in dispute.

51.     The Panel interpreted Hale's Statement of Claim as containing causes of action for "1) suitability; 2) breach of contract; 3) failure to supervise; and 4) negligence."

15

*See* **Exhibit C**, Award at 2; see generally **Exhibit A**, Statement of Claim) .

52.    However,  at the hearing Hale, through her attorney, stipulated that the only

matter at issue was the "know your customer" rule for options trading, which concerned

the due diligence required of a broker in opening an option account for a customer.  (*See*

**Exhibit K** at 13-14, partial transcript of August 6, 2007, hearing session; **Exhibit L** at 95-96, ,

partial transcript of August 7, 2007, hearing session)(wherein the Panel Chair "agree[d] . . .

that is the stipulation and that is where we're headed.  So please limit your questions to

[CBOE Rule] 9.7[, the 'know your customer rule]").

53.    The "know your customer" rule was codified by various self-regulatory

organizations, e.g.  Chicago Board Options Exchange ("CBOE") Rule 9.7 and the National

Association of Securities Dealers (NASD) Rule 2860(b)(16).  (*See* **Exhibit M** (CBOE Rule 9.7),

**Exhibit N** (NASD Rule 2860(16)))

54.    The foregoing notwithstanding, in each instance and with respect to each of

Hale's referenced claims, despite Hale's stipulation that the only claim she was pursing

was  a violation of the "know your customer" rule, the Panel entered an Award finding

optionsXpress liable for causes of action of suitability, breach of contract, failure to

supervise, and negligence, all of which were affirmatively waived by Hale, and the Panel

never found optionsXpress liable for violation of the "know your customer rule."

55.    By entering such an Award, the Panel exceeded its powers by deciding issues

that were no longer in dispute, and thus not submitted to the arbitrators for resolution and

were outside the scope of the parties' Arbitration Provision.   It has long been the rule in

16

the State of Illinois that an arbitration award may be vacated where the arbitration panel exceeded its powers, and an arbitration panel exceeds its power when it decides matters that were not submitted by the parties for resolution. *Himco Sys. v. Marquette Elecs., Inc.,* 86 Ill. App. 3d 476, 480 (1st Dist. 1980); *see also Heatherly v. Rodman & Renshaw, Inc.,* 287 Ill. App. 3d 372, 375 (1st Dist. 1997) (following that well established rule that "[a]n arbitrator exceeds her authority when she decides matters that were not admitted to her").

56.    A court can look beyond the face of an award to determine if the arbitrators exceeded their powers. *See Edstrom Indus., Inc. v. Companion Life Ins. Co.,* 516 F.3d 546, 550 (7th Cir. 2008) (finding that the arbitrator had exceeded his powers by failing to follow Wisconsin law, although such a violation <u>was</u> <u>not</u> apparent on the face of the award).

57.    Accordingly, the Panel's Award should be vacated because "an arbitrator's award is binding only on the issues submitted to him and decided by him within the scope of the powers enumerated in the agreement. If the arbitrator exceeds his authority under the contract, the decision is void and unenforceable to the extent such power is exceeded." *Nuest v. Westinghouse Air Brake Co.,* 313 F. Supp. 1228, 1234 (S.D. Ill. 1970).

**D.    <u>The Award Should be Vacated Because the Panel's Gross Errors of Judgment in Law and Gross Mistakes of Fact.</u>**

58.    As more fully set forth below in subsections i, ii, iii, iv, and v, with regard to Hale's claims involving "know your customer" rule, failure to supervise and suitability, negligence, breach of contract, and damages, the Panel was informed and/or supplied with

a plethora of case law confirming that:

- optionsXpress had the right to rely on the extensive experience of Hale's professional Investment Adviser in determining, pursuant to the "know your customer rule," that Hale was qualified to open an options trading account.

- optionsXpress had no duty as a matter of law to monitor or supervise Hale's self-directed Accounts to determine the suitability of the investments entered in her Accounts. (*See* **Exhibit B**, and <u>optionsXpress Brief in Support of its Motion to Dismiss</u> and <u>optionsXpress Reply in Response to Claimant's Response to its Motion to Dismiss and Response to Claimant's Motion for Summary Judgment</u>, *sans exhibits*, which are attached hereto as **Exhibits G** and H, respectively).

