# EXHIBIT J

LEXSEE 1994 U.S. APP. LEXIS 11976

**T-BILL OPTION CLUB, Plaintiff-Appellant, v. BROWN & COMPANY SECURITIES CORPORATION, Defendant-Appellee.**

**No. 92-2737**

**UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT**

*1994 U.S. App. LEXIS 11976*

**January 14, 1994, Argued**
**May 23, 1994, Decided**

**NOTICE:**    [*1] UNPUBLISHED ORDER NOT TO BE CITED PER SEVENTH CIRCUIT RULE 53.

**SUBSEQUENT HISTORY:**    Reported in Table Case Format at: *23 F.3d 410, 1994 U.S. App. LEXIS 17988.*

**PRIOR HISTORY:**    Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 88 C 8461. James B. Parsons, Judge.

**DISPOSITION:**    AFFIRMED.

**JUDGES:** Before Hon. WILLIAM J. BAUER, Circuit Judge, Hon. JOHN L. COFFEY, Circuit Judge, Hon. KENNETH F. RIPPLE, Circuit Judge

**OPINION**

ORDER

The plaintiff, T-Bill Option Club ("T-Bill"), brought an action for breach of contract and breach of fiduciary duty in Illinois state court against the defendant, Brown & Company Securities Corporation ("B&C"). Following removal to federal court, based on the diversity of citizenship of the parties, *see 28 U.S.C. § 1332(a)(1),* the case was submitted to a jury. It returned a verdict in favor of defendant B&C on both causes of action, and the district court entered judgment accordingly. T-Bill now appeals. For the reasons that follow, we affirm.

I

BACKGROUND

T-Bill is an Illinois general partnership which, at the time of the events in this lawsuit, traded in stock options and other securities. T-Bill's managing partner, Sheldon Pollack, is an experienced options trader who made all investment decisions for T-Bill. [*2] B&C, a Massachusetts corporation located in Boston, is a discount brokerage firm. The relationship between T-Bill and B&C arose in 1984 when Mr. Pollack responded to a B&C advertisement in Barron's and opened a nondiscretionary account for T-Bill with B&C. [1] The fact that the account was nondiscretionary meant that T-Bill, through Mr. Pollack, would make its own investment decisions; B&C would give no investment advice. [2]

1    The advertisement stated in part:

There are two kinds of investors. Those with experience. And those searching for it.

If you are one of the few with experience, one of the few who doesn't need his hand held, Brown and Company can offer you margin and commission rates that are lower than you might think possible.

. . . .

We can offer such savings by dealing only with investors who make their own investment decisions. And don't need someone to make decisions for them.

1994 U.S. App. LEXIS 11976, *2

Def. Exh. 1.

2    The Customer's Agreement provided that B&C would "not offer or provide any opinions, judgment or information concerning the nature, value, potential or suitability of any investment." Pl. Exh. 1, P 19.

[*3] B&C has a maintenance requirement: A customer must maintain with B&C, either in the form of cash or marketable securities, a deposit equal to a certain percentage of the value of the securities held in the customer's main trading account. Maintenance requirements allow a customer to purchase a greater amount of securities with a given amount of capital than the customer could purchase in a cash-only account. *See generally Schenck v. Bear, Stearns & Co., 484 F. Supp. 937, 939-40 (S.D.N.Y. 1979).* A customer's buying power is therefore determined by the maintenance reserve. If the maintenance reserve consists of marketable securities, fluctuations in the value of the equity will affect the level of the maintenance account. For example, if the stock prices drop, the maintenance level will drop and more maintenance collateral will be required.

The issue in this case concerns the maintenance requirement in T-Bill's account with B&C and the stock market's sharp decline in October 1987. That month culminated in what is said to have been the worse day in the market's history--Black Monday, October 19, 1987. [3] As a result, the value of the securities [*4] in T-Bill's maintenance account dropped below B&C's requirements, thereby creating a maintenance deficiency. On October 22, 1987, B&C telephoned Mr. Pollack to inform him that the T-Bill account had a deficit balance. In response, Mr. Pollack ordered the account closed and tendered $ 162,961 to B&C to correct T-Bill's account deficit.

