# EXHIBIT L

NASD DISPUTE RESOLUTION, INC.

ARBITRATION NO: 06-05183

August 7, 2007

Tapes 3 - 5

LINDA HALE,

VS.

OPTIONSXPRESS, INC.

APPEARANCES BY:

On behalf of the Claimants:

    Neil B. Solomon, Esq.
    (Neil B. Solomon, P.A.)

On behalf of the Respondent:

    Hillary Victor, Esq.
    Jeffry Henderson, Esq.

Panel Members:

    Kevin S. Doty, Esq., Chairperson
    Allen Robin, Public Arbitrator
    Bernard A. Taub, Industry Arbitrator

G & L TRANSCRIPTION, INC.
4801 NORTHWEST 27TH AVENUE
BOCA RATON, FLORIDA  33434

(561) 998-1981



1   or perhaps it's white.  Its just pass Page 24 of 24.  You
2   have to look at something that says, IM2860- -- in opening
3   accounts; right?
4        A    Yes.
5        Q    Mr. Solomon directed your attention to
6   Subsection B2 of that; right?
7        A    Yes, he did.
8        Q    Does that say that OptionsXpress has entered --
9   in addition to a customers account records they maintain
10  experience of a person who -- trading authority?
11       A    Yes, it does.
12       Q    Did OptionsXpress maintain any kind of a record
13  of claimant's -- Mr. Wise's --
14       A    Yes, it did.
15       Q    Okay.
16       A    Mr. Wise opened the account some months prior to
17  Ms. Hale's accounts being opened and submitting
18  information about his own financial condition and his
19  trading history.  Last night I was able to go on line and
20  look at these records which are readily available, and saw
21  that Mr. Wise had some 24 years of experience in options
22  going back to 1973.  He showed that he had done somewhere
23  around 100 option trades per year, and this, although not
24  being the solo factor, certainly was one of the positive
25  determining factors in accepting Ms. Hale.

created using
BCL easyPDF
Printer Driver

1   Mr. Wise that identified commission rates -- sales account
2   -- do you recall that?
3       A   Yes.
4       Q   Was that a deal sheet?
5       A   No, it was not and it was requested to create a
6   summary of what Mr. Wise had and it was --
7       Q   This is Respondent's Exhibit 32 --
8       CHAIRMAN DOTY:  Let Mr. Solomon see it before you ask
9   any questions.  I'll ask, just to speed it along.  What
10  are we looking at?
11      MR. HENDERSON:  -- 9/28 --
12      CHAIRMAN DOTY:  All right.  Any objection, Mr.
13  Solomon?
14      MR. SOLOMON:  No sir.
15      CHAIRMAN DOTY:  All right.  It will be admitted as
16  Respondent's 32.  You may continue.
17      MR. SOLOMON:  Oh actually, I'm sorry.  I object to
18  9.7 and 9 -- I don't object if that's the rule.  I will it
19  again that we're not saying that the recommendation Rule
20  9.9 there is no obligation in this case and the only
21  suitability obligation we are talking about at the time
22  the account is open which Mr. Stern acknowledged
23  OptionsXpress does have.
24      MR. HENDERSON:  -- is --
25      CHAIRMAN DOTY:  And I agree that that was the -- that



```
 1   is the stipulation and that is where we're headed.  So
 2   please limit your questions to 9.7.
 3        MR. SOLOMON:  Thank you, sir.
 4        (Respondent's Exhibit 32, admitted into evidence.)
 5        Q    (BY MR. HENDERSON):  For -- purposes, Mr. Stern,
 6   a letter claims that OptionsXpress -- Rule 9.7 and in
 7   front of you you see the Rule 9.7.  Are you familiar with
 8   -- Rule 9.7(a)?
 9        A    Yes, I am.
10        Q    Is -- Rule 9.7(a) and (b) a federally -- a clone
11   of the NASD Rule 2860(b)16?
12        A    Yes, it is.
13        Q    If you look at 9.7(a), what does 97(a) require
14   that a member firm such as OptionsXpress do in connection
15   with an option account approval rule?
16        A    It says that the account has to be approved --
17        Q    What does 9 -- say?  What does 9 -- require that
18   you do before its either approved --
19        A    That's -- submitting the -- information --
20   decision as to appropriate --
21        Q    Does it also require you to ascertain the
22   customers --
23        A    Yes.
24        Q    Is that similar if not identical to the part of
25   2860(b)16?
```



1   A   And if the statement was -- statement included --

3   Q   So if the statement was included from the previous firm, you'd look at that too but you wouldn't go back and call the other firm and get previous statements for that; correct?

7   A   --

8   Q   I don't know if you were here at the time but there is a grid in the compliance manual that shows the criteria that -- shows the criteria where someone like yourself or Kevin Flynn is suppose to follow when approving an account. Are you familiar with the grid?

13  A   I'm familiar with the -- .

14  Q   -- Well, did you -- you probably know that without having to look at it to determine what level to choose; correct?

17  A   Yes, I also know it is a guideline. It is not firm facts.

19  Q   So if that guideline says there should be two years of options experience, and it indicates here that my client didn't have that two years, you could go outside that guideline if necessarily; correct?

23  A   Right, we could.

24  Q   Based on what?

25  A   Any additional information we might get online.


created using BCL easyPDF Printer Driver

```
 1    Q    Okay.  Do you do anything when you get an
 2  account like this -- you said you got the LTA; right?
 3    A    Yes.
 4    Q    Before you approve the account?
 5    A    I believe it was in the account factor --
 6    Q    That LTA indicating that Tim Wise to be -- had
 7  trading discretion on the one hand, and not authorized to
 8  withdrawal money, but on the other hand he was also termed
 9  the advisor and was to get paid fees directly into his
10  account and Ms. Hale's account.  Are you aware of that?
11    A    I was aware of the LTA -- the third part --
12    Q    You knew his name at the time?
13    A    I'm not -- I can't recall.  I mean, I saw that
14  he was an advisor.  I look to see --
15    Q    Do you remember if you did?
16    A    What, if I --
17    Q    No, if you had information --
18    A    Yeah, I did.  It was in the -- he has an account
19  with OptionsXpress.  It's the administrative system --
20    Q    He had an account before Ms. Hale opened hers
21  then?
22    A    --
23    Q    Did you know what the relationship between Ms.
24  Hale and Mr. Wise was at the time?
25    A    Just what was stipulated on the third party that
```



1  she requested that he be the advisor.
2      Q    Okay.  Isn't there a rule that requires that you
3  do a further investigation or that you learn what the
4  relationship is between the advisor and the person who is
5  advising the --
6      A    I'm not sure exactly which rule you're referring
7  to, but I --
8      Q    Sorry, I didn't mean to interrupt you.
9      A    I mean, I checked to see what his trading --
10 what his experience was --
11     Q    So you looked at his account --
12     A    Yes.
13     Q    So Kevin Flynn does that first probably.  He
14 does the exact same thing you do?
15     A    I believe so, yes.  We do the same process.  We
16 look at it --
17     Q    And then he passes it along to you?  You as his
18 boss have the final stamp of approval?
19     A    Correct.
20     Q    After that happens, could you describe the
21 duties -- can you describe what Kevin Flynn does on a day
22 to day basis with respect to supervising and dealing with
23 the accounts as compared to you?
24     A    At the time you didn't have -- you know, we're
25 not supervising these accounts, but we're supervising the