- in the absence of any duty, there can be no finding of negligence as a matter of law. *Id.*

- a violation of an exchange rule or NASD rule does not constitute a private cause of action for damages, for which damages can be awarded. *Id.*

- based on the proofs, the compensatory damage award of $175,000 was a patently gross mistake of fact, in view of the fact that Hale lost virtually no money in her Account.

59.     In fact, at no time during the proceeding was the panel ever provided with any conflicting or contradictory case law by Hale. Moreover, at the hearing Hale, through her attorney, stipulated that the only matter at issue was the "know your customer" rule for options trading, which concerned the due diligence required of a broker in opening an

18

option account for a customer. (*See* **Exhibit K** at 13-14, partial transcript of August 6, 2007, hearing session; **Exhibit L** at 95-96, , partial transcript of August 7, 2007, hearing session)(wherein the Panel Chair "agree[d] . . . that is the stipulation and that is where we're headed. So please limit your questions to [CBOE Rule] 9.7[, the 'know your customer' rule]").

60.     The "know your customer" rule was codified by various self-regulatory organizations, e.g. Chicago Board Options Exchange ("CBOE") Rule 9.7 and the National Association of Securities Dealers (NASD) Rule 2860(b)(16). (*See* **Exhibit M** (CBOE Rule 9.7), **Exhibit N** (NASD Rule 2860(16)))

61.     The foregoing notwithstanding, in each instance and with respect to each of Hale's referenced claims, despite Hale's stipulation that the only claim she was pursing was a violation of the "know your customer" rule, the Panel ignored Hale's stipulation, blatantly ignored the well settled law, and as a result made gross errors in law or fact which is apparent on the face of the Award.

62.     In addition, based on the proofs, the compensatory damage award of $175,000 was a patently gross mistake of fact, in view of the fact that Hale lost virtually no money in her Accounts.

   i.      *The Panel made a gross error of judgment in law and gross mistake of fact in finding optionsXpress liable for claims of suitability, because optionsXpress had only a "know your customer" obligation which it fulfilled.*

63.     There is no dispute that at the time Hale submitted her application to open an account she had disclosed that she had retained a professional investment adviser and

provided that investment adviser with a power of attorney to place trades in her account with optionsXpress.

64.    There is also no dispute that Hale's Investment Adviser had over thirty years of experience in the financial markets, had over twenty years experience trading options, had managed Hale's accounts at another firm, and that he was an established customer of optionsXpress. (**Exhibit O** at 142-43, partial transcript of August 8, 2007; **Exhibit L** at 18, partial transcript of August 7, 2007)

65.    CBOE Rule 9.7 "know your customer" enables optionsXpress to rely on the experience of Hale's Investment Adviser  and her transfer of options positions in discharging its know your customer obligation. A firm need not solely look to the information provided by the customer on the application, but may also consider "other information known about the customer." *Report of the SEC's Special Study of the Options Market* (December 22, 1978) at p. 345, available at: http:// www.sechistorical.org/ collection/ papers/1970/ 1978_SS_SEC_OptMrkt/ 08_Chapter_V_3.pdf.  (hereinafter "SEC's Special Study of the Options Market")

66.    Based on Hale's disclosures and her experience with her other accounts and her Investment Adviser's extensive experience in trading options (including his management of Hale's accounts at prior firms), Hale was qualified to open an account with optionsXpress to trade options.

67.    In the instant case, optionsXpress' due diligence inquiry went substantially beyond the requirements imposed under the law.  In this regard, it is well established that

a broker has no duty to investigate each customer of an investment adviser or to inquire about the agreement between an investment adviser and his client, and that such inquiries would be ethically unsound. (*See Unity House. v. North Pacific Investments, Inc.*, 918 F. Supp. 1384, 1393 (D. Hi. 1996)(following *Cumis Ins. Soc'y v. E.F. Hutton & Co.*, 457 F. Supp. 1380, 1390 (S.D.N.Y. 1978); *see also* SEC's Special Study of the Options Market; *See* **Exhibit L** at 145-47, partial transcript of August 7, 2007, hearing session (wherein the Panel was reminded that optionsXpress may consider additional information including the investment adviser's experience)).