3    *See* Lawrence J. De Maria, *Stocks Plunge 508 Points, A Drop of 22.6%; 604 Million Volume Nearly Doubles Record,* N.Y. Times, Oct. 20, 1987, at A1 ("Stock market prices plunged in a tumultuous wave of selling yesterday, giving Wall Street its worst day in history and raising fears of a recession.").

In August 1988, T-Bill filed a two-count complaint against B&C. It alleged breach of contract and breach of fiduciary duty and sought $ 474,000 damages. T-Bill claimed that B&C knew T-Bill's account was deficient as many as ten days before B&C gave T-Bill notice of the

deficiency, and that B&C therefore had a duty to inform T-Bill of the deficiency well before October 22, 1987. T-Bill [*5] asserted that, if B&C had notified it in timely fashion, the account would have been closed to preserve the equity that remained in the account.

The case proceeded to trial. Both parties relied on B&C's brochure, [4] among other material, in addressing whether B&C had either a contractual or a fiduciary duty to give T-Bill a "margin call," the industry term for notification of a maintenance deficiency, and, if B&C had any such duty, whether B&C breached it. Both parties presented expert testimony on the subject of maintenance requirements and margin calls. On June 24, 1992, a jury returned a verdict in favor of B&C on both the contract and fiduciary duty counts, and the district court entered judgment accordingly.

4    A typical excerpt relied upon by T-Bill reads:

Our traders have access to on-line terminals and can give you account status and history, buying power and money balances as well as the latest quotes, market data and Dow Jones News.

Pl. Exh. 4, at 2. A typical excerpt relied upon by B&C reads:

Our approach is not for everyone. Our clients expect us to provide up-to-date account and market information and to execute their orders as efficiently and inexpensively as possible. They do not expect us to provide investment advice and guidance.

Pl. Exh. 4, at 5.

[*6]  II

DISCUSSION

On appeal, T-Bill raises two issues. First, although it does not challenge the judgment with respect to the breach of contract count, T-Bill submits that the district court's jury instructions on the fiduciary duty count were erroneous as a matter of law and warrant reversal. Second, T-Bill asserts that the district court abused its discretion in allowing B&C's proffered expert to testify

as an expert under *Federal Rule of Evidence 702.* We shall address each issue in turn.

A. *Jury Instructions*

The district court instructed the jury on the fiduciary duty count with instructions which read, in part, as follows:

> To find in favor of T-Bill on this claim, therefore, you must determine whether there was a fiduciary relationship, whether defendant breached it, and what, if any, damages resulted.

> If you find that the T-Bill account was totally nondiscretionary and that all investment decisions were to be made by T-Bill alone without any advice from defendant, then you may find that there was no fiduciary duty, and find in favor of the defendant and against plaintiff, T-Bill.

Tr. 1483. T-Bill noted its objection to this instruction. [5] During the course [*7] of deliberation, the jury requested clarification on the fiduciary duty issue:

> If we believe that [B&C] . . . has no responsibility to T-Bill for investment decisions regardless of any other responsibilities they might have, e.g., notification of account deficiency, should we find in favor of defendant[?]

Tr. 1481. The jury also asked the court to define "investment decisions" as used in the court's instructions. Although the district court did not define "investment decisions" for the jury, it gave a follow-up instruction to answer the jury's question on the fiduciary duty issue:

> If you should find that the T-Bill account was totally nondiscretionary both within the terms of the contract and in the relationship that developed between the parties in that all decisions relating to or having bearing upon the investments were to be made by T-Bill alone without or irrespective of any advice, suggestions or warnings from the defendant, then you should find that there was no fiduciary relationship between the parties and find on this issue accordingly.

Tr. 1514-15. Again T-Bill noted its objection. Soon after the court gave the jury this instruction, the jury returned a verdict [*8] for B&C on both the contract and fiduciary duty counts.