68.    Accordingly, on the face of the Award, the Panel made a gross error of judgment in law and gross mistake of fact in finding that optionsXpress was liable for Hale's claims of suitability, when optionsXpress had no "suitability" obligation and only a "know your customer" obligation – which Hale's counsel conceded. (*See* **Exhibit L** at 95-96, partial transcript of August 7, 2007, hearing session, wherein Hale's counsel objected to CBOE Rules 9.7 and 9.9 and withdrew that objection reiterating that Hale did not make a claim that a recommendation was made under Rule 9.9 (the suitability rule) "there is no obligation in this case and the only suitability obligation we are talking about at the time the account is open," which in fact is the "know your customer" obligation and not a "suitability" obligation).

> ii.    The Panel made a gross error of judgment in law and gross mistake of fact in finding optionsXpress liable for failure to supervise and suitability because optionsXpress had no duty to supervise or to determine the suitability of investments made in Hale's self-directed Accounts.

69.    There is no dispute that Hale's Accounts were self-directed and that she retained an independent investment adviser, who was not an employee, broker, or independent contractor of optionsXpress, to trade on her behalf.  Moreover, Hale stipulated at hearing that not a single trade placed in her Accounts was recommended by optionsXpress and that optionsXpress makes no recommendations.  (*See* **Exhibit K** at 13-14, partial transcript of August 6, 2007, hearing session (wherein Hale's counsel represented to the Panel that "we stipulate on the record optionsXpress made no specific recommendations from any specific transaction").  Because Hale's Accounts were self-directed, optionsXpress had no duty to supervise or monitor those Accounts for the suitability of Hale's investments.  (*See* **Exhibits B, G, and H**).

70.    It has long been the rule that a broker-dealer has no duty to supervise and monitor the investments made in a self-directed account, especially when the customer has retained an investment adviser to use his discretion in placing trades in the account.  *See Cumis Ins. Soc'y. Inc. v. E.F. Hutton & Co.*, 457 F. Supp. 1380, 1390 (S.D.N.Y. 1978)(finding that placing a burden on a broker to monitor an investment adviser's activities "would be more than burdensome; it would be ethically unsound").  In fact it is well settled that a fundamental element required of a claim for suitability is a showing that the broker made a recommendation to buy or sell a specific security.  *Parsons v. Hornblower & Weeks-Hemphill,*

22

*Noyes*, 447 F.Supp. 482 (M.D.N.C. 1977);  *See also In re Thomas E. Warren*, III, 1994 SEC LEXIS 508 * 11 (Feb. 24, 1994)(holding that suitability claims were not supported because the record does not contain any evidence that broker "recommended the transactions that were effected in these accounts").  In the instant case, Hale's attorney stipulated that no such recommendations where made by optionsXpress.  (*See* **Exhibit K** at 13-14)

71.     In the instant case, the Panel was supplied with an undisputed breadth of case law regarding the absence of any suitability or supervision duty at various stages of the proceeding, and Hale never submitted any authority to the contrary or disputed this authority. (*See* **Exhibits B, G, & H**)  Again, the Panel blatantly ignored the well-settled and undisputed body of law, and as a result grossly erred in their judgment of the law in finding that optionsXpress was liable under a suitability theory.

72.     The rule that a broker-dealer has no duty to supervise or monitor the activities in a self-directed account is even more compelling where the broker is a discount broker, as was the case in this matter. *See Shwe Ming Chee, M.D. v. Marine Midland Bank, N.A.*, 1991 U.S. Dist. LEXIS 1151 at *10-11 (E.D.N.Y. Jan. 29, 1991) (holding that "[t]here is even greater reason to reject monitoring liability [on a broker-dealer] in the case of discount brokers whose admitted function is *not* to give advice so investors can save money on commission") (emphasis in the original).  A copy of the *Shwe Ming Chee, M.D. v. Marine Midland Bank, N.A.* decision is attached hereto as **Exhibit I**.

73.     Not only is there no duty, but as recognized by the court in *Unity House*, to impose the duty of suitability and supervision on a broker holding a self-directed account

would be even more unwarranted in a case where the broker knows that an investment adviser is trading on behalf of another. *See Unity House, Inc. v. North Pacific Inv., Inc.*, 918 F. Supp. 1384, 1393 n.7 (D. Haw. 1996).