> 5    Although T-Bill apparently tendered alternate instructions, *see* Tr. 1406, it does not refer to them in its brief. Moreover, because no reporter was present at the instructions conference, the proposed instructions are not contained in the record on appeal. Cf. *Smith v. Great American Restaurants, Inc., 969 F.2d 430, 436 (7th Cir. 1992).* It is, of course, the obligation of a party objecting to jury instructions on the ground that a modification is necessary also to tender correct instructions to the court. See *Rufolo v. Midwest Marine Contractor, Inc., 6 F.3d 448, 449 n.1 (7th Cir. 1993), vacated and remanded on other grounds, 62 U.S.L.W. 3704* (U.S. April 25, 1994) (93-764).

T-Bill submits that the district court's instructions essentially required the jury to find that no fiduciary duty existed. Because both parties had agreed that T-Bill's account with B&C was [*9] nondiscretionary, T-Bill maintains that the use of the phrase "should find" in the second instruction in place of the phrase "may find" in the first instruction precluded the jury from finding in favor of T-Bill. Moreover, T-Bill asserts that even the court's original instruction was erroneous because it failed to inform the jury of the fact-specific nature of a fiduciary duty under Illinois law. See *Burdett v. Miller, 957 F.2d 1375, 1381 (7th Cir. 1992)* (stating that "fiduciary duties are sometimes imposed on an ad hoc basis").

In response, B&C contends that T-Bill's assumption in its opening brief that Illinois law applies to the fiduciary duty count is mistaken. Rather, B&C asserts, because the choice-of-law provision in the Customer Agreement [6] states that Massachusetts law governs the enforcement of the parties' agreement, Massachusetts law controls on the issue of fiduciary duty, just as it did on the contractual claim. Under Massachusetts law, B&C states, it is clear that investment relationships, whether discretionary or not, do not give rise to a fiduciary duty. See *Lefkowitz v. Smith Barney, Harris Upham & Co., Inc., 804 F.2d 154, 155 (1st Cir. 1986)* [*10] (stating that "a simple stockbroker-customer relationship does not

constitute a fiduciary relationship in Massachusetts"). Thus, according to B&C, the district court should have directed a verdict against T-Bill on the issue of fiduciary duty. B&C argues that, in any event, the jury instructions reflected Illinois law. However, B&C states, because T-Bill had conceded that its B&C account was nondiscretionary, the district court's own instructions demonstrate that a verdict should have been directed against T-Bill under Illinois law, too.

> 6 The Customer Agreement states: "This agreement and its enforcement shall be governed by the laws of Massachusetts." Pl. Exh. 1, P 16.

We are inclined to agree with T-Bill that the choice-of-law provision in the Customer Agreement covered only claims concerning that agreement, not all other claims arising between the two parties. *Cf. Griswold v. E.F. Hutton & Co., Inc., 622 F. Supp. 1397, 1403 (N.D. Ill. 1985)* (stating that a choice-of-law provision [*11] in a "Client Agreement" did not apply to a dispute concerning a release the parties had executed). We need not delve into the matter deeply, however, because, even assuming *arguendo* that Illinois law applies, the jury instructions on fiduciary duty were not erroneous as a matter of law, much less sufficiently prejudicial to warrant reversal. *See Mayall v. Peabody Coal Co., 7 F.3d 570 (7th Cir. 1993)* (stating that we seek "'only to determine if the instructions as a whole were sufficient to inform the jury correctly of the applicable law'") (citation omitted); *Littlefield v. McGuffey, 954 F.2d 1337, 1344 (7th Cir. 1992)* (stating that "reversal is mandated only 'if the jury's comprehension of the issues is so misguided that a litigant is prejudiced'") (citation omitted). [7]

> 7 *See also Doe v. Burnham, 6 F.3d 476, 479 (7th Cir. 1993)* (stressing that "our review of jury instructions is limited").