74.    Hale has never claimed that optionsXpress failed to fulfill its only duty to properly execute or carry out the orders placed in her Accounts. (*See* **Exhibit A**) Because Hale's accounts were self-directed, optionsXpress' duty to Hale was exceedingly narrow and limited to the execution of the orders that she, or her adviser, placed in her account. *T-Bill Option Club v. Brown & Co. Sec. Corp.*, 1994 U.S. App. LEXIS 11976 * 12 (7th Cir. May 23, 1999) (following the general rule that "[t]he scope of the duty 'owed by a broker carrying a nondiscretionary account for a customer is an exceedingly narrow one, consisting at most of a duty to properly carry out transactions ordered by the customer'"). A copy of the *T-Bill Option Club v. Brown & Co. Sec. Corp.* decision is attached hereto as **Exhibit J**. Again, the Panel was supplied with an undisputed body of case law at various stages of the proceeding in support of this position, and Hale never submitted any contrary authority. (*See* **Exhibits B, G, & H**)

75.    It is an undisputed fact that optionsXpress ascertained Hale's financial situation and investment objectives before approving her Accounts for options trading, that none of the trades placed in her Accounts were recommended by optionsXpress, and that the Accounts were self-directed. Based on the foregoing, the finding of liability by the Panel for suitability, which requires a finding of an unsuitable recommendation by optionsXpress regarding a particular trade, was a gross error in law and gross mistake of

24

fact on the face of the Award.

76.    Accordingly, on the face of the Award, the Panel made a gross error of judgment in law and gross mistake of fact in finding that optionsXpress was liable for suitability or failure to supervise.

    **iii.    Because optionsXpress had no duty to supervise or monitor the investments placed in Hale's Accounts and no duty to determine the suitability of those investments, the Panel made a gross error of judgment in law and gross mistake of fact in finding optionsXpress liable for negligence.**

77.    It is well established that in order to prove a cause of action in negligence, a claimant must show that the broker owed her a duty, that the duty was breached, that she suffered damages, and that the broker's breach was the proximate cause of the injury. *Martello v. Century Supply Co.*, 163 Ill. App. 3d 521, 523 (1987).

78.    In the instant case, optionsXpress supplied the panel with the breadth of case law confirming, as a matter of law, that optionsXpress had no duty to Hale other than to properly execute the orders placed in her Accounts – a duty that Hale has not claimed was breached.  (*See* **Exhibits B, G, & H**)  Hale provided no authority or law contradicting or contesting this authority.  Accordingly, it is axiomatic that the failure to prove the existence of a duty defeats a claim of negligence. *Id.* at 524 (finding that a plaintiff's failure to show a legal duty "obviates the need to address the issue of proximate cause").

79.    As explained by the court in *Unity House v. North Pac. Invs. Inc.*, 918 F. Supp. 1384, 1393 (D. Hi. 1996)(dismissing claimant's negligence claim), in following the general rule that a discount broker's only obligation to a customer was to enter their orders within

a reasonable period of time, the court noted that:

> To hold otherwise would impose unjustifiably onerous burdens on brokers to (1) ascertain whether their immediate clients actually were handling funds for undisclosed third parties and (2) prevent trades by the immediate clients that are unsuitable *for the third parties. See Securities Indus. Ass'n v. Bd. of Governors of Federal Reserve Sys.,* 468 U.S. 207, 209 n. 2, 82 L. Ed. 2d 158, 104 S. Ct. 3003 (1984) ("Schwab is known as a 'discount' broker because of the low commissions it charges. Schwab can afford to charge lower commissions than full-service brokerage firms because it does not provide investment advice or analysis, but merely executes the purchase and sell orders placed by its customers."); *Chee v. Marine Midland Bank, N.A.,* 1991 U.S. Dist. LEXIS 1151, 1991 WL 15301, *4 (E.D.N.Y. 1991) ("There is even greater reason to reject monitoring liability in the case of discount brokers whose admitted function is not to give advice so investors can save money on commissions").

80.     Indeed, as recognized by *Cumis Ins. Soc'y v. E.F. Hutton & Co.,* 457 F. Supp.

1380 (S.D.N.Y. 1978), such a burden would be unwarranted even where the immediate

client is an *investment advisor,* in which case the broker *knows* that the advisor is trading on

behalf of another:

> The burden of such a duty would be massive, as it would effectively require a broker to identify and to investigate each customer of each investment advisor, and to inquire about the various agreements that the advisors had made with their clients. This duty would be more than burdensome; it would be ethically unsound. *Id.* at 1390. Such a proposed duty is "a good example of a plaintiff's deep-pocket theory that attempts to stretch the securities laws beyond recognition." *Id.* at 1382.

81.     Even had optionsXpress executed orders for unsuitable securities placed in

Hale's Accounts by her Investment Adviser, whom she vested with discretionary

authority, optionsXpress still could not be liable. *See Rolf v. Blyth Eastman Dillon & Co., Inc.,*

*et al., per curium,* 1978 WL 4098 at footnote 16A (2nd Cir. 1978) (noting that liability is not

imposed on a "broker-dealer who merely executes orders for 'unsuitable' securities made by an investment adviser vested with sole discretionary authority to control the account").

82.    On the face of the Award, in view of the absence of any duty owed by optionsXpress to Hale, the Panel made a gross error of judgment in law and gross mistake of fact in finding that optionsXpress was liable for negligence.

> iv.    **Because there is no cause of action for a breach of an exchange or self-regulatory organization's rules, the Panel made a gross error of judgment in law and a gross mistake of fact in finding optionsXpress liable for breach of contract.**

83.    In her Claim, Hale alleged that optionsXpress breached rules of the NASD and the Chicago Board Options Exchange ("CBOE"). Nowhere did Hale allege a breach of contract, or any of the elements of a breach. (*See* **Exhibit A**) As further discussed in Section C herein, it is well established that an arbitrator exceeds his powers when he decides matters which were not submitted to him. *Himco Sys. v. Marquette Elecs., Inc.*, 86 Ill. App. 3d 476, 480 (1st Dist. 1980).

84.    Even if there was some theory to support a private right of action, and assuming for argument sake that Hale had alleged a breach of contract, and that Hale was a party to a contract between optionsXpress and a exchange or self regulatory organization, Hale would not be entitled to assert a private cause of action. It is well-settled law, and the Panel was supplied with an uncontradicted body of case law at various stages of the proceeding, that an investor generally does not have a private cause of action for a violation of an exchange rule or rules of the NASD, absent a finding of fraud. *See Shull v.*

*Dain, Kalman & Quail, Inc.*, 561 F.2d 152, 160 (8th Cir. 1977); *See Spicer v. Chicago Bd. of Options Exchange, Inc.*, 977 F.2d 255, 264 (7th Cir. 1992) (citing to *Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 410 F.2d 135 (7th Cir. 1969)(holding that New York Stock Exchange Rule 405 (the NYSE's "know your customer" rule) did not support a private right of action without a finding of fraud); *See also Smith v. Smith, Barney, Harris, Upham & Co., Inc., et al*, 505 F. Supp. 1380 (D.C. Mo. 1981); *Birotte v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 468 F. Supp 1172 ( D. N.J. 1979)(Dismissing plaintiff's causes of action for breach of the Chicago Board of Options  Exchange Rule 9.7 ("know your customer") and Rule 9.9 ("suitability"), because there was no private right of action in favor of investor against brokerage firm for firm's alleged violation of exchange rules); *See also* **Exhibits B, G, & H)** In the instant case, no allegation of fraud was alleged, and none found. (*See* **Exhibit C**) Therefore, Hale cannot recover for the violation of an exchange rule or rules of the NASD. As explained by the court in *Country Mut. Ins. Co. v. National Bank*, 109 Ill. App. 2d 133, 137 (1969), "[i]f, in fact and in law, there was no cause of action available to claimants, the arbitrator exceeded his powers in entering awards, and the court would be correct in vacating the awards."

85.     As explained by the court in *Klock v. Lehman Brothers Kuhn Loeb Inc.* 584 F. Supp. 210, 217 (S.D.N.Y. 1984), in finding "no persuasive demonstration of congressional intent to create a federal right of action under the rules at issue," the court noted the following factors:

(1) the statutory bases for the NYSE and NASD Rules, see 15 U.S.C. §§ 78f(b)(5) and (6) and 78o-3(b)(6) and (7), do not confer any rights or proscribe any conduct by exchange or association members;

(2) there is apparently no mention of this subject in the legislative history;

(3) there are several express provisions in the Act creating private remedies under specified circumstances, suggesting that the failure to provide for private actions for violation of exchange or association rules was not an oversight; and,

(4) the statutory scheme provides for self-regulation and enforcement by exchanges and associations, suggesting that Congress has selected this as the exclusive means of enforcement.

(citations omitted)

86.     In view of the foregoing, a cause of action for breach of contract based on a violation of exchange and self-regulatory organization's rules was without any basis in law or fact. Accordingly, on the face of the Award, the Panel made a gross error of judgment in law and gross mistake of fact in finding that optionsXpress was liable for breach of contract, when no such allegation was even pled in Hale's complaint. (*See* **Exhibit A**)

> *v.    In light of the fact that Hale incurred virtually no damages in her Accounts, the Panel made a gross mistake of fact in awarding Hale any compensatory damages.*

87.     As set forth above, Hale's combined equity in her Accounts following the transfer to optionsXpress was $141,896.01.

88.     The evidence was undisputed that Hale withdrew $30,728.47 from her Accounts, paid transaction fees of $13,045.90, and paid management fees to her Investment Adviser of $51,925.70, for a total of $95,700.07 in withdrawals and fees. In light of the

$23,982 Hale received in rebates from her Investment Adviser and the $21,143.17 balance in her Accounts as of December 29, 2006, the month in which Hale filed her Arbitration Claim, Hale incurred losses totaling $1,070.71.

89.    In light of the fact that the undisputed evidence confirmed, and the Panel had been informed, that there were virtually no losses, the Panel made a gross mistake of fact in awarding $175,000.00 in compensatory damages to Hale.

90.    Furthermore, it should be unequivocal that the law requires that damages must be directly traceable to a breach and cannot be speculative, and that in the instant case the Award is simply irrational and contrary to common sense and accordingly, must be vacated. *Wallace v. Buttar,* 378 F.3d 182, and FN7 (2nd Cir. 2004) (holding that an award must be vacated when Arbitrators knew of well defined explicit law and refused to apply or ignored it); *See also Hardy v. Walsh Manning Securities, LLC,* 341 F.3d 126, 133 (2nd Cir. 2003) (finding logical impossibility of award warranted remand). *Nationwide Mut. Ins. Co. v. Home Ins. Co.,* 330 F.3d 843, 847 (6th Cir. 2003) (vacatur of damages award upheld because award both exceeded the arbitrators' authority and manifestly disregarded the law by asserting jurisdiction over a nonparty); *See also Halligan v. Piper Jaffray Inc.,* 148 F.3d 197, 204 (2d Cir. 1998) ( court concluded where there was "overwhelming evidence" and the applicable law had been explained to the arbitrators, the arbitrators manifestly "ignored the law or the evidence or both.").

91.    Hale had the duty to provide concrete evidence of a pecuniary loss and failure to do so mandates dismissal. *Lama Holding, 88 N,Y,2d 413 (1996); see also Tripi v.*

*Prudential Securities, Inc.,* 303 F. Supp 2d 349, 353 (S.D.N.Y. 2003).

92.    Accordingly, on the face of the Award, Panel made a gross mistake of fact and manifestly disregarded the law in awarding $175,000.00 in compensatory damages to Hale, who incurred losses totaling $1,070.71.

WHEREFORE, optionsXpress, Inc., respectfully requests the entry of an order vacating the underlying Arbitration Award, and such further or alternative relief as the Court deems appropriate under the circumstances.

Respectfully submitted,

OPTIONSXPRESS, INC.


By:   _/s/  Robert B. Christie_
     One of Its Attorneys

Jeffry M. Henderson
Robert B. Christie
HENDERSON & LYMAN
175 West Jackson, Suite 240
Chicago, Illinois 60604
312-986-6960
jhenderson@henderson-lyman.com
rchristie@henderson-lyman.com

Hillary Victor, Corporate Counsel
optionsXpress Holdings, Inc.
311 West Monroe Street, Suite 1000
Chicago, Illinois 60606
312-267-6627
hvictor@optionsxpress.com

## CERTIFICATE OF SERVICE

I hereby certify that on August 5, 2008, I electronically filed Petitioner's Second Amended Application to Vacate Arbitration Award the Clerk of the Court using the CM/ECF system, and pursuant to Local Rule LR5.9, served all counsel of record through the Court's transmission facilities.

/s/   Robert B. Christie
Robert B. Christie

Robert B. Christie
HENDERSON & LYMAN
175 West Jackson, Suite 240
Chicago, Illinois 60604
312-986-6957

32