In *Burdett v. Miller, 957 F.2d 1375, 1381 (7th Cir. 1992)* [*12] (applying Illinois law), we stated that "the relation between an investment advisor and the people he advises" is not one of the *"categories* of relations in which fiduciary duties are imposed." Yet a broker does serve as an agent for its customer and therefore usually bears a fiduciary duty at least with respect to some aspect of their relationship. *Martin v. Heinold Commodities, Inc., 117 Ill. 2d 67, 510 N.E.2d 840, 844, 109 Ill. Dec. 772 (Ill. 1987).* However, this means only that a broker is an agent whose "fiduciary duty is limited to actions

occurring within the scope of his agency." *Id. at 845.* The scope of the duty "owed by a broker carrying a nondiscretionary account for a customer is an exceedingly narrow one, consisting at most of a duty to properly carry out transactions ordered by the customer." *Index Futures Group, Inc. v. Ross, 199 Ill. App. 3d 468, 557 N.E.2d 344, 348, 145 Ill. Dec. 574 (Ill. App. 1990).* [8]

> 8 *See also Refco, Inc. v. Troika Inv. Ltd., 702 F. Supp. 684, 687 n.9 (N.D. Ill. 1988)* ("Even in the most limited type of agency--the nondiscretionary account where the broker is simply called on to carry out its principal's orders--the concept of faithfulness to duty (what the law labels a "fiduciary" duty) operates to preclude the agent's dealing to its own advantage rather than its principal's.").

> T-Bill's emphasis in this case on demonstrating that T-Bill and B&C had a fiduciary relationship, therefore, goes only halfway toward making its case. As Justice Frankfurter stated in another context, "to say that a man is a fiduciary only begins the analysis; it gives direction to further inquiry. To whom is he a fiduciary? What obligations does he owe as a fiduciary?" *SEC v. Chenery Corp., 318 U.S. 80, 85-86, 87 L. Ed. 626, 63 S. Ct. 454 (1943).*

[*13] In this case, T-Bill has not alleged any impropriety concerning any transactions it ordered B&C to execute. Nonetheless, it submits that the jury instructions were erroneous because they did not allow the jury to base its decision on the specific facts in this case which T-Bill claims demonstrate the existence of a fiduciary obligation. *See Burdett, 957 F.2d at 1381* (stating that "fiduciary duties are sometimes imposed on an ad hoc basis"). We do not agree. In relationships falling outside the per se categories of relationships in which fiduciary duties are imposed, a plaintiff is entitled to a fact-specific instruction on fiduciary duty only "when there is a special confidence reposed on one side and a resulting superior knowledge and influence on the other." *A.T. Kearney, Inc. v. INCA Int'l, Inc., 132 Ill. App. 3d 655, 477 N.E.2d 1326, 1332, 87 Ill. Dec. 798 (Ill. App. 1985).* [9] Except for its duty to execute faithfully the transactions T-Bill ordered, B&C did not occupy a position of special trust or confidence; indeed, it appears that this is precisely why T-Bill opened an account with [*14] B&C in the first place. Mr. Pollack, T-Bill's

13   *See also Jones v. Hamelman, 869 F.2d 1023, 1027-28 (7th Cir. 1989); Kelsay v. Consolidated Rail Corp., 749 F.2d 437, 448 (7th Cir. 1984).*

**[*18]**  T-Bill concedes that Duffey's qualifications as an expert included, among other things, a two-year term as Director of Compliance of the Chicago Board of Options Exchange, where he supervised the checking of brokers' margin requirements, and various other positions in which he dealt with margin and maintenance requirements. Nonetheless, T-Bill asserts that, because Duffey has never received any formal education in the field and has never previously testified as an expert in a case involving maintenance requirements, the district court abused its discretion in allowing him to testify. We do not agree. First, *Rule 702* lists several ways in which a person can be qualified as an expert, and the rule lists those ways in the disjunctive. *See Fed. R. Evid. 702* (stating that "a witness qualified as an expert by knowledge, skill, experience, training, or education, may

testify") (emphasis added). Under the "liberal standard" of *Rule 702*, we cannot say that Duffey was sufficiently lacking in knowledge, skill, or experience with the concept and requirement of maintenance to permit us to conclude that the district court abused its discretion. *See AMPAT/Midwest, Inc. Illinois Tool Works Inc., 896 F.2d 1035, 1045 (7th Cir. 1990);* **[*19]** *see also Tagatz v. Marquette Univ., 861 F.2d 1040, 1042 (7th Cir. 1988)* (stating that *Rule 702* is "latitudinarian"). Second, suffice it to say that it would be very difficult indeed for a proffered expert witness to give admissible expert testimony if *Rule 702* prohibited anyone from testifying as an expert who had never done so before.

Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED.